# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALI SAADALLAH BELHAS,**<br>**Saddikeen,**<br>**City of Tyre, Lebanon** | |
| **SAADALLAH ALI BELHAS,**<br>**Saddikeen,**<br>**City of Tyre, Lebanon** | |
| **IBRAHIM KHALIL HAMMOUD,**<br>**Qana,**<br>**City of Tyre, Lebanon** | **Civil Action No. _____** |
| **RAIMON NASEEB AL HAJA,**<br>**Qana,**<br>**City of Tyre, Lebanon** | **COMPLAINT** |
| **HAMIDAH SHARIF DEEB,**<br>**Rashqinayeh,**<br>**City of Tyre, Lebanon** | |
| **ALI MOHAMMED ISMAIL,**<br>**Lebanon** | **DEMAND FOR JURY TRIAL**<br><br>**CLASS ACTION** |
| **HALA YASSIM KHALIL,**<br>**Al-Battam Mountains,**<br>**Lebanon**<br>                    **Plaintiffs,** | |
|                    **v.** | |
| **MOSHE YA'ALON, former Head of Army**<br>**Intelligence, Israel,** | |
|                    **Defendant.** | |

Plaintiffs, by and through their attorneys, allege the following:

## I. PRELIMINARY STATEMENT

1. On April 18, 1996, at 1400 hours local time, the Israeli Defense Forces (hereinafter

"IDF"), acting deliberately, shelled the United Nations (UN) compound at Qana in southern Lebanon.  The attack killed over a hundred villagers who had taken refuge there and injured many others.  Fijian soldiers assigned to the United Nations were also injured.

2. The Plaintiffs are those who were injured and represent those who were killed and injured.  Defendant, Moshe Ya'alon, as Head of Army Intelligence, participated in the decision to shell the UN compound at Qana.  He also had command responsibility for the attack.

3. This is a class action for compensatory and punitive damages against Moshe Ya'alon for violation of international, federal and state law committed against the civilians seeking refuge at Qana.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over this action based on 28 U.S.C. § 1350 (Alien Tort Claims Act and the Torture Victim Protection Act) and 28 U.S.C. § 1331. The Court also has diversity jurisdiction over the federal claims pursuant to 28 U.S.C. § 1332.

5. Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)(3) and/or § 1391(d), as this Court has personal jurisdiction over Defendant.

## III.  JURY DEMAND

6. Plaintiffs demand a trial by jury in this action on all issues and all of their claims.

## IV.  PARTIES

### a.  Plaintiffs

7. Plaintiff Saadallah Ali Belhas is a citizen of Lebanon and a resident of Saddikeen, City of Tyre, Lebanon.  He sues on his own behalf, on behalf of his wife Zaineb and his unmarried

children Ghaleb Saadallah Belhas, Fayyad Saadallah Belhas, Nayla Saadallah Belhas, Fatimeh Saadallah Belhas, Zahra Saadallah Belhas, Amal Saadallah Belhas, Mohamed Saadallah Belhas, Ibrahim Saadallah Belhas, and Kadijah Saadallah Belhas, all of whom died in the attack on April 18, 1996. He also sues on behalf of all others similarly situated.

8. Plaintiff Ali Saadallah Belhas, married son of Saadallah Ali Belhaus, is a citizen of Lebanon and a resident of Saddikeen, City of Tyre, Lebanon. He sues on his own behalf and on behalf of his infant son Hassan Ali Belhas, his daughter Fatimeh Ali, his son Abbas Ali, and on behalf of his wife, Zahra Ali Belhas, all of whom died in the attack on April 18, 1996. He also sues on behalf of all others similarly situated.

9. Plaintiff Ibrahim Khalil Hammoud is a citizen of Lebanon, and a resident of Qana, City of Tyre, Lebanon. He sues on his own behalf for disabling injuries suffered on April 18, 1996, and on behalf of his father Khalil Hammoud, his sister Mariam Hammoud, his brother Ali Khalil, his sister Nada Khalil, his sister Huda Khalil and his infant brother Zulfikar Khalil, all of whom died in the attack on April 18, 1996. He also sues on behalf of all others similarly situated.

10. Plaintiff Raiman Nasseeb al Haja is a citizen of Lebanon and a resident of Qana, City of Tyre, Lebanon. He sues on his own behalf for disabling injuries he suffered April 18, 1996, and on behalf of his mother Georgette Michael al Haja who died in the same attack. He also sues on behalf of all others similarly situated.

11. Plaintiff Hamidah Sharif Deeb, is a citizen of Lebanon and a resident of Rashqinayeh, Tyre, Lebanon. She sues on her own behalf for disabling injuries she suffered on April 18, 1996, and on behalf of her sister, Sakheh Zeeb, who was killed in the attack. On April 18, 1996, Hamidah Sharif Deeb's left arm and right leg were severed as a result of Defendant's attack. She

sues on her own behalf and on behalf of all others similarly situated.

12. Plaintiff Hala Yassim Khalid is a citizen of Lebanon and a resident of the Al-Battam Mountains, Lebanon. She sues on her own behalf for disabling injuries she suffered on April 18, 1996, and on behalf of her brothers Ali Khalil and Hussam Khalil who were killed in the attack. She also sues on behalf of all others similarly situated.

13. Plaintiff Ali Mohammed Ismail is a citizen of Lebanon. He sues on his own behalf for injuries suffered on April 18, 1996, and on behalf of his son, Mohammed Hassan Ismail, his daughter, Mariam Ismail, and his wife Banan Ismail, who were killed in the attack. He also sues on behalf of all others similarly situated.

## b. Defendant

14. Defendant Moshe Ya'alon was at all times relevant to this action a Major General in the IDF, and Head of Israeli Army Intelligence. Defendant is an Israeli citizen, and is retired from the IDF.

## c. Class Allegations

15. The class consists of all women, men, and children who are surviving victims of the deliberate and unlawful shelling of Qana who suffered physical and mental injuries caused by Defendant on or about April 18, 1996. The class also consists of all women, men, and children whose family members were killed by or at the direction and command of the Defendant, on or about April 18, 1996 in Qana, and who are acting as legal representatives of the deceased Qana victims, and/or their next of kin, and/or their estates.

16. The exact number of class members is not known, but it is estimated that the class includes at least several hundred victims of the shelling and many hundreds of family members.

The class is so numerous that joinder of individual members is impracticable.

17. The claims of Plaintiffs, the class representatives, are typical of the claims of the class. Plaintiffs are able to, and will, fairly and adequately protect the interests of the class.

18. There are common questions of law and fact in this action that relate to and affect each member of the class, including:

a)  Whether Defendant  knew or should have known that forces under his command were: deliberately and wantonly attacking and killing internally displaced persons who had taken refuge in a known and clearly-marked UN compound; failing to warn the United Nations Interim Force In Lebanon (UNIFIL) compound of impending attacks; failing to take precautions to minimize the injury and death of civilians; and deliberately using disproportionate force in an area which the Defendant knew was heavily populated with civilians.

b)  Whether Defendant authorized, commanded, and directed the unlawful acts of the forces under his command at Qana;

c)  Whether Defendant aided and abetted or conspired with other forces committing the unlawful acts at Qana;

d)  Whether Defendant failed to take appropriate measures to prevent troops under his command from committing violations of the laws of war;

e) Whether Defendant failed to report, punish or otherwise ratified such unlawful acts by forces under his command;

f)  Whether Defendant's actions give rise to liability under the applicable international and domestic law.

19.  This action is properly maintained as a class action because: a) the Defendant has

acted and failed to act in a way generally applicable to the class, making any declaratory relief

appropriately awarded to the class as a whole; b) questions of law and fact common to the

members of the class predominate over questions affecting individual members; and c) a class

action is superior to other available methods for the fair and efficient adjudication of the

controversy.

## V. GENERAL ALLEGATIONS

20. Moshe Ya'alon was Head of Army Intelligence, Aman, of the IDF, from 1995-1998,

during which period the Qana massacre occurred.

21. Upon information and belief:  Aman produces comprehensive national intelligence

estimates for the Prime Minister and cabinet, daily intelligence reports, risk of war estimates,

target studies on nearby Arab countries, and communications intercepts.  The head of Aman

personally gives the chiefs of staff reports concerning intelligence collected.  Aman also conducts

cross border operations and has a small semi-autonomous air force.  It uses aerial reconnaissance

and radio intercepts to collect information on the strength levels of guerilla forces and for target

compilations and uses pilotless drones to observe enemy installations.

22. Defendant acted singly and in concert with others in the above mentioned human

rights violations and war crimes by authorizing, directing, planning, commanding, instigating,

inciting, ratifying, aiding and abetting, conspiring in, failing to prevent and/or report and punish

those responsible, or is otherwise responsible for, the April 18, 1996 attack on internally

displaced persons sheltered in the headquarters compound of the Fijian Battalion of UNIFIL.

23. As Head of Army Intelligence of the IDF, Defendant had constructive notice that

civilians were sheltered at the Qana compound.  Two Israeli reconnaissance helicopters with real

time data link and a remotely piloted vehicle were present over the Qana compound at the time of the shelling.

24. As Head of Army Intelligence of the IDF, Defendant had actual notice that the site attacked was a UN compound and that civilians were sheltered there. During the attack UNIFIL officers provided notice that civilians had taken refuge in the compound, yet the IDF forces did not cease their attack.

25. Upon information and belief: From 1988 until 2000, the Northern Command was responsible for patrolling Israel's northern border with Syria and Lebanon. The Golani Brigade was directly subordinate to the Northern Command, which took direction from Defendant, former Head of Military Intelligence, for its operations. In February 1995, the Golani Brigade formed an elite special operations unit, Egoz. This unit began operations in June 1995 and was specially trained to combat Hezbollah within and beyond occupied territory in southern Lebanon and the region where the UNIFIL compound was located. It was responsible to both the Golani brigade, and to Aman who regulated cross border operations. Egoz's activities during this period constituted a cross-border operation, and were therefore within Aman's jurisdiction, and under Defendant's command.

26. At all times relevant hereto, Defendant was acting under color of Israeli law.

## VI. STATEMENT OF FACTS

### a. Qana

27. Qana is a village located southeast of City of Tyre, Lebanon. Qana is approximately 10 kilometers north of the area then occupied by the Israeli army. Since March 23, 1978, the UN has maintained a compound manned by Fijian peace keepers in Qana.

**b. Operation "Grapes of Wrath"**

28. In April 1996, the IDF launched the military operation codenamed "Grapes of Wrath". The Northern Command directed the bombing, strafing and shelling of small villages in southern Lebanon intended to force thousands of inhabitants to flee their homes to exert pressure on the Lebanese government to disarm the guerilla forces of Hezbollah that opposed the Israeli occupation in southern Lebanon.

29. Beginning April 11, 1996, the Israeli air force and artillery began intensive bombing of Beirut and the Bekkaa valley.

30. On April 12, 1996, through the Voice of the South, a Southern Lebanese Army radio station which was under Israel's control, the IDF issued warnings to Lebanese civilians to evacuate a large number of towns and villages in the south of Lebanon. The IDF also stated that civilians who remained in their villages or towns would be considered connected with Hezbollah.

**c. The Shelling of the UNIFIL Compound in Qana**

31. By April 18, 1996, over 800 Lebanese civilians including Plaintiffs, had sought refuge in the UNIFIL compound in Qana from the IDF bombings.

32. Plaintiffs and other civilians in the compound were internally displaced persons who fled their homes in the City of Tyre, Qana, and the Al-Battam mountains as a result of "Grapes of Wrath."  Most of the civilians sheltered there were women, children, and elderly people as they were those who were too poor or otherwise unable to get transportation out of the areas of shelling.

33. The UNIFIL compound in Qana was well north of the demarcation line of Israel's zone of occupation.

34. On April 18, 1996, just after 2:00 pm local time, the headquarters of the compound of the Fijian battalion of UNIFIL came under artillery fire by the IDF.

35. Defendant took no precautions to prevent civilian casualties from the shelling at Qana. The Defendant issued no warning to the UNIFIL base that it was about to come under attack. Upon information and belief, the Defendant participated in the decision to target the center of the UN compound during the course of the attack.

36. The IDF continued to shell the compound even after it was specifically notified by UNIFIL that they were shelling a UN position in which civilians were taking shelter.

**d. Notice to Defendant**

37. Upon information and belief, Defendant had constructive notice that hundreds of civilians were present in the UNIFIL compound.

38. At all times relevant to the complaint, the official policy of the government of Israel specifically prohibited harm to civilians in the course of IDF operations and prohibited the attack on UNIFIL forces. IDF policy was to issue warning signals before firing on UN compounds.

39. At all times relevant to the complaint, UNIFIL forces were present in Lebanon with the consent of all parties to the conflict.

40. Prior to April 17, 1996, the IDF had followed customary warning and notification procedures of attacks near positions of UN peacekeepers to prevent shelling and casualties at UNIFIL bases or positions.

41. Prior to April 17, 1996, the IDF practice had been to fire smoke bombs and/or make shortwave radio contact to warn UN compounds of imminent attacks in their vicinity.

42. At all times relevant to the complaint, the UNIFIL personnel reasonably relied on

such warnings to protect themselves and the civilians in the vicinity of their bases.

43. Prior to April 17, 1996, IDF practice was to cease or redirect shelling when notified by the firing of red signal flares by UN personnel that shells had landed within 200 meters of a UN base or position.

44. Prior to the shelling at Qana, IDF Northern Command had a practice of responding to UNIFIL radio reports of shelling that landed within 200 meters of UNIFIL positions by radioing the relevant artillery battalion to cease or adjust fire.

45. Upon information and belief, two Israeli helicopters were present two kilometers south-east of the compound during the shelling, and one was close to the compound immediately after the shelling.  Additionally, one remotely piloted vehicle (RPV) equipped with real time data link capability was present in the Qana area before, during and after the shelling. The presence of the RPV and the helicopters enabled the Israeli forces to observe the presence in the UNIFIL compound of almost 800 civilians.

46. The Defendant was on actual notice of the presence of civilians in the UNIFIL compound at Qana from the beginning of the operation.  Defendant admitted that as of the second day of the operation, Aman was aware that civilians in southern Lebanon had been taking refuge in UN compounds.

47. Upon information and belief, the Director of Israeli Artillery, Brigadier General Dan Harel, confirmed that the IDF had been informed by UNIFIL only two days prior to the incident that there were some 5,000 to 9,000 civilians taking shelter in UNIFIL bases in the area.

48.  Defendant knew or reasonably should have known that UNIFIL policy was to deny entry to the camp to any non-civilian, armed persons.

49.  Defendant, acting singly and in concert with others, authorized, directed, planned, commanded, instigated, conspired, aided, abetted, incited, ratified, and failed to prevent and/or is otherwise responsible for the shelling of the UNIFIL compound at Qana.

50.  Defendant failed to take appropriate and necessary measures to prevent troops under his command from shelling civilians at Qana.

51.  Upon information and belief, Defendant did not report, discipline or punish his subordinates for the attack on the UNIFIL compound at Qana.

52.  Defendant knew or should have known that Lebanese civilians had sought shelter in the UNIFIL compound in Qana, and that directly shelling the compound with proximity fuse shells would kill or maim civilians in breach of customary international law, including that enumerated in the Geneva Conventions, and that the injuries complained of herein were a foreseeable result of such activity. Specifically: 1) the use of highly lethal proximity fuse shells in an attack on an area known or reasonably known to contain hundreds of civilians constituted a disproportionate use of lethal weapons; 2) Defendant's failure to warn the civilian refugees of the impending attack violated the international laws of war; 3) Defendant's failure to distinguish between civilian and military targets violated the international laws of war; 4) Defendant's failure to take all feasible precautions to prevent civilian casualties violated the international laws of war.  These acts were carried out by soldiers over whom Defendant Ya'alon had command authority.

## VII. SPECIFIC ALLEGATIONS

### a. The Ali Saadallah Belhas Family

53.  On the morning of April 13, 1996, Plaintiff Ali Saadallah Belhas heard the warning

-11-

from the IDF of an impending attack on neighboring villages.  He and his family took refuge at the UNIFIL compound.

54. Plaintiff Ali Saadallah Belhas was in his village with his family including his newborn son when he heard of the impending bombardment.

55.  Because of the recent birth of Plaintiff's son, his family was not able to travel far for shelter, so they sought shelter in the UNIFIL compound at Qana.

56.  During the bombardment of the UNIFIL compound by the IDF, Ali Saadallah Belhas was injured and his wife Zahra, infant son Hassan, his daughter Fatimeh Ali and his son Abbas were all killed.  Plaintiff Ali Saadallah Belhas saw his infant son being decapitated, saw shrapnel penetrate his wife's body, and saw his sister's dismembered body.

**b.  The Saadallah Ali Belhas Family**

57. On or about April 13, 1996, Saadallah Ali Belhas heard the warning broadcast over the radio that the villagers of Saddikeen should evacuate because of a pending attack by the IDF. At the time he was only a few days out of the hospital and still convalescing.

58. Saadallah Ali Belhas and his family fled and took refuge in the UNIFIL compound in Qana.

59. During the IDF bombardment of the UNIFIL compound on April 18, 1996, his wife Zeineb and his children Ghaleb Saadallah Belhas, Fayyad Saadallah Belhas, Naylah Saadallah Belhas, Fatimeh Saadallah Belhas, Zahra Saadallah Belhas, Amal Saadallah Belhas, Mohamed Saadallah Belhas, Ibrahim Saadallah Belhas, and Kadijah Saadallah Belhas were killed.

60. Other members of the extended family of Plaintiff Saadallah Ali Belhas were killed including his brother Ramatallah Ali Belhas, his wife, children and a grandchild, Plaintiff's

brother Mohammed Ali Belhas and his children, Plaintiff's niece and two of her children and many cousins and their children.  His father lost an eye in the shelling.

### c. The Hammoud Family

61. Plaintiff Ibrahim Khalil Hammoud and his family sought protection at the UNIFIL compound in Qana.

62. When the IDF bombarded the compound, Plaintiff's father, mother, two brothers and two sisters were killed.  Plaintiff suffered shrapnel wounds in his back and right leg for which he underwent two operations.  He remains partially disabled, and suffers ongoing pain.

### d. The Khalil Family

63. In 1996, after the IDF warned of an attack on the village of Jabel Al Battam, neighboring houses were hit.  Hala Yassim Khalil, along with thirty seven other members of her family, fled to the UNIFIL compound. The family included her grandfather, her parents, aunts, uncles, and several small children.

64. They remained in the UNIFIL compound for several days while the IDF shelled villages in the area.

65. During the IDF assault on the UNIFIL compound, Plaintiff Hala Yassim Khalil suffered injuries in the shoulder and shrapnel in her eye and other injuries as a result of the Israeli shelling.  Her brothers Ali Khalil and Husaam Khalil, her uncle and his three children were killed in the assault.  All of the other family members, including Plaintiff's sister, Diana Khalil, sustained injuries and two suffered permanent injuries. One uncle is permanently deaf.

### e. The Deeb Family

66. Plaintiff Hamidah Sharif Deeb and her family, including her brothers, sister and

sister-in-law and her children were in their house when they heard the radio warnings to leave the village of Rishkaniad. She and her family took refuge in the UNIFIL compound at Qana where they remained for several days while the IDF bombarded neighboring villages.

67. When the shelling of the compound at Qana began Hamidah Sharif Deeb was injured, as a result of which she had to undergo a series of surgical procedures and is now permanently disabled.

68. Two of her brother's children and her sister died during the IDF attack.

**f. The Ismail Family**

69. Plaintiff Ali Mohammed Ismail and his family including his two children, his wife, his eleven siblings, their spouses and children and his mother went to the UNIFIL compound on the day the shelling of the surrounding villages began. His house was hit by a rocket and destroyed. When the shelling of the compound at Qana began, Plaintiff was injured and his children, wife and sister were killed.

**g. The al Haja Family**

70. Plaintiff Raimon Naseeb al Haja went to the UNIFIL compound to seek shelter, and was disabled by the shelling of the compound on April 18, 1996. His mother, Georgette Michael al Haja was killed in the same attack.

**VIII. CLAIMS FOR RELIEF**

71. Plaintiffs' causes of action arise under and violate domestic and international law, as defined in agreements, declarations, conventions, resolutions and treaties, including but not limited to the following:

a) Customary international law and treaties of the United States;

-14-

b) Statutes and common law of the United States of America;

c) Statutes and common law of the District of Columbia;

d) Any other applicable laws, domestic, foreign, or international.

72. The claims under the law of nations are based on norms which are definable, obligatory, and universally recognized.

73. The law of nations requires all sides to an international armed conflict to distinguish between combatants and civilians prior to launching any military attack.

74. The law of nations requires military combatants to take all feasible precautions in the choice of means and methods of attack, with a view to avoiding or minimizing loss of civilian life and injury to civilians.

75. The law of nations prohibits indiscriminate military attacks, defined as attacks that are not directed at specific military targets.

76. The law of nations prohibits the targeting of civilians in a military attack.

77. The law of nations prohibits military retaliation against civilians, even in the event of prior unlawful military attacks on civilians by the other side to the armed conflict.

78. The law of nations requires a warning prior to any bombardment of towns or cities where civilians are present.

79. The law of nations prohibits the disproportionate use of lethal weapons.

80. The law of nations requires that civilians be treated humanely at all times by parties to an international armed conflict.

81. The law of nations prohibits military attacks on internally displaced persons.

82. The law of nations prohibits military attacks on UN installations, camps, compounds,

and personnel.

83. The law of nations prohibits military attacks on civilians under the protection of the UN.

84. The law of nations prohibits military attacks on humanitarian aid facilities and personnel.

85. The law of nations applies equally to defensive and aggressive military attacks.

86. The law of nations prohibits acts or threats of violence the primary purpose of which is to spread terror among the civilian population.

87. The law of nations requires military commanders to take appropriate measures to prevent troops under their command from violating the laws of war.

88. Under the law of nations, the presence of individual combatants in the midst of a civilian population does not deprive that population of its civilian character.

89. In cases of doubt as to whether a person is a civilian, the law of nations requires combatants to consider that person as a civilian.

## General Allegations

90. The acts described in this Complaint were inflicted under color of law.

91.  The acts and injuries to Plaintiffs and their deceased relatives described herein, as well as those similarly situated, were part of a pattern and practice of systematic human rights violations designed, ordered, implemented and directed with the participation of Defendant and carried out by military personnel acting with his direction, encouragement or acquiescence.

**FIRST CLAIM FOR RELIEF**

*(War Crimes)*

92. Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 91 of this Complaint as if fully set forth herein.

93. The abuses committed against Plaintiffs and Decedents described herein were acts against a civilian population and were war crimes.

94. The shelling of the UNIFIL compound and attack on the Plaintiffs and Decedents also constitute grave breaches and were war crimes.

95. The acts and omissions constituting war crimes caused Plaintiffs to suffer damages, including severe physical and mental pain and suffering, in amounts to be determined at trial.

96. Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**

*(Extrajudicial Killing)*

97. Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 96 of this Complaint as if fully set forth herein.

98. With regard to the events alleged herein, Defendant acted under the actual or apparent authority and/or color of law of the State of Israel.

99. The killings of Decedents constitute extrajudicial killings under the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 (note)). Additionally, the killings also constitute torts committed in violation of the law of

nations, and thus of the United States, as reflected in federal common law which incorporates extrajudicial killing, pursuant to 28 U.S.C. §§ 1331 and 1350.  Thus, the conduct constitutes violations of the law of nations and customary international law prohibiting extrajudicial killing, reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, and is thus actionable.  Defendant knew or should have known that Lebanese civilians were taking shelter in the UNIFIL compound in Qana, and that directly shelling the compound with proximity fuse shells would unlawfully kill innocent civilians, and that the deaths complained of herein were a foreseeable result of such activity.  Even with this knowledge, Defendant's acts and/or omissions resulted in the IDF shelling the compound in Qana.

100. Upon information and belief, no adequate remedies are available to the Plaintiffs under the laws or in the courts of Lebanon, which is the place in which the conduct giving rise to the claim occurred.

101. Defendant's acts and omissions described caused Plaintiffs' and Decedents' next of kin to suffer damages, including severe mental and emotional pain and suffering in an amount to be proven at trial. Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

*(Crimes Against Humanity)*

102. Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 101 of this Complaint as if fully set forth herein.

-18-

103. The abuses committed against Plaintiffs and Decedents constitute crimes against humanity. Defendant knew or should have known that Lebanese civilians had taken shelter in the UNIFIL compound at Qana, and that directly shelling the compound with proximity fuse shells would kill or maim civilians, and that the injuries complained of herein were a deliberate and foreseeable result of such activity. As such, Defendant was responsible for the murder and injuries of Plaintiffs and Decedents, and these murders were knowingly committed as part of a widespread or systematic attack against a civilian population.

104. Defendant, by virtue of this inhuman act, also caused great suffering and serious injury to the mental and/or physical health of Plaintiffs and Decedents' next of kin in the context of a widespread or systematic attack against a civilian population.

105. Defendant's acts and omissions constitute "tort[s] committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. § 1350 and also violate 28 U.S.C. § 1331 in that the acts and omissions against Plaintiffs violated customary international law prohibiting war crimes as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

106. Defendant's acts and omissions described caused Plaintiffs and Decedents' next of kin to suffer damages, including severe mental and emotional pain and suffering in an amount to be proven at trial. Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

*(Cruel, Inhuman or Degrading Treatment or Punishment)*

107. Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 106 of this Complaint as if fully set forth herein.

108. The abuses committed against Plaintiffs and Decedents described herein each separately constitute cruel, inhuman, or degrading treatment or punishment. These acts include, but are not limited to: the intentional and illegal shelling of a UN compound sheltering hundreds of civilians seeking refuge from the IDF bombing of their villages and homes resulting in severe physical and psychological abuse and agony, humiliation, fear and debasement; the injury and death of family members during such shelling, resulting in profound fear, loss, and anguish.

109. Defendant's acts also constitute torts committed in violation of the law of nations, and thus of the United States, as reflected in federal common law which incorporates extrajudicial killing, pursuant to 28 U.S.C. §§ 1331 and 1350. Thus, the conduct constitutes a violation of the law of nations and customary international law prohibiting CIDTP as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities. Extrajudicial killing is similarly reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, and is thus actionable.

110. Defendant's acts and omissions described caused Plaintiffs to suffer damages, including severe mental and emotional pain and suffering in an amount to be proven at trial.

111. Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount

-20-

to be determined at trial.


**WHEREFORE,** each plaintiff prays for judgment against the Defendant as follows:

a)  For compensatory damages according to proof, but in an amount over $75,000;

b)  For punitive and exemplary damages according to proof;

c)  For reasonable attorneys' fees and costs of suit, according to proof;

d)  For a declaratory judgment declaring that the conduct of the Defendant was in

violation of the law of nations, treaties of the United States, the common law of the United

States, and the laws of the District of Columbia; and

e)  For such other and further relief as the court may deem just and proper.

Respectfully submitted,


November 4, 2005                              _____/s/_____
                                             JAMES R. KLIMASKI (#243543)
                                             KLIMASKI & ASSOCIATES, P.C.
                                             1819 L Street NW – Suite 700
                                             Washington, DC 20036-3830
                                             (202) 296-5600
                                             (202) 296-5601  Fax
                                             Klimaski@klimaskilaw.com

                                             MARIA C. LAHOOD
                                             JENNIFER M. GREEN
                                             WILLIAM GOODMAN
                                             ABDEEN JABARA (# 426159)
                                             CENTER FOR CONSTITUTIONAL RIGHTS
                                             666 Broadway, 7th Floor
                                             New York, NY 10012
                                             (212) 614-6430
                                             (212) 614-6499 Fax
                                             mlahood@ccr-ny.org


-21-

JUDITH BROWN CHOMSKY
LAW OFFICES OF JUDITH BROWN CHOMSKY
PO Box 29726
Elkins Park, PA 19027
(215) 782-8367
jchomsky@igc.org

SUSAN M. AKRAM
Associate Professor
Boston University School of Law
765 Commonwealth Avenue
Boston, MA  02215
(617) 353-3148
sakram@gbls.org

*Counsel for Plaintiffs*