## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALI SAADALLAH BELHAS, SAADALLAH )
ALI BELHAS, IBRAHIM KHALIL )
HAMMOUD, RAIMON NASEEB AL HAJA, )
HAMIDAH SHARIF DEEB, ALI )
MOHAMMED ISMAIL, and HALA YASSIM )
KHALIL, )
                                 )
              Plaintiffs, )
                                 )
    vs. )
                                   )
MOSHE YA'ALON, former Head of Army )
Intelligence, Israel, )
                                   )
             Defendant. )
                                   )

Civil Action No. 1:05 CV 02167 (PLF)

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOSHE YA'ALON'S
## MOTION TO DISMISS THE COMPLAINT

Robert N. Weiner
Jean E. Kalicki
Matthew Eisenstein
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
Tel.: (202) 942-5000
Fax: (202) 942-5999

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ..................................................................................................3

ARGUMENT .........................................................................................................9

I.  THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE
GENERAL YA'ALON IS IMMUNE FROM SUIT ......................................9

    A.  This Case is In Substance a Suit Against Israel, Subject to the Foreign
Sovereign Immunities Act ................................................................9

    B.  Plaintiffs Sue General Ya'alon in his Official Capacity...................10

II.  THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION UNDER
THE POLITICAL QUESTION AND ACT OF STATE DOCTRINES ....................16

    A.  The Complaint Raises Nonjusticiable Political Questions Reserved to the
Executive Branch ...........................................................................16

        1.  The political question doctrine has particular force in the area of
foreign policy. ..................................................................16

        2.  Courts have avoided entanglement in political and military
decisions, especially regarding the Middle East ...................18

        3.  The political question doctrine bars adjudication of this case ............22

    B.  The Complaint Asks the Court To Judge the Legality and Validity of
Sovereign Acts by Israel ................................................................27

CONCLUSION.....................................................................................................30

Tab A:
    Letter from Daniel Ayalon, Ambassador of the State of Israel to the
United States, to Mr. Nicholas Burns, Under-Secretary of State for
Political Affairs, dated Feb. 6, 2006 .......................................................

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases:**

*Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997) ...................................................21

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) .................................9

\* *Baker v. Carr*, 369 U.S. 186 (1962)................................................................... *passim*

\* *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ..................................27, 28

*Bao Ge v. Li Peng*, 201 F. Supp. 2d 14 (D.D.C. 2000), *aff'd*,
35 Fed. Appx 1 (D.C. Cir. 2002) ...............................................................13

*Bernstein v. Van Heyghen Freres Societe Anonyme*, 163 F.2d 246 (2d Cir. 1947)......................27

*Chicago & S. Air Lines Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948) ..............................18

*Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095 (9th Cir. 1990)...............................16

\* *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005) ....................................7, 20

*Denegri v. Republic of Chile*, No. Civ. A. 86-3085, 1992 WL 91914 (D.D.C.
Apr. 6, 1992).........................................................................10

\* *Doe v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005) ................................ *passim*

\* *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996) ...............................10

\* *El-Shifa Pharm. Indus. Co. v. United States*, 402 F. Supp. 2d 267 (D.D.C. 2005) ...........14, 15, 20

*Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283 (11th Cir. 2002) .........................30

*Haig v. Agee*, 453 U.S. 280 (1981) ...............................................................19

*Herbage v. Meese*, 747 F. Supp. 60 (D.D.C. 1990), *aff'd*, 946 F.2d 1564 (D.C. Cir. 1991).........11

*Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996) ...............................30

\* *Hwang Geum Joo v. Japan*, 413 F.3d 45 (D.C. Cir. 2005).............................17, 18

*Industria Panificadora, S.A. v. United States*, 763 F. Supp. 1154 (D.D.C. 1991) ........................17

\* *In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765 (S.D.N.Y. 2005)* ................ 12

   *In re Terrorist Attacks on September 11, 2001,* 392 F. Supp. 2d 539 (S.D.N.Y. 2005) .......... 13, 14

   *Int'l Ass'n of Machinists v. OPEC,* 649 F.2d 1354 (9th Cir. 1981) ................................ 28

\* *Jungquist v. Nahyan,* 115 F.3d 1020 (D.C. Cir. 1997) ................................ 10

   *Kadic v. Karadzic,* 70 F.3d 232 (2d Cir. 1995) ................................ 14

   *Mujica v. Occidental Petroleum Corp.,* 381 F. Supp.2d 1164 (C.D. Cal. 2005) ................ 15

   *Park v. Shin,* 313 F.3d 1138 (9th Cir. 2002) ................................ 10

   *Republic of Austria v. Altmann,* 541 U.S. 677 (2004) ................................ 18

   *Roe v. Unocal Corp.,* 70 F. Supp. 2d 1073 (C.D. Cal. 1999) ................................ 29

\* *Saltany v. Reagan,* 702 F. Supp. 319 (D.D.C. 1988), *aff'd in relevant part,*
   *rev'd in part,* 886 F.2d 438 (D.C. Cir. 1989) ................................ 15, 29

   *Saudi Arabia v. Nelson,* 507 U.S. 349 (1993) ................................ 9

   *Schneider v. Kissinger,* 412 F.3d 190 (D.C. Cir. 2005) ................................ 17, 24

   *Sosa v. Alvarez Machain,* 542 U.S. 692 (2004) ................................ 18

   *Tannenbaum v. Rabin,* No. CV-95-4357, 1996 WL 75283 (E.D.N.Y. Feb. 13. 1996) ................ 11

   *Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litig.),*
   978 F.2d 493 (9th Cir. 1992) ................................ 10

   *Transaero, Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148 (D.C. Cir. 1994) ................ 9

   *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp. Int'l,* 493 U.S. 400 (1990) ................ 27

   *World Wide Minerals Ltd. v. Republic of Kazakhstan,* 296 F.3d 1154
   (D.C. Cir. 2002), *cert. denied,* 123 S. Ct. 1250 (2003) ................................ 27

## Statutes:

22 U.S.C. § 7421(9) ................................ 26

Alien Tort Claims Act, 28 U.S.C. § 1350 ................................ *passim*

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602-11 ................ 8

Syria Accountability and Lebanese Sovereignty Restoration Act, Pub. L. 108-175 (2003) ...........4

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992),
    *reprinted at* 28 U.S.C. § 1350 note.......................................................................10, 15, 30

**Rules:**

Fed. R. Civ. P. 12(b)(6)..................................................................................................8

Fed. R. Civ. P. 12(h)(2)..................................................................................................8

**Legislative Materials:**

H. Con. Res. 149, 104th Cong., 2d Sess. (1996) .........................................................6

H. Con. Res. 280, 107th Cong., 1st Sess. (2001)......................................................6

H. Con. Res. 331, 106th Cong., 2d Sess. (2000) ........................................................1

H.R. Rep. No. 102-367(I) (1991), *reprinted in* 1992 U.S.C.C.A.N. 84 ........................10

H.R. Res. 392, 107th Cong. (2002)..............................................................................5

S. Res. 82, 109th Cong., 1st Sess. 2005.................................................................4

S. Rep. No. 102-249 (1991).................................................................................10, 30

**Miscellaneous:**

*Airstrike by U.S. Draws Protests from Pakistanis*, N.Y. Times, Jan. 15, 2006............................26

*Annan 'increasingly concerned' by civilian casualties in Iraq,* UN News Centre,
    Mar. 26, 2003, *at* http://www.un.org/apps/news/story.asp?
    NewsID=6571 &Cr=iraq&Cr1=relief..........................................................................26

"Blasts, then silence: Cease-fire begins," CNN, Apr. 26, 1996, *at*
    http://www.cnn.com/WORLD/9604/26/cease.fire ..............................................................2

"Casualties Since September 29, 2000," *at* http://www1.idf.il/SIP_STORAGE/DOVER/
    files/7/21827.doc (last updated Jan. 15, 2006) .........................................................4

Center for Constitutional Rights website, http://www.ccr-ny.org/v2/reports/report.asp?
    ObjID=TCRlT9TuSb&Content=471 and ObjID=7cqLkN05AO&Content=454..............25

Counterterrorism Cooperation Accord, U.S. - Isr., State Dep't No. 96-126 (Apr. 30, 1996) ...................................................................................................................6

\* Fed. Defendants' Memorandum of Points and Authorities, *Doe v. State of Israel*, No. 1:02 CV 01431 (D.D.C.), October 31, 2002 .............................................18, 19

Interview with Secretary of State Colin L. Powell (May 18, 2003), *at* http://www.state.gov/secretary/rm /2003/18810.htm ........................................25

Israeli Ministry of Foreign Affairs, Address by Prime Minister Shimon Peres to the Knesset on the IDF Operations in Lebanon (Apr. 22, 1996), *at* http://www.mfa.gov.il/MFA/ Terrorism%20Obstacle%20to%20Peace/Terrorism%20from%20Lebanon%20 Hizbullah/PM%20PERES%20TO%20THE%20KNESSET%20ON%20THE%20 IDF%20OPERATIONS%20IN%20L..........................................................13, 14

Israeli Ministry of Foreign Affairs, Cabinet Communique (Apr. 21, 1996), *at* http://www.mfa.gov.il/MFA/Archive/Communiques/1996/CABINET%20 COMMUNIQUES%20-%2021-Apr-96 ......................................................14

Israeli Ministry of Foreign Affairs, Response to UN Secretary's Report on Kana Incident (May 9, 1996), *at* http://www.mfa.gov.il/MFA/Terrorism- %20Obstacle%20to%20Peace/Terrorism%20 from%20Lebanon-%20Hizbullah/RESPONSE%20TO%20UN%20SECRETARY- S%20REPORT%20ON%20KANA%20INCIDENT ......................................6

\* Letter from Daniel Ayalon, Ambassador of the State of Israel to the United States, to Mr. Nicholas Burns, Under-Secretary of State for Political Affairs, dated Feb. 6, 2006 ................................................................................. *passim*

Marc Grossman, Under Secretary of State for Political Affairs, Remarks to the Center for Strategic & Int'l Studies (May 6, 2002), *at* http://www.state.gov/p/9949.htm .................26

President Bill Clinton, Address on Arrival in St. Petersburg (April 18, 1996), *at* http://www.clintonfoundation.org/legacy/041896-speech-by-president-on-arrival- st-petersburg.htm ...........................................................................................1

President Bill Clinton & President Ilyas Hrawi, Remarks in Oval Office (Apr. 24, 1996), *at* http://clinton6.nara.gov/1996/04/1996-04-24-presidents-clinton-and-hrari-of- lebanon-in-photo-op.html. ...........................................................................2

President George W. Bush, Address to the Nation (Mar. 17, 2003), *at* http://www.whitehouse.gov/news/releases/2003/03 /iraq/20030317-7.html......................5

President George W. Bush & King Abdullah of Jordan, Press Conference (Mar. 15, 2005), *at* http://www.whitehouse.gov/news/releases/2005/03/20050315.html.................23

\*  Statement of Interest of the United States, *Doe v. Liu Qi,* No. C 02 0672 CW (N.D. Cal. Sept. 27, 2002) ................................................................................................16, 25

Statement of State Department Spokesman Richard Boucher (Apr. 28, 2003), *at* http://www.state.gov/r/pa/prs/dpb/2003/20025.htm ........................................25

Statement of National Security Advisor Condoleezza Rice, June 12, 2003 at http://www.whitehouse.gov/news/releases/2003/06/20030612-12.html ...........................26

Statement of Philip T. Reeker, Deputy State Department Spokesman (May 14, 2003), *at* http://www.state.gov/r/pa/prs/dpb/ 2003/20584.htm ........................................25

United Nations S.C. Res. 1373, U.N. SCOR, 56th Sess., 4385th Mtg., U.N. Doc. S/Res/1373 (2001). .................................................................................................5

United Nations S.C. Res. 1559 (2004)..........................................................................5, 23

U.S. Dep't of State, *Comprehensive List of Terrorists and Groups Identified Under Executive Order 13224, at* http://www.state.gov/s/ct/rls/fs/ 2001/6531.htm ........................................................................................................1

\*  U.S. Dep't of State Dispatch, vol. 8, no. 18, Apr. 29, 1996, *at* http://dosfan.lib.uic.edu/ ERC/briefing/dispatch/1996/html/Dispatchv7no18.html .....................................2, 6, 8, 23

U.S. Dep't of State Daily Press Briefing (Apr. 19, 1996), *at* http://www.hri.org/docs/statedep/1996/96-04-19.std.html ...............................24

U.S. Dep't of State Daily Press Briefing (May 6, 1996), *at* http://www.hri.org/docs/statedep/1996/96-05-06.std.html ............................2, 5

U.S. Dep't of State Daily Press Briefing (June 7, 2005), *at* http://www.state.gov/r/pa/prs/dpb/2005/47320.htm ........................................23

U.S. Dep't of State, "Israel and the Occupied Territories: Report on Human Rights Practices for 1996" (Jan. 30, 1997), *at* http://www.state.gov/www/global/human_rights/ 1996_hrp_report/israel.html..................................................................................5

White House Press Briefing, Jan. 4, 2006, *at* http://www.whitehouse.gov/news/ releases/2006/01/20060104-1.html#a ...................................................................26

This is a political case by Lebanese plaintiffs against an Israeli defendant for injuries that occurred during a battle on the Israeli-Lebanese border. Ostensibly brought against a former Israeli general who is in the United States briefly as a visiting scholar, the suit is one of a series of cases -- none successful -- attacking Israel's conduct of the war on terrorism. This case, like the prior cases, does not belong in federal court.

Plaintiffs' claims arise from combat between Israel and Hezbollah in 1996. Although Plaintiffs, tellingly, describe Hezbollah merely as a guerrilla force "that opposed Israeli occupation of southern Lebanon," the United States has formally designated it as a terrorist organization.[1]  The U.S. Congress has found that "southern Lebanon has for decades been the staging area for attacks against Israeli cities and towns by Hezbollah and by Palestinian terrorists, resulting in the death or wounding of hundreds of Israeli civilians." H. Con. Res. 331, 106th Cong., 2d Sess. (2000). On April 18, 1996, Hezbollah was launching such attacks from artillery batteries located close to a United Nations compound in Qana, Lebanon. Return fire by Israel struck the compound, killing and injuring civilians, allegedly including plaintiffs.

The United States responded immediately with intensive diplomacy. The President dispatched the Secretary of State to the Middle East and called for an immediate ceasefire, "to allow our diplomatic efforts to go forward."[2]  A week later, President Clinton met with the President of Lebanon and again emphasized that the Administration was "doing everything we can to bring an end to the fighting and to get a set of understandings which will prevent it from

---

[1] *See* U.S. Dep't of State, *Comprehensive List of Terrorists and Groups Identified Under Executive Order 13224, at* http://www.state.gov/s/ct/rls/fs/2001/6531.htm.

[2] President Bill Clinton, Address on Arrival in St. Petersburg (April 18, 1996), *at* http://www.clintonfoundation.org/legacy/041896-speech-by-president-on-arrival-st-petersburg.htm.

recurring."[3]  Those efforts resulted in a ceasefire on April 26, 1996.[4]  On April 29, 1996, the

President expressed regret over the loss of life by those in Qana "who were caught between --

make no mistake about it -- the deliberate tactics of Hezbollah in their positioning and firing and

the tragic misfiring in Israel's legitimate exercise of its right to self-defense."[5]  On May 7, 1996,

the State Department spokesman, echoing the President's conclusion that Israel had answered all

questions and expressed regret for the targeting error, condemned Hezbollah for "us[ing] those

civilians as cover in a very cynical and despicable way."[6]  Once again, the Administration

interwove the Qana incident and U.S. political efforts, stressing the goal of the U.S. to "make

sure that [the ceasefire] is upheld and honored, that civilians are not attacked in the future."  *Id.*

Plaintiffs here seek to remove the issue from the diplomatic arena and lodge it in the

courts.  Their complaint treats General Ya'alon as a convenient incarnation of Israeli policy.  The

very caption of the Complaint identifies him by his position, former Head of Army Intelligence

for the State of Israel.  Carefully skirting allegations that he actually ordered or had advance

knowledge of the attack, *see* Compl. ¶ 49, Plaintiffs allege a "pattern and practice of systematic

human rights violations," not *by* General Ya'alon, but rather "designed, ordered, implemented

and directed *with [his] participation*" and carried out by the Israeli military "acting with his

---

[3] President Bill Clinton & President Ilyas Hrawi, Remarks in Oval Office (Apr. 24, 1996), *at* http://clinton6.nara.gov/1996/04/1996-04-24-presidents-clinton-and-hrari-of-lebanon-in-photo-op.html.

[4] *See, e.g.,* "Blasts, then silence: Cease-fire begins," CNN, Apr. 26, 1996, *at* http://www.cnn.com/WORLD/9604/26/cease.fire.

[5] U.S. Dep't of State Dispatch, vol. 8, no. 18, Apr. 29, 1996 (reprinting speech by President Clinton on Apr. 28, 1996), *at* http://dosfan.lib.uic.edu/ERC/briefing/dispatch/1996/html/Dispatchv7no18.html.

[6] U.S. Dep't of State Daily Press Briefing (May 6, 1996), *at* http://www.hri.org/docs/statedep/1996/96-05-06.std.html.

direction, encouragement *or acquiescence.*" *Id.* ¶ 91 (emphasis added).  If we penetrate the

evasions, the complaint inflates what the U.S. government concluded was a misdirected artillery

barrage into a wholesale indictment of the Israeli military.

Sovereign immunity precludes such assaults on foreign governments.  Even if it were

otherwise, plaintiffs still could not entangle this Court in foreign policy judgments reserved to

the political branches.  Indeed, plaintiffs seek to lure the Court into not just any foreign policy

concerns, but as other courts have found, ones involving a singularly volatile region where the

United States seeks to guide the search for peace.  The State of Israel has formally advised the

Department of State that this request improperly involves "the U.S. courts in evaluating Israeli

policies and operations in the context of an continuing armed conflict against terrorist

operatives."[7]  Israel expressed concern that such involvement "risks complicating or

undermining the important political and diplomatic avenues that are currently being pursued" to

end terrorism and bring peace to the region." *Id.*  As Israel's protest indicates, this Court is not

the proper forum to adjudicate political claims, to prosecute some ideological struggle, or to

conduct foreign relations.

### INTRODUCTION

Since it was founded more than 50 years ago, the State of Israel has weathered attacks

threatening its very right to exist.  The United States has stood with Israel through five declared

wars and repeated terrorist assaults.  With U.S. support, Israel has signed peace treaties with two

of its sovereign neighbors -- Egypt and Jordan -- and has established diplomatic relations with

---

[7] Letter from Daniel Ayalon, Ambassador of the State of Israel to the United States, to Mr.
Nicholas Burns, Under-Secretary of State for Political Affairs, dated Feb. 6, 2006 (hereafter
"State of Israel Letter," attached hereto).

several other countries in the Middle East.  Further, the United States has brokered many

discussions to limit hostilities across Israel's northern border with Lebanon.  With regard to the

Israeli-Palestinian relationship, the United States has lead the diplomatic efforts, from the

Declaration of Principles by Israel and the PLO at the White House in 1993 to the "Roadmap for

Peace" by President Bush in 2003, and to this day.

But a comprehensive peace, an end to the violence, has proved elusive.  Since September

2000, for example, terrorists have killed more than 1,884 Israelis and injured more than 7,633,

many critically.[8]  With a population of only 6.9 million -- a little over 2% of that of the United

States -- Israel's casualties have been staggering.  But the numbers of dead and injured still do

not convey the full impact of the terror – the families shattered, the children orphaned, the

livelihoods lost, the fear enkindled.

Israel has faced repeated terrorist attacks across its borders as well.  In the mid-1990s,

Hezbollah militias, in what Plaintiffs blandly describe as "oppos[ing] the Israeli occupation,"

Compl. ¶ 28, rained Katyusha rockets on towns and civilian areas in northern Israel.  As noted,

Congress has found that Hezbollah for decades has used southern Lebanon as a staging ground

for attacks on Israel.  Moreover, the Syria Accountability and Lebanese Sovereignty Restoration

Act specifically states that the "Israeli-Lebanese border and much of southern Lebanon is under

the control of Hizballah, which continues to attack Israeli positions, allows Iranian Revolutionary

Guards and other militant groups to operate freely in the area, and maintains thousands of rockets

along Israel's northern border, destabilizing the entire region."  Pub. L. 108–175, Dec. 12, 2003.

*See also* S. Res. 82, 109th Cong., 1st Sess. (2005) ("Hezbollah has continued to carry out attacks

---

[8] *See* "Casualties Since September 29, 2000," *at* http://www1.idf.il/SIP_STORAGE/
DOVER/files/7/21827.doc (last updated Jan. 15, 2006).

against Israel and its citizens.")  Between 1994 and mid-April, 1996, Hezbollah terrorists

launched hundreds of Katyusha rocket attacks from Lebanon, causing some 20,000 to 30,000

Israeli civilians to flee their homes.[9]  On April 11, 1996, the IDF launched operation "Grapes of

Wrath," counterattacking with artillery fire.  Compl. ¶¶ 28-29.  First, however, the IDF publicly

announced the operation and warned civilians to leave the areas from which Hezbollah operated.

*Id.* ¶ 30.  While many civilians heeded this advance warning, Hezbollah continued to attack

Israel from areas where civilians remained.  As the U.S. State Department has stated, on April

18, 1996, Hezbollah fired from within 300 yards of the United Nations compound at Qana.[10]

The return fire from Israel hit the compound.

     All States have a basic right and duty to protect their citizens against terrorism.  *See*

United Nations S.C. Res. 1373 (2001).  After the terrorist attack on the World Trade Center,

President Bush affirmed that this country "has the sovereign authority to use force in assuring its

own national security."  President George Bush Address to the Nation (Mar. 17, 2003), *at*

http://www.whitehouse.gov/news/releases/2003/03/20030317-7.html.  Israel, too, has sovereign

authority to use force in assuring its national security, indeed, its national survival.  Congress has

recognized Israel's operations as "an effort to defend itself against the unspeakable horrors of

ongoing terrorism ... aimed only at dismantling the terrorist infrastructure in the Palestinian

areas."  H.R. Res. 392, 107th Cong. (2002).  Indeed, Congress specifically found that the

terrorist attacks on Israel "justifies Israeli counterterrorist operations as the response of a

---

[9] *See* U.S. Dep't of State, "Israel and the Occupied Territories: Report on Human Rights
Practices for 1996" (Jan. 30, 1997), *at* http://www.state.gov/www/global/human_rights/
1996_hrp_report/israel.html.

[10] U.S. Dep't of State Press Briefing (May 6, 1996), *supra* n.6.

legitimate government defending its citizens."  H. Con. Res. 280, 107th Cong., 1st Sess. (2001).

*See* H. Con. Res. 149, 104th Cong., 2d Sess. (1996) (reaffirming "full support for Israel in its

effort to combat terrorism as it attempts to pursue peace with its neighbors in the region").  And

the State Department has created a Joint Counterterrorism Group with Israel for the

"development and facilitation of programs of counterterrorism cooperation."  Counterterrorism

Cooperation Accord, U.S.-Isr., State Dep't No. 96-126 (Apr. 30, 1996).

   From 1995 to 1998, General Ya'alon was the Head of Army Intelligence in the Israeli

Defense Forces ("IDF"), and was involved among other things in providing intelligence for the

defense of Israel against terrorist attacks by Hezbollah and others.  This suit is a political

broadside against that defense and the intelligence analysis that underlay targeting decisions by

the IDF.  Ignoring the official statement by Israel that the "UN position was hit by artillery fire

due to incorrect targeting based on erroneous data,"[11] ignoring President Clinton's statement that

the fire was misdirected,[12] plaintiffs allege that the attack was an indiscriminate or even a

deliberate assault on civilians.  Compl. ¶¶ 1, 35.

   Rather than sue Israel directly, however, plaintiffs named defendant Ya'alon.  The

fortuity of his visiting fellowship in the District apparently was so enticing that plaintiffs sued

him even though they could not connect him to this attack other than by virtue of his official

position.  Compl. ¶ 20.  Plaintiffs do not allege a single fact suggesting that General Ya'alon

intended IDF forces to shell the United Nations compound or that he actually knew civilians

---

[11] Israeli Ministry of Foreign Affairs, Response to UN Secretary's Report of Kana Incident (May 9, 1996), *at* http://www.mfa.gov.il/MFA/Terrorism-%20Obstacle%20to%20Peace/ Terrorism%20from%20Lebanon-%20Hizbullah/RESPONSE%20TO%20UN%20SECRETARY-S%20REPORT%20ON%20KANA%20INCIDENT.

[12] U.S. Dep't of State Dispatch, Apr. 29, 1996, *supra* n. 5.

were present *at the targeted location.*  Rather, plaintiffs allege that by virtue of his position as

head of Army Intelligence, *id.* ¶¶ 23, 24, General Ya'alon had either "constructive notice" *or*

"actual notice" that civilians were sheltered *at the Qana compound. Id.* ¶¶ 22, 23, 37, 46; *see*

*also* ¶ 52 ("knew or should have known").  They further assert that General Ya'alon authorized

or ratified *or* was "*otherwise responsible*" for the attack, *id.* ¶ 22 (emphasis added), thereby

committing, among other things, a war crime, a crime against humanity and extrajudicial killing.

    As convenient a foil as General Ya'alon may be, suing him cannot avoid the line of cases

rejecting attempts to drag U.S. courts into the Middle East conflict.  In November, Judge Bates

of this Court rejected a suit against Israel and current and former senior officials that alleged war

crimes and genocide through indiscriminate military action and other asserted wrongdoing in the

West Bank and Gaza.  The Court stated that however plaintiffs characterized their suit, "the

character of those claims is, at its core, the same: peculiarly volatile, undeniably political, and

ultimately nonjusticiable."  *Doe v. State of Israel,* 400 F. Supp. 2d 86, 112 (D.D.C. 2005).

Likewise, the U.S. District Court for the Western District of Washington recently dismissed a

effort *by these same lawyers* to bar Caterpillar from selling bulldozers to Israel for use in the war

on terror.  The Court declined to become enmeshed in a lawsuit that "challenges the official acts

of an existing government in a region where diplomacy is delicate and U.S. interests are great."

*Corrie v. Caterpillar, Inc.,* 403 F. Supp. 2d 1019, 1032 (W.D. Wash. 2005), *appeal pending.*

Other courts, too, have declined to second-guess military judgments or to intercede in issues

encompassed within U.S. diplomacy.

    The concerns expressed in those cases have the same force here.  Plaintiffs would have

this Court take a position directly at odds with that of the President and the Department of State,

who credited Israel's position that the shelling had been aimed at Hezbollah artillery, not the

U.N. compound, and who described the attack as "Israel's legitimate exercise of its right to self-defense."[13]  Further, they would insert this Court into issues intertwined with Executive Branch diplomacy focused on the broader, compelling quest for peace in the Middle East.  The Government of Israel has formally advised the U.S. Department of State that such judicial intervention would run "counter to the ongoing Israel-US dialogue and the key diplomatic role of the US in the region."  State of Israel Letter, *supra* n.7.  And plaintiffs would have this Court set a precedent of individual liability for official government policies and military targeting decisions that could be used against American soldiers and government officials.  Indeed, the very counsel representing plaintiffs in this case have previously sued Secretary of Defense Rumsfeld, Attorney General Gonzales and others in Germany and elsewhere for actions relating to Iraq and the war on terror.  Encouraging such suits is contrary to the stated policy of the United States.

The complaint thus should dismiss the case on two threshold jurisdictional grounds:[14]

> First, General Ya'alon is immune from suit under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602-11 ("FSIA").  The State of Israel enjoys sovereign immunity, which Plaintiffs cannot circumvent by suing Israel's public servants.  Their claims against General Ya'alon are for official acts.  Their suit is, through and through, an attack on Israel.  Such an attack is not permitted in U.S. courts.
>
> Second, even if plaintiffs could overcome this barrier, this political suit, like the prior cases attacking Israel's policies, is not justiciable.  It presents issues reserved to and resolved by other branches of government.  It would interfere with vital objectives of U.S. foreign policy.  And it would intrude on the sovereignty of a

---

[13] U.S. Dep't of State Dispatch, Apr. 29, 1996, *supra* n. 5.

[14] This motion addresses whether the Court has power to hear the case.  If need be, General Ya'alon may move later, as Fed. R. Civ. P. 12(h)(2) permits, to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), for failure to exhaust local remedies, and for *forum non conveniens*.

foreign nation.  Under both the political question and Act of State doctrines, the Court should not exercise jurisdiction.

## ARGUMENT

I. **THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE GENERAL YA'ALON IS IMMUNE FROM SUIT**

    A. **This Case is In Substance a Suit Against Israel, Subject to the Foreign Sovereign Immunities Act**

The FSIA bars suit against foreign states and their agencies and instrumentalities. Because of this statute, plaintiffs could not sue Israel or the IDF.  Plaintiffs thus proceed more obliquely, suing General Ya'alon, the former head of Army Intelligence, for actions on behalf of Israel.  The law, however, turns on substance, not form.  Sovereign immunity extends to government officers for acts on behalf of the State, as opposed to private action on their own behalf.  Plaintiffs sue General Ya'alon for official acts.  They identify him by title in the caption of the complaint, and assail his implementation of official policies of the State of Israel.  Thus, in substance, this suit is against Israel.  As the Supreme Court has held, "a foreign state is presumptively immune from the jurisdiction of United States courts," and "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against [it]." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  The same is true for the IDF, because the "armed forces of a foreign sovereign … are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself" for purposes of FSIA analysis. *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994); *Doe v. State of Israel*, 400 F. Supp. 2d at 101 (finding IDF to be a "foreign state").

Nothing in the complaint touches on any of the exceptions under the FSIA.  Alleging violations of international law does not negate the FSIA's protection. *See Argentine Republic v.*

*Amerada Hess Shipping Corp.*, 488 U.S. 428, 436 (1989) ("[I]mmunity is granted in those cases involving alleged violations of international law that do not come within one of the FSIA's exceptions."). Nor does sovereign immunity evaporate merely because plaintiffs invoke the Alien Tort Claims Act or the Torture Victim Protection Act. *See Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litig.)*, 978 F.2d 493, 497 (9th Cir. 1992) ("[T]he FSIA trumps the [ATCA] when a foreign state or ... an individual acting in her official capacity is sued."); *Denegri v. Republic of Chile*, No. Civ. A. 86-3085, 1992 WL 91914 at *2 (D.D.C. Apr. 6, 1992) ("[T]here is no generalized international law exception to sovereign immunity under the FSIA."); H.R. Rep. No. 102-367(I), at 5 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 88 ("The TVPA is subject to restrictions in the [FSIA]."); S. Rep. No. 102-249 (1991), at 7 (same).

**B.     Plaintiffs Sue General Ya'alon in his Official Capacity**

Further, as many courts have recognized, sovereign immunity would be a hollow defense if plaintiffs could evade it by suing a senior official of the foreign government. The law sensibly foils this tactic. Sovereign immunity protects foreign officials acting on behalf of their governments, just as it protects those governments from suit based on the officials' acts. *See, e.g., Jungquist v. Nahyan*, 115 F.3d 1020, 1027 (D.C. Cir. 1997); *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996).

Thus, in deciding whether to dismiss based on sovereign immunity, courts "consider whether an action against the foreign official is merely a disguised action against the nation that he or she represents." *Park v. Shin*, 313 F.3d 1138, 1144 (9th Cir. 2002). Courts in this Circuit have not hesitated to disregard plaintiffs' labels that do not fit the facts alleged. For example, in *El-Fadl v. Central Bank of Jordan,* the plaintiff claimed that Jordanian officials had instigated an unwarranted investigation of his activities, leading to his detention and torture by Jordanian

military police. 75 F.3d at 670. Although plaintiff alleged these actions were undertaken "in an individual capacity," the D.C. Circuit rejected this label. Rather, the court found the officials immune from liability because "the only evidence in the record" showed that they had acted on behalf of the sovereign and not in their purely personal capacities. *Id.* at 671. Similarly, in *Herbage v. Meese*, 747 F. Supp. 60, 65-66 (D.D.C. 1990), *aff'd,* 946 F.2d 1564 (D.C. Cir. 1991), the Court rejected plaintiff's claim that Britain's Home Secretary and the Director of Public Prosecutions had conspired "solely in their individual capacity" wrongfully to extradite plaintiffs to the United States. *Accord Tannenbaum v. Rabin*, No. CV-95-4357, 1996 WL 75283 at *3 (E.D.N.Y. Feb. 13, 1996) (rejecting suit against Israel's Minister of Police and former Prime Minister, where the claim against them was "in their official roles only").

The recent decision by Judge Bates in *Doe v. Israel* is directly apposite here. In that case, Palestinian-Americans sued Israel, various agencies, sitting ministers and former officials based on conduct in the West Bank. The suit invoked the same statutes plaintiffs invoke here. Further, it included the counts plaintiffs assert here -- extrajudicial killing, war crimes, and cruel, and inhuman or degrading treatment. Indeed, it specifically faulted the killing and wounding of civilians "during IDF missile, bomb and rocket attacks" aimed at militants, *Doe* Compl. ¶ 180, just as plaintiffs do here. And it purported to sue the individual defendants in both their official and personal capacities. In finding that the case was merely a "disguised action" against Israel itself, the Court was "mindful that foreign sovereigns are legal fictions to the extent that they can only act through their individual officers." 400 F. Supp. 2d at 104. Thus, the Court held, "[a] suit against an individual officer of a nation who has acted on behalf of that nation is the functional equivalent of a suit against the state itself." *Id.* By contrast, "suits against officers in their personal capacities must pertain to private action -- that is, to actions that exceed the scope

of authority vested in that official so that the official cannot be said to have acted on behalf of the state." *Id.*

Applying these principles to the claims against individual Israeli officials, the Court noted that "[t]o begin with, plaintiffs challenge the conduct of the Israeli occupation activities in the West Bank -- something that is an official policy of the sovereign State of Israel." *Id.* at 105. Further, the plaintiffs did not assert that the defendants "acted out of personal gain or for private motivation. All allegations stem from actions taken on behalf of the state and, in essence, the personal capacity suits amount to suits against the officers for being Israeli government officials." *Id.* Therefore, the Court held, the defendants were within "the FSIA's protective umbrella." *Id.*

This Court should reach the same result here. Starting with the caption of the complaint, plaintiffs sue General Ya'alon as "former Head of Army Intelligence" for the State of Israel.[15] Just as in *Doe,* they do not allege that General Ya'alon acted for personal gain or private motivation. Indeed, beyond identifying his position in the IDF structure, Compl. ¶ 20, the Complaint does not identify a single concrete act General Ya'alon purportedly took in connection with the incident, much less one in his personal or private capacity. Plaintiffs instead posit that "as Head of Army Intelligence," General Ya'alon had either "constructive notice" or "actual notice" of the presence of civilians at the UN compound. *Id.* ¶¶ 23-24. This is a hedge, connoting that Plaintiffs cannot say General Ya'alon knew civilians were present, but believe he should have known. Nor do Plaintiffs allege any facts suggesting that General Ya'alon knew the

---

[15] That General Ya'alon is no longer in office does not affect the FSIA analysis. *See In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 788-89 (S.D.N.Y. 2005) (relevant inquiry is "whether the acts in question were undertaken at a time when the individual was acting in an official capacity").

shelling would endanger the United Nations compound, as opposed to the Hezbollah rocket launch sites that Israel affirmed -- and the U.S. Government found -- were the targets.[16]  Rather, their principal claim is that General Ya'alon either "participated in the decision" to shell the compound, *id.*, ¶ 2, failed to prevent it, or was "otherwise responsible" for it.  *Id.*, ¶ 22.[17]  Based on these hedged assertions, plaintiffs tar General Ya'alon with charges invoked for terrorists and dictators, not military leaders of a democratic ally.

Even setting aside for now the absence of "well pleaded facts"[18] -- not to mention the impropriety of vilifying a public official for "war crimes" based merely on his government position -- these allegations *on their face* address General Ya'alon's official rather than his personal capacity.[19]  Plaintiffs do not allege that General Ya'alon acted outside the scope of his recognized authority as head of Israeli military intelligence.  To the contrary, like *Doe*, the Complaint attacks Israeli policy and official action -- the shelling of sites in Lebanon used for

---

[16] *See, e.g.,* Israeli Ministry of Foreign Affairs, Address by Prime Minister Shimon Peres to the Knesset on the IDF Operations in Lebanon (Apr. 22, 1996) ("The government, in its instructions to the IDF on the operation, ordered it not to harm civilians or civilian targets, and to concentrate solely on Hizbullah installations and on the terrorists themselves.  Overall, this instruction was carried out with great meticulousness.  However, in a military operation, as hard as one tries to maintain purity of arms, mishaps may occur and innocent civilians may be injured.  This was not our intention.") (*at* http://www.mfa.gov.il/MFA/Terrorism-%20Obstacle%20to%20Peace/ Terrorism%20from%20Lebanon-%20Hizbullah/PM%20PERES%20TO%20THE%20 KNESSET%20ON%20THE%20IDF%20OPERATIONS%20IN%20L).

[17] Plaintiffs' reference to "troops under his command." Compl. ¶ 50, is particularly curious, given their own allegation that the Army Intelligence unit Gen. Ya'alon headed was involved primarily in information gathering and analysis.  *Id.* ¶ 21.

[18] *See Bao Ge v. Li Peng*, 201 F. Supp. 2d 14, 19 (D.D.C. 2000), *aff'd,* 35 Fed. Appx. 1 (D.C. Cir. 2002) (where complaint contains "numerous, sweeping allegations" concerning foreign government or its officials, "the Court must consider as true only the 'well-pleaded facts' set forth" in the complaint).

[19] *See generally In re Terrorist Attacks on Sept. 11, 2001*, 392 F. Supp. 2d 539, 553 (S.D.N.Y. 2005) (dismissing claims against Saudi officials where allegations on their face "center on [their] role" in government).

launching rocket attacks into Israel -- and accuses General Ya'alon simply of supporting, implementing, or not preventing it. Nor do plaintiffs allege that General Ya'alon's actions in connection with the Qana incident were somehow "unratified" by his nation's government.[20] Even if they had so alleged, Israel has publicly defended the Qana shelling, while regretting the loss of civilian life that resulted from erroneous information about the precise coordinates of the U.N. camp in relation to Hezbollah rocket launch sites.[21] It has also explicitly confirmed that any actions General Ya'alon took were "in the course of [his] official duties, and in furtherance of official policies of the State of Israel." State of Israel Letter, *supra* n.7. While the Complaint here is insufficient on its face, the statement of a foreign government regarding its official's responsibilities, should the Court consider it, is entitled to "great weight" on a motion to dismiss based on sovereign immunity. *In re Terrorist Attacks,* 392 F. Supp. at 551.

Moreover, in cases against U.S. officials strikingly parallel to this case, this Court has repeatedly confirmed that decisions authorizing military action to combat terrorist threats, and the intelligence underlying those decisions, are inherently official. Individual government employees are not personally liable even when civilians are harmed. Most recently, in *El-Shifa*

---

[20] *See, e.g., Kadic v. Karadzic,* 70 F.3d 232, 250 (2d Cir. 1995) (allowing ATCA claims to proceed against self-proclaimed leader of "state" the U.S. government did not recognize, whose actions were "wholly unratified" by the recognized government of Bosnia-Herzegovina).

[21] *See* Israeli Ministry of Foreign Affairs, Cabinet Communique (Apr. 21, 1996), *at* http://www.mfa.gov.il/MFA/Archive/Communiques/1996/CABINET%20COMMUNIQUES %20-%2021-Apr-96 (noting Prime Minister's characterization of "Operation Grapes of Wrath" as "a war of no alternative which enjoyed the support of the entire government"); *see also* Israeli Ministry of Foreign Affairs, Address by Prime Minister Shimon Peres to the Knesset on the IDF Operations in Lebanon (Apr. 22, 1996), *supra* n.16 (expressing Prime Minister's "feelings of appreciation to the IDF, to the Chief-of-Staff, to the General Staff, to the Northern Command and to the commanders and soldiers of the air force, ground forces and the navy, for acting responsibly and firmly" in Operation Grapes of Wrath).

- 14 -

*Pharmaceutical Industries Co. v. United State,* 402 F. Supp. 2d 267, 275 (D.D.C. 2005), the

Court dismissed ATCA claims arising out of the President's decision to destroy a Sudanese

pharmaceutical plant with cruise missiles, based on intelligence indicating it was a chemical

weapons-related facility.  The Court found that even though the President's conclusion may have

been erroneous and the intelligence faulty, his decision nonetheless was a "policy judgment"

fully within his authority as Commander in Chief of the armed forces, for which he enjoyed

absolute immunity from suit." *Id.* at *3.  Similarly, in *Saltany v. Reagan,* 702 F. Supp. 319

(D.D.C. 1988), *aff'd in relevant part, rev'd in part,* 886 F.2d 438 (D.C. Cir. 1989), the Court

rejected ATCA claims for civilian deaths and injuries resulting from U.S. military air strikes

ordered by President Reagan on targets in Libya.  Unfortunate as it was there -- and here --that

civilians were harmed, the court found it "manifest" that "civilian or military officials of the

United States Government who are alleged to have planned and/or executed the air strikes [on

Libya] ordered by the President ... did so in their official capacities," and thus were entitled to

immunity. *Id.* at 321.[22]

Under these principles, military and civilian leaders of our allies, when acting

comparably on behalf of *their* States against terrorist threats, are engaged in official conduct and

are entitled to immunity under the FSIA.  Indeed, the State Department has urged courts to be

"especially careful" where a claim against a foreign official criticizes the policies of a foreign

state, because "denial of immunity in such circumstances would allow 'litigants to accomplish

---

[22] The conclusion that military actions involving air strikes are quintessential government acts
has also been confirmed in the context of the act of state doctrine. *See Mujica v. Occidental
Petroleum Corp.,* 381 F. Supp. 2d 1164, 1190 (C.D. Cal. 2005) (noting in act of state context that
ATCA and TVPA claims arising from bombings by the Columbian Air Force "involve[d]
official acts because ... [p]rivate citizens do not generally have the ability to maintain an air
force and authorize the use of military force") (citations omitted).

indirectly what the [FSIA] barred them from doing directly,' ... by the simple expedient of naming a high level foreign official as a defendant rather than a foreign state." Statement of Interest of the United States, *Doe v. Liu Qi*, No. C 02 0672 CW, at 4-5 (N.D. Cal., Sept. 27, 2002) (quoting *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1101-02 (9th Cir. 1990)) (submitted herewith) ("*Liu Qi* Statement").

Here, plaintiffs do just that. They launch against General Ya'alon -- on information and belief, no less -- politically charged invective that they could not properly advance against Israel or the IDF. They cannot properly assert it against him either. The Court should dismiss the case for lack of subject matter jurisdiction.

## II.    THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION UNDER THE POLITICAL QUESTION AND ACT OF STATE DOCTRINES

Apart from the bar of sovereign immunity, this case fails because it is a political exhibition, not a justiciable controversy. It poses a clear and present danger of conflicting with determinations of the Executive Branch, interfering with U.S. foreign policy, and infringing on the sovereignty of a close ally. Under the political question and Act of State doctrines, this Court should dismiss the complaint.

### A.    The Complaint Raises Nonjusticiable Political Questions Reserved to the Executive Branch

#### 1.    The political question doctrine has particular force in the area of foreign policy.

As Judge Bates observed in *Doe*, the political question doctrine is "a natural outgrowth of fidelity to the concept of separation of powers. It is based upon respect for the pronouncements of coordinate branches of government that are better equipped and properly intended to consider issues of a distinctly political nature." *Doe*, 400 F. Supp. 2d at 111. The Supreme Court's

decision in *Baker v. Carr*, 369 U.S. 186 (1982), serves as "the starting point for analysis under

the political question doctrine." *Hwang Geum Joo v. Japan,* 413 F.3d 45, 48 (D.C. Cir. 2005).

The *Baker* Court identified six categories of nonjusticiable political questions:

> ... [1] a textually demonstrable constitutional commitment of [the
> issue] to a coordinate political department; or [2] a lack of
> judicially discoverable and manageable standards for resolving
> [the issue]; or [3] the impossibility of deciding the issue without an
> initial policy determination of a kind clearly for nonjudicial
> discretion; or [4] the impossibility of a court's undertaking
> independent resolution without expressing lack of the respect due
> coordinate branches of government; or [5] an unusual need for
> unquestioning adherence to a political decision already made; or
> [6] the potentiality of embarrassment from multifarious
> pronouncements by various departments on one question.

369 U.S. at 217.  The test mandated by *Baker* does not *balance* these factors.  Rather, it assesses

whether *any* are present.  If they are, then the Court ordinarily should dismiss the case. *See*

*Hwang Geum Joo*, 413 F.3d at 48; *Schneider v. Kissinger,* 412 F.3d 190, 194 (D.C. Cir. 2005);

*El-Shifa Pharm.*, 402 F. Supp. 2d at 275 ("If even one of these elements is present, 'then

adjudication of the case may be said to require resolution of a political question which is

nonjusticiable and hence not reviewable by a court.'") (quoting *Industria Panificadora, S.A. v.*

*United States*, 763 F. Supp. 1154, 1159 (D.D.C. 1991)).

  Although not every case touching on foreign relations raises nonjusticiable political

questions, *Baker*, 369 U.S. at 211, courts have been particularly sensitive in this arena, where

"many ... questions uniquely demand a single-voiced statement of the Government's views." *Id.*

The Supreme Court long ago explained why judges should tread cautiously:

> [T]he very nature of executive decisions as to foreign policy is
> political, not judicial.  Such decisions are wholly confided by our
> Constitution to the political departments of the government,
> Executive and Legislative.  They are delicate, complex, and
> involve large elements of prophecy.  They are and should be

> undertaken only by those directly responsible to the people whose
> welfare they advance or imperil. They are decisions of a kind for
> which the Judiciary has neither aptitude, facilities nor
> responsibility and have long been held to belong in the domain of
> political power not subject to judicial intrusion or inquiry.

*Chicago & S. Air Lines Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

### 2.    Courts have avoided entanglement in political and military decisions, especially regarding the Middle East

In *Doe*, the U.S. Government made clear in briefs it filed that the Executive Branch is

intricately involved in diplomacy in the Middle East, that the security issues are volatile and

delicate, and that claims such as the ones asserted here would potentially disrupt the Executive's

conduct of foreign affairs. In the U.S. Government's view, claims challenging Israeli actions in

the West Bank and U.S. support for them implicate the *Baker* factors:

> [I]n order to award the Plaintiffs the relief they seek the Court
> would have to make findings and determinations respecting the
> nature and appropriateness of Israeli actions undertaken in the
> midst of an ongoing armed conflict abroad that the United States
> (through its political branches) is attempting to resolve. Such
> findings – which would have to assess the context and
> appropriateness of Israeli actions – themselves *would intrude upon
> the foreign policy prerogatives of the political branches* ....

Fed. Defs.' Mem. at 37-38 (emphasis added) (submitted herewith).[23]

---

[23] The Supreme Court has recently confirmed that "federal courts should give serious weight to
the Executive Branch's view of [an ATCA] case's impact on foreign policy," and should be
"particularly wary of impinging on the discretion of the Legislative and Executive Branches in
managing foreign affairs." *Sosa v. Alvarez Machain*, 542 U.S. 692, 727, 733 n.21 (2004); *see
also Republic of Austria v. Altmann*, 541 U.S. 677, 702 (2004) (statements by the Executive
concerning "the implications of exercising jurisdiction over *particular* [foreign governments] in
connection with *their* alleged conduct ... might well be entitled to deference as the considered
judgment of the Executive on a particular question of foreign policy"). The D.C. Circuit recently
applied these principles to affirm the dismissal of a case where the Executive had expressed
concern about the case's impact on foreign policy. *See Hwang Geum Joo*, 413 F.3d at 52 ("The
Executive's judgment that adjudication by a domestic court [concerning the interests of foreign
states] would be inimical to the foreign policy interests of the United States is compelling and
renders this case nonjusticiable under the political question doctrine.").

The Government also invoked other factors under *Baker* regarding judicial competency to decide the same issues that are presented here:

> What constitute legitimate actions in furtherance of Israel's internal security or self-defense ... are determinations for the President to make, taking into account complex historical, diplomatic, military and factual circumstances that are only developed and accessible through the conduct of the Nation's diplomatic and military relationships. The same is true with respect to any assessments of Israel's human rights record. All such determinations, at core, include value-laden judgments based on complex factual circumstances that the President is uniquely qualified to make and that the courts are, as an institutional matter, uniquely unqualified to make in these circumstances.

Fed. Defs.' Mem. at 39.

The District Court in *Doe* agreed with this assessment. It found that,

> The first *Baker* factor is undeniably implicated here. It is hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli-Palestinian conflict, which has raged on the world stage with devastation on both sides for decades. The region of the Middle East specifically, and the entire global community generally, is sharply divided concerning these tensions; American foreign policy has come under attack as a result. This Court has previously observed that "foreign policy is constitutionally committed to the political branches, and disputes over foreign policy are nonjusticiable political questions."

400 F. Supp. 2d at 111-112 (citing *Haig v. Agee*, 453 U.S. 280, 292 (1981)). In *Doe*, as here, plaintiffs asked the Court to declare that actions Israel justifies as self-defense in fact were illegal. The Court declined, because "[w]hether plaintiffs dress their claims in the garb of RICO or other federal statutes, or the tort laws of various states, the character of those claims is, at its core, the same: peculiarly volatile, undeniably political, and ultimately nonjusticiable. A ruling on any of these issues would draw the Court into the foreign affairs of the United States, thereby interfering with the sole province of the Executive Branch." *Id.* at 112.

The Court also found that these claims implicated the third, fourth and fifth *Baker* factors. To determine whether Israeli conduct in the West Bank and Gaza was tortious or illegal would, in the Court's judgment, usurp the roles of coordinate branches of government. It "would also implicitly condemn American foreign policy by suggesting that the support of Israel is wrongful. Conclusions like these present a potential for discord between the branches that further demonstrates the impropriety of a judicial decision on these quintessential political issues." *Id.* at 112. To answer the question, the Court found, would require it to assess whether Israel's actions were appropriate "self-defense." *Id.* Again, "[s]uch a predicate policy determination is plainly reserved to the political branches of government, and the Court is simply not equipped with 'judicially discoverable or manageable standards' for resolving a question of this nature." *Id.* at 112-113.

The U.S. District Court for the Western District of Washington reached the same conclusion. There, the plaintiffs, represented by plaintiffs' counsel here, sought to enjoin Caterpillar from selling bulldozers to Israel because they were allegedly used, among other things, to violate the Geneva Convention and to commit extrajudicial killings. The Court declined. In its view, the lawsuit "challenges the official acts of an existing government in a region where diplomacy is delicate and U.S. interests are great." *Corrie*, 403 F. Supp. 2d at 1032. To issue the order requested, the Court found, "would certainly invade the foreign policy prerogatives of the political branches of government." *Id.*

*El-Shifa Pharmaceutical Industries* also dismissed claims, much like those asserted here, involving a U.S. missile attack allegedly based on flawed intelligence. The Court refused to consider the claims, finding that judgments regarding national security presented a political question. In particular, the Court held, the designation of the factory as a terrorist facility,

- 20 -

"erroneous though it may have been, was made as part of a military response to the terrorist

bombings of the U.S. embassies in Kenya and Tanzania. It is this type of delicate decision

regarding national security, foreign relations, and global politics that is entrusted to the sole

discretion of the executive." 402 F. Supp. 2d at 275. The plaintiff could not avoid the political

question doctrine "by framing the claims using common tort principles." *Id.* at 274. Even if the

information prompting the attack was wrong, the Court would not and could not weigh the

intelligence underlying military decisions. Indeed, the Court noted, "[a] judicial inquiry into the

reasonableness of the judgments made regarding the El-Shifa plant could mimic the executive's

role in formulating foreign policy, could improperly interfere with the executive's role in

commanding the country's military forces, and could require an inappropriate second-guessing

of executive branch decisions." *Id.* at 275-76. It is no more appropriate, and the Court is no

better situated, to second-guess the targeting decisions of the Israeli military and the intelligence

that informed them.

The Eleventh Circuit applied the same principles in *Aktepe v. United States*, 105 F.3d

1400 (11th Cir. 1997). There, Turkish sailors sued for injuries after a U.S. aircraft carrier

mistakenly attacked their ship during a NATO training exercise. The Court upheld dismissal on

political question grounds, refusing to intrude on military judgments far less entwined with

national policy than the ones at issue here. First, it found that the case, having arisen from a

NATO exercise, implicated the relationship between the U.S. and its allies. The second *Baker*

factor applied because assessing whether the Navy properly fired the missiles required a

determination of how a "reasonable military force" should have acted. *Id.* at 1404. In the

Court's view, it was "difficult to conceive of an area of governmental activity in which the courts

have less competence," because "courts lack standards with which to assess whether reasonable

care was taken to achieve military objectives while minimizing injury and loss of life." *Id.*
(citation omitted).  The same problems implicated the third and fourth *Baker* factors, because the
judgments sought "inevitably would require ... initial policy decisions of a kind appropriately
reserved for military discretion," and would "express a lack of respect for the political branches
of government." *Id.*

### 3.    The political question doctrine bars adjudication of this case

Like these prior cases, this suit implicates the factors set forth in *Baker*.  It focuses on

— a military targeting decision

— by a key U.S. ally

— against rocket launch sites of an organization the U.S. has designated as
    terrorist,

— in a war on terror the U.S. supports,

— in a region that is particularly volatile

— where the U.S. Government has expressed concern about judicial
    interference as it seeks to mediate a resolution of decades of conflict.

The first *Baker* factor applies because this matter involves quintessentially political
judgments about foreign policy, which is committed by the Constitution to the Executive Branch.

The second factor -- lack of judicially manageable standards -- applies because, as in the
cases above, the Court would have to evaluate a military targeting decision and assess whether
Israel acted in legitimate self-defense.  For the reasons stated above, those are not judgments
suited for the courts.

The third through sixth *Baker* factors are also compelling.  This is a time of both turmoil
and opportunity in the Middle East, including in both Lebanon and Israel, and the United States
continues to pursue diplomatic avenues to peace.  Among other things, the United States

continues to urge that Hezbollah militias be disarmed, consistent with the United Nations' call in 2004 for "the disbanding and disarmament of all Lebanese and non-Lebanese militias" within Lebanese territory, as part of Lebanon's transition to a democracy free of Syrian control.[24] President Bush has also expressed concern that "Hezbollah may try to derail the peace process between Israel and the Palestinians."[25] Pronouncements by the Court in these areas could complicate, if not thwart, the initiatives by the Executive Branch in Lebanon and throughout the region, as well as the U.S. Government's ongoing dialogue with Israel about Palestinian issues and responses to the two nations' common war on terror. Indeed, Israel has formally objected at the highest levels to adjudication of this suit as an unwarranted interference in its conduct of military and security operations in the war on terror, as an intrusion into its sovereignty, and as a potential complication in its ongoing dialogue on Mideast peace. State of Israel Letter, *supra* n.7.

Moreover, as noted, the Executive Branch has made its position on the Qana incident clear, that Israel intended to target rocket launch sites, not the U.N. compound, and that Hezbollah bore responsibility. President Clinton, again, described the incident as a "tragic misfiring in Israel's legitimate exercise of its right to self-defense."[26] The State Department spokesman, as noted, pointedly refused to condemn Israel, and credited Israel's denial that it

---

[24] *See* United Nations S.C. Res.1559 (2004); U.S. Dep't of State Daily Press Briefing (June 7, 2005), *at* http://www.state.gov/r/pa/prs/dpb/2005/4732./htm (noting that Hezbollah remains "a designated Foreign Terrorist Organization," that "armed groups cannot work outside the rule of law" in any democratic society, that "Hezbollah and its armed militia are not controlled by institutions that are responsive to the will of the Lebanese people," and that "[s]imply put, Hezbollah makes Lebanon and its people less secure, not more secure").

[25] President George Bush & King Abdullah of Jordan, Press Conference (Mar. 15, 2005), *at* http://www.whitehouse.gov/news/releases/2005/03/20050315.html.

[26] U.S. Dep't of State Dispatch, Apr. 29, 1996, *supra* n.5.

targeted the refugees at the U.N. camp.[27] The U.S. Government also made clear that it addressed this incident not as a legal dispute, but rather in the political context of ongoing diplomacy. Immediately after the incident, the State Department spokesman highlighted the U.S. Government's broader agenda of peace in the region: "[t]he situation in the Middle East is among the most volatile situations the United States confronts anywhere in its diplomacy. ... What we've got to do is to stop the shelling on both sides of the border, shelling that began, of course, with Hizbollah attacks on civilian populations in Israel." *Id.* In furtherance of that goal, Secretary of State Warren Christopher went to Israel and Syria, and negotiated a ceasefire.

Against this backdrop, for this Court to adjudicate plaintiffs' claims would disregard "an initial policy determination" by the Executive Branch, exhibit "lack of the respect due coordinate branches of government," potentially disavow "a political decision already made" and risk embarrassing the United States with "multifarious pronouncements by various departments on one question." *Baker,* 369 U.S. at 210. To find, as plaintiffs assert, that Israel through General Ya'alon "act[ed] deliberately [in] shelling the United States (UN) compound at Qana," Compl. ¶ 1 -- notwithstanding the conclusion of the President and Department of State to the contrary -- would interfere with the efforts of the Executive Branch to provide "a single-voiced statement of the Government's views" in delicate matters of foreign affairs. *Baker*, 369 U.S. at 211. *See also Schneider v. Kissinger,* 412 F.3d at 196 (cautioning that "[i]t is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role" in the conduct of foreign policy).

---

[27] U.S. Dep't of State Daily Press Briefing (Apr. 19, 1996), *at* http://www.hri.org/docs/statedep/1996/96-04-19.std.html.

Proceeding with this case also could expose senior U.S. officials to suits in foreign courts arising out of their official acts. In an ATCA case against Chinese officials involved with China's policy towards the Falun Gong, the U.S. Government asked the Court "to take into account the potential for reciprocal treatment of United States officials by foreign courts in efforts to challenge U.S. government policy," including suits alleging international law violations against individuals "in carrying out their official functions under the Constitution, laws and programs of the United States." *Liu Qi* Statement, *supra*, at 8. This concern is palpable here, where plaintiffs' own counsel sued Secretary Rumsfeld and other U.S. officials *in Germany* for human rights violations in Iraq.[28] In Belgium, the U.S. exerted great diplomatic pressure for repeal of a law under which General Tommy Franks, President Bush, the Secretary of Defense and other top U.S. officials faced lawsuits for "war crimes" in Iraq or Afghanistan arising out of U.S. military operations or ongoing security sweeps in the midst of civilian populations.[29] Indeed, then-National Security Advisor Condoleezza Rice said that it could not be countenanced

---

[28] *See* Center for Constitutional Rights website, http://www.ccr-ny.org/v2/reports/report.asp? ObjID=TCRIT9TuSb&Content=471. In this country, plaintiffs' counsel filed an ATCA complaint in the District of Columbia against Secretary Rumsfeld and military leaders attacking the treatment of prisoners at Guantanamo Bay. *Id.* at http://www.ccr-ny.org/v2/reports/report.asp?ObjID=7cqLkN05AO&Content=454. Advocacy groups have filed additional suits against Secretary Rumsfeld, former director of the CIA George Tenet, and military leaders in various federal courts.

[29] The State Department condemned the Belgian suit (which has since been dismissed) as an "abuse of [Belgium's] legal system for political ends." Statement of Philip T. Reeker, Deputy State Department Spokesman (May 14, 2003), *at* http://www.state.gov/r/pa/prs/dpb/2003/20584.htm. The United States Government expressed similar views of the impropriety of suits in Belgium against former President George H.W. Bush and other senior U.S. officials arising out of the 1991 Gulf War. *See* Interview with Secretary of State Colin L. Powell (May 18, 2003), *at* http://www.state.gov/secretary/rm/2003/18810.htm; Statement of State Department Spokesman Richard Boucher (Apr. 28, 2003), *at* http://www.state.gov/r/pa/prs/dpb/2003/20025.htm. The Belgian suits ultimately were dismissed after Belgium amended its war crimes law, under significant pressure from the United States.

for an "ally" to permit such charges against "freely and democratically elected leaders."[30] Moreover, U.S. military operations sometimes result in unfortunate deaths or injuries of civilians, just as Israel's operation against Hezbollah sites in Lebanon did.[31] Indeed, after an errant U.S. bomb struck a crowded market in Baghdad in 2003, the Secretary General of the U.N. expressed "increasing concern over civilian casualties of the conflict in Iraq" and pointedly reminded "belligerents that they should respect international humanitarian law."[32] The Administration has sought to protect American officials from liability for such events.[33] Congress has agreed, with a finding in federal legislation that "senior officials of the United States Government should be free from the risk of prosecution by the International Criminal Court, especially with respect to official actions taken by them to protect the national interests of the United States." 22 U.S.C. § 7421(9).

---

[30] Condoleezza Rice, National Security Advisor, Remarks at Town Hall Los Angeles (June 12, 2003), *at* http://www.whitehouse.gov/news/releases/2003/06/20030612-12.html.

[31] *See, e.g., Airstrike by U.S. Draws Protests from Pakistanis*, N.Y. Times, Jan. 15, 2006 (U.S. airstrike in Pakistan aimed at Al Qaeda leader Ayman al-Zawahiri kills 18 civilians); White House Press Briefing (Jan. 4, 2006), *at* http://www.whitehouse.gov/news/ releases/2006/01/20060104-1.html (family of 12 killed by U.S. pilots who targeted a house where they believed insurgents had taken shelter). Given plaintiffs' attack on Israel's shelling at Qana, the Administration's justification of the strikes in Pakistan and Iraq are noteworthy. The U.S. military, the White House said of the Iraq strike, "target[s] the terrorists and the Saddam loyalists who are seeking to kill innocent civilians and disrupt the transition to democracy." *Id.*

[32] *Annan 'increasingly concerned' by civilian casualties in Iraq*, UN News Centre, Mar. 26, 2003, *at* http://www.un.org/apps/news/story.asp?NewsID=6571 &Cr=iraq&Cr1=relief.

[33] *See, e.g.*, Marc Grossman, Under Secretary of State for Political Affairs. Remarks to the Center for Strategic & Int'l Studies (May 6, 2002), *at* http://www.state.gov/p/9949.htm ("We must ensure that our soldiers and government officials are not exposed to the prospect of politicized prosecutions and investigations. Our President is committed to a robust American engagement in the world to defend freedom and defeat terror; we cannot permit the [International Criminal Court] to disrupt that vital mission.").

The last thing that this Court, any court, would wish to do is interfere with the foreign policy of the United States and in particular with the search for peace in one of the most difficult areas of the world. This case -- from its overheated allegations of war crimes to its hyperbolic assault on Israel's efforts to defend itself against terrorist attacks -- poses that risk. It seeks to embroil the Court in the foreign policy of the United States and in second-guessing the security policy and that military intelligence of one its closest allies. The Court should not leap into that thicket. Plaintiffs should pursue their political goals in political forums, not in a Federal Court.

**B.      The Complaint Asks the Court To Judge the Legality and Validity of Sovereign Acts by Israel**

The Act of State doctrine also mandates dismissal of this case. The doctrine applies where "the outcome of the case turns upon [] the effect of official action by a foreign sovereign." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp. Int'l*, 493 U.S. 400, 406 (1990). The Supreme Court has described the doctrine "as a consequence of domestic separation of powers, reflecting the 'strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." *Id.* at 404 (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964)). The policies underlying the doctrine include "international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations." *Id.* at 408; *see also World Wide Minerals Ltd. v. Republic of Kazakhstan,* 296 F.3d 1154, 1165 (D.C. Cir. 2002).[34]

---

[34] The doctrine extends to the governmental acts of State officials vested with sovereign authority. *See Bernstein v. Van Heyghen Freres Societe Anonyme,* 163 F.2d 246, 249 (2d Cir. 1947). As noted above, the alleged acts at issue here were official, not private.

Further, plaintiffs cannot evade the Act of State doctrine by claiming the shells that injured them landed outside Israel's borders. They have sued a former official who served in Israel.

*[Footnote is continued on next page]*

The Supreme Court has articulated a three-factor test for applying the Act of State doctrine, focusing on: (a) "the degree of codification or consensus concerning a particular area of international law," (b) the extent to which the issue "touch[es] ... sharply on national nerves," with greater justification for "exclusivity in the political branches" the more "important the implications of an issue are for our foreign relations," and (c) whether "the government which perpetrated the challenged act of state is no longer in existence." *Sabbatino*, 376 U.S. at 428. Of these factors, "[t]he 'touchstone' or 'crucial element' is the potential for interference with our foreign relations." *Int'l Ass'n of Machinists v. OPEC,* 649 F.2d 1354, 1360 (9th Cir. 1981).

Here, the second and third factors apply. The third ought not to be controversial: Israel is a stable democracy, with continuity of government. The second, critical *Sabbatino* factor -- the sensitivity of the issue for foreign relations -- is particularly compelling here, for the reasons addressed above.

Again, *Doe* properly applies the prevailing law. Assessing allegations like those advanced here -- including claims regarding failure to prevent civilian casualties during IDF military action -- the Court recognized the infringement on Israeli sovereignty. Specifically, the Court held,

> The actions challenged by plaintiffs are classic acts of state. Tort challenges brought against foreign military officials for such alleged harms as unlawful detention during a political revolution implore the courts to "declare invalid and deny legal effect to acts of a military commander representing the . . . government." Plaintiffs do not challenge the actions of third-parties in procuring the alleged unlawful acts; rather, they ask this Court directly to

---

[Footnote continued from previous page]
Plaintiffs do not claim that General Ya'alon took any actions himself in Lebanon. They charge him, as head of Army Intelligence, with such things as authorizing, planning, commanding, failing to discipline -- none alleged to occur outside his offices in Jerusalem.

> declare that they were treated illegally by Israeli defendants on
> Israeli soil.  Such a determination would offend notions of
> international comity and sovereignty.

400 F. Supp. 2d at 113 (citations omitted).

These principles, and the reluctance of federal courts to review officially sanctioned

military decisions of foreign governments recognized by the United States, are well-established.

Thus, for example, in *Saltany v. Reagan*, the Court dismissed ATCA claims against the United

Kingdom arising out of civilian injury and death from U.S. military action against Libya.  702 F.

Supp. at 320-21.  The Court explained that "[w]hat is charged is, quite simply, Britain's

complicity in an illicit act of war committed by the United States.  By any definition that

description of the United Kingdom's allegedly wrongful conduct constitutes an archetypal act of

state." *Id.*  Similarly, in *Roe v. Unocal Corp.*, the Court dismissed an ATCA claim that would

"ultimately place the Court in the position of evaluating the legitimacy of orders directed to

subordinate officers" of the Burmese military.  70 F. Supp. 2d 1073, 1079 (C.D. Cal. 1999).  The

Court reasoned that this process, necessitating discovery among other things into "details of their

command structure and the authority of commanding officers," would place the court "in an

unseemly, if not impossible position." *Id.*  Because the U.S. courts "rarely, if ever, entertain

suits challenging the propriety of orders from the United States Armed Forces," the Court was

"not persuaded that it should undertake such an inquiry with respect to a foreign military." *Id.* at

1080.

This case would require the same type of inquiry the Court in *Roe* found so problematic.

Plaintiffs seek to hold liable a former high-level Israeli official, who oversaw military

intelligence, for the alleged act of the Israeli armed forces -- pursuant to decisions of Israeli

political leaders -- in shelling suspected terrorist sites across its borders.  To establish such

- 29 -

"command responsibility" for purposes of the TVPA, plaintiffs would need to demonstrate at minimum that defendant either directly ordered or participated in these acts. *See* S. Rep. No. 102-249 (1991) at 8-9; *Ford ex rel. Estate of Ford v. Garcia,* 289 F.3d 1283, 1288-89 (11th Cir. 2002); *Hilao v. Estate of Marcos,* 103 F.3d 767, 779 (9th Cir. 1996). Plaintiffs no doubt would assert a need for discovery into the command structure and rules of engagement of Israeli military forces, what intelligence Israel gathered and how, the communications among field officers and their commanders up the line, and the discussions among political leaders in setting Israeli policy and authorizing its implementation in this case. No country -- not Burma, not Israel, not the United States -- would tolerate such a wholesale invasion of sovereignty.

In sum, this case, no less than *Doe*, presses a frontal assault on Israel's policies and interferes with its sovereign rights. Plaintiffs ask the Court to adjudicate the legality and political justification of military operations by a key U.S. ally, in areas from which lethal attacks on its citizens repeatedly have been launched. Their claims collide directly with the Act of State doctrine.

## CONCLUSION

For the reasons discussed above, Moshe Ya'alon's motion should be granted and the claims against him dismissed in their entirety.

Dated: February 21, 2005                    Respectfully submitted,

                                            /s/Robert N. Weiner
                                            Robert N. Weiner (D.C. Bar No. 298133)
                                            Jean E. Kalicki  (D.C. Bar No. 427679)
                                            Matthew Eisenstein (D.C. Bar No. 476577)
                                            ARNOLD & PORTER LLP
                                            555 Twelfth Street, N.W.
                                            Washington, D.C. 20004-1206
                                            Tel: (202) 942-5000, Fax: (202) 942-5999
                                                *Attorneys for Defendant Moshe Ya'alon*

- 30 -

# TAB A

Letter from Daniel Ayalon, Ambassador of the State of Israel to
the United States, to Mr. Nicholas Burns, Under-Secretary of
State for Political Affairs, dated Feb. 6, 2006

**AMBASSADOR OF ISRAEL**
WASHINGTON, D.C.



שגריר ישראל
וושינגטון

February 6, 2006

Ambassador Nicholas Burns
Under-Secretary for Political Affairs
The Department of State
Washington, D.C.

        Re:        *Matar v. Dichter*, Civ. No. 05-10270 (S.D.N.Y.)
                   *Belhas v. Ya'alon*, Civ. No. 05-02167 (D.D.C.)

Dear Ambassador Burns,

I wish to draw your attention to the above-referenced lawsuits recently filed in U.S. federal district courts against Avraham Dichter, former Director of Israel's Internal Security Agency and Moshe Ya'alon, former head of Army Intelligence for the Israeli Defense Forces.

Both suits, filed by the same counsel, seek to hold former senior officials of the Government of Israel *personally liable* for casualties resulting from military actions undertaken by the State of Israel in defending against terrorism. The *Matar* case involves military action undertaken in Gaza in July, 2002 against Saleh Mustafa Shehahdeh, the military commander of the Hamas terrorist organization. The *Belhas* case concerns an incident in April, 1996 in which casualties resulted from return fire directed against targets and rocket launch sites of the Hezbollah terrorist organization located, quite deliberately, in very close proximity to the United Nations compound in Qana.

Israel fully respects the United States legal system and the independence of its judiciary. At the same time, I feel obliged to convey to you our concerns regarding the fundamental inappropriateness and political nature of these lawsuits.

As you know, the State of Israel has long welcomed a dialogue with the United States, through diplomatic and political channels, about the terrorist threat confronting both our countries, and the proper measures for securing the safety of our citizens while upholding the rule of law and minimizing harm to others from military and security operations. We acknowledge also the critical leadership role of the United States in advancing the peace process between Israel and its neighbors.

**AMBASSADOR OF ISRAEL**
WASHINGTON, D.C.

שגריר ישראל
וושינגטון

The attempts to draw US courts into the adjudication of these cases runs counter to the ongoing Israel-US dialogue and the key diplomatic role of the US in the region.

These lawsuits would embroil the U.S. courts in evaluating Israeli policies and operations in the context of an continuing armed conflict against terrorist operatives. They touch directly upon issues related to the Middle East peace process and ongoing and extensive diplomatic efforts, led by the US government, to end terrorism and bring peace and stability to Israel's relations with Lebanon and with the Palestinian side.

As such, the cases raise quintessentially political questions, in which judicial interference is improper, impracticable and risks complicating or undermining the important political and diplomatic avenues that are currently being pursued.

While ostensibly brought against Mr. Dichter and Gen.Yaalon personally, these cases challenge sovereign actions of the State of Israel, approved by the government of Israel in defense of its citizens against terrorist attacks. They attempt to circumvent Israel's sovereign immunity for official state acts.

The plaintiffs could not sue Israel directly in the U.S. courts for its military and security policies, and have consequently sought to directly sue senior Israeli officials, both of whom continue to play a prominent role in Israeli public life. However, anything Mr. Dichter and Gen. Ya'alon did in connection with the events at issue in the suits was in the course of their official duties, and in furtherance of official policies of the State of Israel. To allow a suit against these former officials is to allow a suit against Israel itself.

Both cases also raise significant concerns in that they appear to be part of a deliberate, and potentially expanding, agenda on the part of some private groups to import political conflicts into foreign courts or to use lawsuits as a means for advancing certain political or propaganda objectives. We know that the US itself has had to confront similar misuse of legal avenues in cases brought against its own officials in foreign countries, some of which have been brought by the very same lawyers behind the cases against Mr. Dichter and Gen. Yaalon.

**AMBASSADOR OF ISRAEL**
WASHINGTON, D.C.



שגריר ישראל
וושינגטון

We have brought these cases to the attention of the relevant legal officials in the State Department, but given the sensitive political issues raised by the cases and their potential diplomatic implications we considered it appropriate to address you directly as well, and to place our concerns on record.

Please accept, sir, the assurances of my highest consideration.

Sincerely,

Daniel Ayalon