# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALI SAADALLAH BELHAS, SAADALLAH ALI BELHAS, IBRAHIM KHALIL HAMMOUD, RAIMON NASEEB AL HAJA, HAMIDAH SHARIF DEEB, ALI MOHAMMED ISMAIL, and HALA YASSIM KHALIL,<br><br>    Plaintiffs,<br><br>    vs.<br><br>MOSHE YA'ALON, former Head of Army Intelligence, Israel,<br><br>    Defendant. | Civil Action No. 1:05 CV 02167 (PLF) |

## APPENDIX OF UNITED STATES GOVERNMENT COURT SUBMISSIONS CITED IN DEFENDANT MOSHE YA'ALON'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION TO DISMISS

Exhibit A    Memorandum of Points and Authorities in Support of Federal Defendants' Motion to Dismiss Official Capacity Claims, *Doe v. State of Israel*, No. 1:02 CV 01431 (JDB) (D.D.C. Oct. 31, 2002)

Exhibit B    Statement of Interest of the United States, *Doe v. Liu Qi,* No. C 02 0672 CW (N.D. Cal. Sept. 27, 2002)

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOHN DOE, et al.,                          )
                                           )
    Plaintiffs,                        )
                                           )       No. 1:02 CV 01431 (JDB)
    v.                                 )
                                           )
STATE OF ISRAEL, et al.,                   )
                                           )
    and                                )
                                           )
GEORGE W. BUSH,                            )
President of the United States,            )
1600 Pennsylvania Avenue, NW               )
Washington, DC 20500,                      )
                                           )
    and                                )
                                           )
COLIN POWELL,                              )
Secretary of State,                        )
2201 C Street, NW                          )
Washington, DC  20520                      )
                                           )
    Defendants.                        )
                                           )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## FEDERAL DEFENDANTS' MOTION TO DISMISS OFFICIAL CAPACITY CLAIMS

    President George W. Bush and Secretary of State Colin Powell (collectively, the "Federal

Defendants") hereby move to dismiss the claims asserted against them in their official

capacities.[1]  Plaintiffs' claims against the Federal Defendants are based on the provision of

---

[1] The undersigned appears on behalf of the Federal Defendants in their official capacities only.  The undersigned is *not* authorized to appear on behalf of either of the Federal Defendants in his individual capacity, nor does the filing of this Motion constitute a waiver of any defense on behalf of those individuals.  The Federal Defendants have not been personally served in their individual capacities.  See Fed. R. Civ. P. 4(i)(2)(B).

American military aid to Israel and seek to both hold the Federal Defendants liable for past

actions allegedly undertaken by the Israelis and enjoin any future military assistance to Israel.

The foreign aid program at the heart of Plaintiffs' claims, however, constitutes an exercise of the

foreign affairs powers of the United States, and there is no basis to conclude that Congress

intended that private individuals – or the Courts – would have any role in overseeing this

program. Indeed, as other courts to address the issue have held, the claims at issue raise

quintessentially political questions that are not suited for judicial resolution. As discussed below,

Plaintiffs' claims should be dismissed because: (i) there is no applicable waiver of sovereign

immunity for the tort and Racketeer Influenced and Corrupt Organizations Act ("RICO") claims

asserted against the Federal Defendants, (ii) neither the Arms Export Control Act nor the Foreign

Assistance Act provides a private cause of action, (iii) Plaintiffs lack standing to assert their

injunctive claim against the Federal Defendants, (iv) Plaintiffs' injunctive claim raises

nonjusticiable political questions, and (v) this Court lacks the authority to issue an injunction

against the President. Accordingly, the claims asserted against the Federal Defendants in their

official capacities should be dismissed.

## BACKGROUND

### I.     The Claims at Issue

Plaintiffs instituted this action by filing a 140-page Complaint, see Fed. R. Civ. P. 8(a)

(calling for "short and plain statement" of the claim), essentially alleging that they have been

harmed by certain actions of the Israeli Defendants.[2] The Complaint contains 19 claims for relief

---

[2] Plaintiffs also filed a separate untitled 150-page document, with some 19 affidavits attached, signed and affirmed by counsel. The Federal Defendants are unclear as to the nature or purpose of this document. See Fed. R. Civ. P. 7(a) (listing pleadings and noting that "[n]o other

against dozens of Defendants. The only claims asserted against the Federal Defendants are the Fourth Claim for Relief (RICO), the Fourteenth, Fifteenth, and Sixteenth Claims for Relief (common law torts), and the Nineteenth Claim for Relief (seeking injunctive relief).[3]

The Complaint describes in great detail the alleged harms suffered by the Plaintiffs at the hand of the Israeli Defendants. In some – but by no means all – of these cases, these harms are alleged to have been inflicted with U.S. origin weapons. Apparently seeking to connect the provision of American aid to Israel with the injuries about which they complain, Plaintiffs have asserted the above-referenced claims against the Federal Defendants.

Plaintiffs' RICO and common law tort claims seek to hold the Federal Defendants liable for, and seek damages as redress for, the injuries that the Plaintiffs have allegedly suffered in Israel. Plaintiffs' injunctive claim against the Federal Defendants rests on the assertion that "Plaintiffs have been injured as the direct and proximate result of Defendants George W. Bush and Colin Powell's failure to report to Congress pursuant to the Arms Export Control Act and Foreign Assistance Act, Israel's [alleged] systemic and continuous misuse of military assistance provided by the United States . . . ." Compl., ¶ 560. As discussed below, this claim is apparently based on the fact that the President has not issued a report to Congress stating that Israel may be in substantial violation of a bilateral agreement entered into pursuant to the Arms Export Control Act, see 22 U.S.C. § 2753(c)(2), and Secretary Powell's failure to include some unspecified

_____

pleading shall be allowed.").

[3] The Complaint does not make clear which of these claims are asserted against the Federal Defendants in their individual capacities and which are asserted against them in their official capacities. As discussed above, this motion only addresses these claims to the extent that they are asserted against the Federal Defendants in their official capacities.

information about Israel in the State Department's annual human rights report issued pursuant to the Foreign Assistance Act, see 22 U.S.C. § 2304(b).

While not entirely clear, the claim for injunctive relief appears to be based both on the alleged past harms suffered by Plaintiffs and on unspecified "future injury." Compl., ¶ 559. As a remedy, Plaintiffs "seek to enjoin Defendants Bush and Powell and their agents from providing any further military assistance to Israel until such time as defendants Bush and Powell have provided Congress a written report detailing Israel's [alleged] misuse of American military assistance . . . ." Id., ¶ 561; see also id., ¶ 563(d).[4]

## II.    Statutory Background

### A.    The Arms Export Control Act

#### 1.    General Authorizations

The Arms Export Control Act ("AECA"), Pub. L. 90-629 (1968), 82 Stat. 1320, as amended, which is codified principally at Chapter 39 of Title 22 of the United States Code, see 22 U.S.C. §§ 2751 et seq., "authorizes sales [of defense articles or services] by the United States Government to friendly countries . . . ." Id. § 2751. Specifically, the AECA authorizes the President to: (i) sell defense articles and services from US military stocks, id. § 2761, (ii) enter into contracts for the procurement of defense articles or services for sale to any foreign country, id. § 2762, (iii) finance the procurement of defense articles or services by foreign countries, id. § 2763, and (iv) issue guaranties against political and credit risks of nonpayment arising out of

---

[4] Plaintiffs also seek an injunction barring Defendants Boeing/McDonnell Douglas from delivering any weapons to Israel until the President issues the above-referenced reports to Congress. Many of the arguments set forth below with respect to the injunctive claim against the Federal Defendants may similarly apply to this claim as well.

4

certain entities' financing of credit sales of defense articles and services, id. § 2764. With respect

to the financing of defense articles and services under Section 2763 ("Foreign Military

Financing" or "FMF"), the AECA specifically contemplates that funds made available to foreign

countries pursuant to appropriations under that Section may be used to make payments of

principal and interest on such financing. See 22 U.S.C. § 2763(e)(1). As discussed further

below, it is such financing, and the provision of funds to pay for such financing, that constitutes

the primary source of American military aid to Israel. See also Compl., ¶ 219 (discussing FMF

aid to Israel, which is provided pursuant to Section 2763).

      The AECA also governs the private commercial (i.e., non-governmental) export of those

defense articles and services determined by the President to constitute the "United States

Munitions List." 22 U.S.C. § 2778(a)(1). In this regard, the AECA provides that "[i]n

furtherance of world peace and the security and foreign policy of the United States, the President

is authorized to control the import and the export of defense articles and defense services," id., §

2778(a)(1), and provides further that no such articles or services designated by the President

"may be exported . . . without a license for such export . . . issued in accordance with" the AECA

and its implementing regulations. Id. § 2778(b)(2); see id., § 2778(a)(2) (setting forth criteria to

be considered in issuing export licenses).

### 2.    Limitations

      Recognizing the role that arms sales play in the conduct of American foreign affairs, the

AECA expressly provides that "[i]t is the sense of the Congress that all such sales [by the United

States Government] be approved only when they are consistent with the foreign policy interests

of the United States . . . ." Id., § 2751. Recognizing further the President's role in formulating

5

and implementing such foreign policy, the AECA also provides that "[n]o defense article or defense service shall be sold or leased by the United States Government" unless "the President finds" that the furnishing of such article or service "will strengthen the security of the United States and promote world peace." Id. § 2753(a)(1).  Moreover, the recipient of the arms must agree to certain conditions set forth in the Act.  Id. § 2753(a)(2).  It is the violation of such an agreement (rather than a violation of the Act itself) that triggers the reporting requirements discussed below.  See id. § 2753(c)(1)(A) (discussing "substantial violation . . . of any agreement entered into pursuant to any such Act").

The AECA provides further that "[d]efense articles and defense services shall be sold or leased by the United States Government . . . . to friendly countries solely for internal security, for legitimate self-defense," for the purpose of enabling the recipient country to participate in collective security or U.N. requested missions, or for the purpose of the construction of public works.  Id. § 2754; see also id. § 2753(c)(1), (c)(3)(A) (prohibiting issuance of credits or guaranties, or making of sales, to countries using articles and services for purposes not authorized under Section 2754, as determined by the President or the Congress).

The AECA establishes the following framework for implementation of the restrictions set forth in Section 2754.  It provides, in the first instance, that the "President shall report to Congress promptly upon receipt of information that a violation described in [22 U.S.C. § 2753(c)(1) (referencing Section 2754)] may have occurred." Id. § 2753(c)(2).[5]  It is apparently

---

[5] As noted above, such a violation is technically not a violation of the AECA itself, but rather a violation of a bilateral agreement entered into pursuant to the AECA and which incorporates the Act's limitations.  See id. §§ 2753(a)(2) (requiring recipient countries to agree "not to use or permit the use of such [articles or services] for purposes other than those for which furnished unless the consent of the President has first been obtained"), 2753(c)(1)(A).

6

the fact that President has not issued such a report (hereinafter, "AECA report") with respect to Israel that lies at the heart of Plaintiffs' injunctive claim. See, e.g., Compl., ¶ 228.

Determinations of ineligibility for future military assistance or sales, however, are not automatically triggered by such an AECA report. Rather, the AECA expressly provides, in a subsequent sub-section, that "[a] country shall be deemed ineligible [to receive credits, guaranties, or cash sales of defense articles] if the President so determines and so reports in writing to the Congress, or if the Congress so determines by joint resolution." 22 U.S.C. § 2753(c)(3)(A). Moreover, even such a determination of ineligibility is subject to exceptions, as the AECA expressly provides that "[n]otwithstanding a determination by the President of ineligibility," cash sales may still be made to such country "if the President certifies in writing to the Congress that a termination thereof would have significant adverse impact on United States security." Id. § 2753(c)(3)(B). According to the statutory scheme, such a determination of ineligibility may also, in turn, be overcome by a joint resolution of Congress. Id. Finally in this regard, a finding of ineligibility continues until such time as "the President determines that the violation has ceased." Id. § 2753(c)(4). On the whole, therefore, the AECA recognizes that ineligibility determinations are the province of the President and Congress.

**B.    The Foreign Assistance Act**

**1.    Authorized Assistance**

The Foreign Assistance Act of 1961 ("FAA"), Pub. L. 87-195, 75 Stat. 424, as amended, which is codified principally at Chapter 32 of Title 22 of the United States Code, see 22 U.S.C. §§ 2151 et seq., authorizes a variety of international assistance programs, referred to generally as "American Aid," id. § 2401, including non-military as well as military assistance. See generally

7

id. §§ 2301 - 2349bb-4.[6]  Of particular relevance here, the FAA authorizes non-military, economic support to non-developing countries.  Such economic support, denominated "Economic Support Funds" ("ESF"), is authorized by Section 531 of the FAA, which "recognizes that . . . the national interests of the United States may require [such] economic support," and which authorizes "the President . . . to furnish assistance to countries . . . on such terms and conditions as he may determine . . . ."  22 U.S.C. § 2346(a).  ESF funds are generally made "available for economic programs only and may not be used for military or paramilitary purposes," id., § 2346(e), and, as discussed below, are the other major source of aid to Israel other than the FMF funds described above.  See Compl., ¶ 219.  The FAA also authorizes the President to furnish, "on such terms and conditions as the President may determine, assistance to foreign countries in order to enhance the ability of their law enforcement personnel to deter terrorists and terrorist groups."  Id., § 2349aa.  See generally id. §§ 2349aa - 2349aa-10.[7]

### 2.    Limitations

Like the AECA, the FAA places certain limitations on the provision of aid authorized by the Act.  Specifically, the provision of "security assistance" – defined to include Economic Support Funds under the FAA and the sale and export of defense articles and services under the AECA, id. § 2304(d)(2) – is prohibited in the case of "any country the government of which

---

[6] The FAA also authorizes a wide variety of development assistance to developing countries.  See id. §§ 2151-2296f (subchapter I of Chapter 32).

[7] The FAA also authorizes the President to "furnish military assistance, on such terms and conditions as he may determine, to any friendly country . . ., the assisting of which the President finds will strengthen the security of the United States and promote world peace."  Id. § 2311(a). As discussed below, military assistance to Israel is provided primarily under the AECA, and FAA assistance to Israel consists primarily of the ESF funds described in the text.

engages in a consistent pattern of gross violations of internationally recognized human rights." Id. § 2304(a)(2).[8]  The Act does not, however, contain any specific mechanism by which the President is to inform Congress or otherwise make a specific formal determination regarding whether a recipient country falls within the purview of Section 2304(a)(2).

In a separate subsection, the FAA also requires the Secretary of State to submit an annual report to Congress regarding the human rights practices of countries receiving security assistance each year (hereinafter, "FAA human rights report").  Id. § 2304(b).[9]  The Act does not provide for the report to address specifically countries that are considered to be engaged in a consistent pattern of gross violations of internationally recognized human rights.  It is apparently the failure to include information to Plaintiffs' liking in this report that – along with the absence of an AECA report with respect to Israel – forms the basis of Plaintiffs' injunctive claim.  See Compl., ¶¶ 232-33.[10]

---

[8] Plaintiffs cite a parallel limitation in the Act regarding the provision of development assistance.  See Compl., ¶ 229 (citing 22 U.S.C. § 2151n(a)).  By its terms, however, Section 2151n(a) applies solely to such development assistance, 22 U.S.C. § 2151n(a) (limitation applicable to assistance provided under subchapter I of Chapter 32), and is therefore irrelevant to the assistance provided to Israel and at issue in this lawsuit.

[9] A copy of the State Department's 2001 human rights report with respect to Israel and the occupied territories is available online at <http://www.state.gov/g/drl/rls/hrrpt/2001/nea/8262.htm>.  The report is issued pursuant to both Section 2304(b) and Section 2151n(d), (f).

[10] The FAA also contains other limitations not applicable here.  Thus, with respect to defense articles and services provided pursuant to the FAA (as defined at 22 U.S.C. § 2403(d), (f), but *not* including Economic Support Funds), the FAA (like the AECA) requires that such material "shall be furnished solely for internal security (including for antiterrorism and nonproliferation purposes), for legitimate self-defense," and for the collective purposes discussed above, id. § 2302, and provides that such assistance is to be terminated if a country uses defense articles or services provided under the Act for a purpose not authorized by Section 2302.  Id., § 2314(d)(1).  Like the AECA, the FAA provides that the "President shall report to the Congress promptly upon the receipt of information" that a violation of a bilateral agreement under the FAA

9

### III.    American Aid to Israel

American aid to Israel takes primarily two forms – Foreign Military Financing ("FMF")

and Economic Support Funding.[11]  FMF – which is authorized by, and appropriated pursuant to,

Section 23 of the AECA, as amended, 22 U.S.C. § 2763 – allows for the financing of foreign

countries' procurement of defense articles and services, and authorizes appropriations under the

Act to be used by foreign countries to make payments on such financing.  Id.  Essentially, the

FMF program provides grants for the acquisition of U.S. defense equipment, services, and

training.  In the fiscal year just ending (FY 2002), the United States provided approximately

$2.04 billion in FMF support to Israel.  See Department of State, Congressional Budget

Justification: Foreign Operations, Fiscal Year 2003 ("2003 CBJ") at 144, 352, 512.[12]  For the

2003 Fiscal Year, the President requested Congress to appropriate $2.1 billion in FMF support

for Israel, id. at 144, 352, 520,[13] and Congress has recently authorized appropriations in this

---

"may have occurred."  Id., § 2314(d)(2)(B).  As with the AECA, however, such a report does not
result in the cessation of aid.  Rather, military assistance is terminated only if the President
determines that such a violation has occurred "and so states in writing to Congress, or if the
Congress so finds by joint resolution."  Id., § 2314(d)(2)(A).  As discussed below, aid to Israel
under the FAA is provided primarily in the form of Economic Support Funds that are not subject
to Section 2314's limitation.  The report described in Section 2314(d)(2)(B) is therefore
irrelevant to this lawsuit.  In any event, the same reasoning that requires dismissal of Plaintiffs'
injunctive claim to the extent that it is based on the parallel AECA report, 22 U.S.C. §
2753(c)(2), would require dismissal of any claim based on Section 2314(d)(2)(B).

[11] In addition to such aid, American arms manufacturers may also engage in private
contract sales to Israel, subject to the export licensing restrictions described above.

[12] The 2003 CBJ can be found online at <http://www.state.gov/m/rm/rls/cbj/2003/>.

[13] The 2003 CBJ provides information by program (for general information about the
FMF program, see pages 141-145), as well as by country (for information about Israel, see page
352).  Additionally, the 2003 CBJ contains "spigot" reports that break down the various forms of
American Aid to every country.  See id. at 504 (FY 2001 spigot), 512 (FY 2002 spigot), 520 (FY

amount.  Foreign Relations Authorization Act, Fiscal Year 2003 ("FRAA"), Pub. L. No. 107-

228, 116 Stat. 1350, Sec. 1221(a).  See also Compl., ¶ 219 (discussing FMF aid).

ESF funds – which, as discussed above, are authorized by, and appropriated pursuant to,

Section 531 of the FAA, 22 U.S.C. § 2346(a) – are intended to foster economic stability and

development and can be used, inter alia, to purchase goods and services from the United States,

service debt owed to the United States, and fund other activities to support Israel's economic

needs.  See generally 2003 CBJ at 37-38, 352.  In the past Fiscal Year, the United States provided

approximately $720 million in ESF support to Israel.  Id. at 40, 352, 512.  In the upcoming Fiscal

Year the President has requested, id. at 40, 352, 520, and Congress has authorized appropriations

of, FRAA, § 1221(a), $600 million in ESF funds.  See also Compl., ¶ 219 (discussing ESF aid).

In addition, the United States occasionally provides additional support to Israel.  For

example, approximately $28 million was appropriated last year for anti-terrorism assistance, see

2003 CBJ at 101, 352; an additional $200 million in appropriations for antiterrorism assistance

was recently authorized for the coming year, FRAA § 1221(a); and approximately $60 million

annually was appropriated in FY 2002 and authorized for appropriation in FY 2003 to assist in

the absorption and resettlement of migrants.  2003 CBJ at 95; FRAA § 115(b).  Additional

assistance may be made available through other non-country specific programs.  Finally, Israel,

like other countries, remains eligible to receive excess defense articles under Section 516 of the

FAA, 22 U.S.C. § 2321j.

## ARGUMENT

As the above discussion readily demonstrates, Congress has established a system of

---

2003 spigot).

foreign aid that envisions an interplay between the Executive and Legislative branches of our Government. The statutory scheme involves the Congressional appropriation of funds for foreign assistance purposes and requires the Executive to report to Congress in certain circumstances regarding such aid programs. The scheme thus reflects the Constitutional grant of foreign affairs authority to the political branches of Government. Congress, as a co-equal branch, has adequate remedies at its disposal to ensure Executive compliance with the law's reporting requirements. There is simply no indication that Congress envisioned or intended that individuals or the Courts would play a role in this foreign affairs program, and such a role is in fact precluded for the reasons discussed below.

Plaintiffs' RICO and common law tort claims against the Federal Defendants must be dismissed because Plaintiffs have failed to identify an applicable waiver of sovereign immunity. Plaintiffs' injunctive claim against the Federal Defendants – which seeks an injunction against future military assistance to Israel – also should be dismissed, for several independent reasons. First, neither the AECA nor the FAA provides for a private cause of action and Plaintiffs cannot assert their claim under the Administrative Procedure Act. Second, Plaintiffs lack standing to assert their injunctive claim, as they cannot meet the "irreducible constitutional minimum" necessary to establish standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Third, Plaintiffs' claim involves political questions not suitable for judicial resolution. Lastly, injunctive relief is not available against the President of the United States and the claim against the President should be dismissed for this separate reason as well.

Indeed, Plaintiffs' injunctive claim against the Federal Defendants is so patently frivolous that other courts have summarily dismissed similar cases. See Mahorner v. Bush, __ F. Supp. 2d

12

at __, No. 02-1530 (RBW), 2002 WL 31084938 (D.D.C. Sept. 16, 2002); O'Donnell v. Powell, No. 1:02 CV 143 (W.D.N.C. July 2, 2002), slip op. attached hereto as Exh. A, aff'd, 2002 WL 2012675 (4ᵗʰ Cir. 2002).

**I.     Plaintiffs' RICO and Common Law Tort Claims Must Be Dismissed.**

Plaintiffs purport to assert claims against the Federal Defendants for violations of RICO and three common law torts: intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence per se. All such claims seek only money damages as relief, and are presumably asserted against the Federal Defendants in their individual capacities. See McCarthy v. Kleindienst, 562 F.2d 1269, 1269 n.* (D.C. Cir. 1977) ("nature of the action, as one for damages in tort, apparently contemplates a judgment against the defendant(s) as individuals"); see generally Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (discussing characteristics that may distinguish individual and official capacity claims). As such, they are beyond the scope of the instant motion.

To the extent that these claims are asserted against the Federal Defendants in their official capacities, they must be dismissed. Actions against government employees acting in their official capacities are treated as actions against the United States. Kentucky, 473 U.S. at 166 ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Accordingly, any such claims are cognizable only to the extent that the United States has waived its sovereign immunity. Cox v. Secretary of Labor, 739 F. Supp. 28, 29 (D.D.C. 1990) (citing cases).

While the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80, (which Plaintiffs do not mention in their Complaint) contains such a waiver for certain common law tort

13

claims against the United States, the FTCA requires Plaintiffs to exhaust administrative remedies

prior to bringing such claims in federal court. 28 U.S.C. § 2675(a). Plaintiffs' failure to do so

requires the dismissal of any official-capacity common law tort claims they purport to assert.

McNeil v. United States, 508 U.S. 106, 113 (1993) ("The FTCA bars claimants from bringing

suit in federal court until they have exhausted their administrative remedies"). See Vanover v.

Hantman, 77 F. Supp. 2d 91, 99 (D.D.C. 1999) (official capacity tort claims dismissed where

FTCA inapplicable), aff'd, 2002 WL 1359630 (D.C. Cir. 2002); Knowlton v. United States, 111

F. Supp. 1, 6-7 (D.D.C. 1999) (dismissing official capacity tort claims for failure to exhaust

administrative remedies under FTCA), aff'd sub nom. Knowlton v. Alouri, 2000 WL 1093323

(D.C. Cir. 2000), cert. denied sub nom. Knowlton v. Bransford, 531 U.S. 1076 (2001); Spradley

v. Spaniol, 684 F. Supp. 10, 12 (D.D.C. 1988) (same).[14]

   Moreover, Plaintiffs have not identified – and the Federal Defendants are unaware of –

any waiver of sovereign immunity even potentially applicable to the RICO claim. The FTCA is

inapplicable to such a claim, as the FTCA is limited to claims based on state law. 28 U.S.C. §

1346(b); see Federal Deposit Insurance Corporation v. Meyer, 510 U.S. 471, 477-78 (1994);

Tarpeh-Doe v. United States, 28 F.3d 120, 123 (D.C. Cir. 1994); see also Starling v. United

States, 1994 WL 706072, at *1 (D.D.C. 1994) ("no jurisdictional basis for private damage

actions against the United States under RICO"); Donahue v. FBI, 204 F. Supp. 2d 169, 175 n. 5

---

[14] Notwithstanding their lengthy Complaint, Plaintiffs have failed to allege that they have exhausted their administrative remedies. Such failure alone is fatal to their claims. See Altman v. Connally, 456 F.2d 1114, 1116 (2d Cir. 1972) (failure "to allege the presentation of the claim to the appropriate federal agency and a final disposition of the claim by that agency" renders FTCA inapplicable); Bruce v. United States, 621 F.2d 914, 918 (8th Cir. 1980) (jurisdiction cannot be predicated on 28 U.S.C. § 1346(b) where plaintiff "failed to allege compliance with the administrative claim procedure set forth in 28 U.S.C. § 2675").

(D. Mass. 2002) ("the FTCA provides a cause of action only for claims based on state law. Therefore a RICO claim is not cognizable under the FTCA.") (internal citations omitted); Sanders v. U.S. Government, 2000 WL 1060773, at *5 (D. Or. 2000). Absent an applicable waiver of sovereign immunity, Plaintiffs' official capacity RICO claim also must be dismissed.

## II.    Plaintiffs Fail to State a Claim for Injunctive Relief.[15]

### A.    Neither the AECA nor the FAA Provides for a Private Cause of Action.

Plaintiffs' injunctive claim must be dismissed because neither the AECA nor the FAA provides for a private cause of action to enforce its terms. The Supreme Court has recently reaffirmed that:

> private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one . . . .

Alexander v. Sandoval, 532 U.S. 275, 286-87 (2001) (citations omitted). The starting point for such an analysis is the "text and structure" of the statute at issue. Id. at 288; see also Touche Ross & Co. v. Redington, 442 U.S. 560, 568 (1979).

Like the statutory language at issue in Touche Ross, by their terms neither the AECA nor the FAA "purport to create a private cause of action in favor of anyone." Id. at 569. Rather, the Acts sets forth a procedure by which the President or the Secretary is to inform Congress of certain information, and establish a mechanism by which Congress and the President – not private citizens – can determine whether a country is ineligible for further military assistance. The Acts say nothing with respect to any right to sue to enforce their provisions and this silence

---

[15] The remainder of this Memorandum discusses Plaintiffs' claim for injunctive relief.

is determinative.

Indeed, even if the Acts' reporting requirements were somehow construed as bestowing rights upon interested parties such that a failure to comply with those reporting requirements impaired those rights (a point the Government does not concede), such a construction would not automatically give rise to a private right of action. The Supreme Court has emphasized that "'the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person.'" Touche Rosse, 442 U.S. at 568, quoting Cannon v. University of Chicago, 441 U.S. 677, 688 (1979). Congress still must express an intent in the statutory scheme to provide for a private cause of action. See Alexander, 532 U.S. at 290 (even "statutes that admittedly create substantive private rights" do not provide private cause of action absent Congressional intent). With respect to this case, the statutes at issue do not create substantive private rights, let alone a private cause of action.

In addition to the lack of any textual basis whatsoever for finding a right to sue, the structure of both the AECA and the FAA provide support for the conclusion that there is no private cause of action to enforce the reporting requirements at issue here. The Acts' structure makes it clear that, as is expected, it is for the political branches of government (Congress and the President), and not for private citizens or the courts, to decide which countries are entitled to receive American military assistance. Thus, each of the Acts expressly provides a basis for an Executive branch decision that a particular country is ineligible to receive further American aid. The AECA also provides for a specific process by which the Legislative and Executive branches can "override" the determination of the other in this regard. 22 U.S.C. § 2753(c)(3), (4). Thus, for example, the AECA vests authority with respect to such a determination of ineligibility with

16

either the President or Congress, id., § 2753(c)(3)(A); allows the President to continue providing

assistance notwithstanding his determination of ineligibility if he determines that "termination

[of aid] would have significant adverse impact on United States security," id., § 2753(c)(3)(B);

grants Congress the authority to override such a determination of significant adverse impact, id.;

and provides that any determination of ineligibility shall continue until "(A) the President

determines that the violation has ceased; and (B) the country concerned has given assurances

satisfactory to the President that such violation will not recur." Id., § 2753(c)(4).

     The conclusion that the AECA and FAA do not provide for private causes of action to

enforce their terms is also consistent with the Constitutional grant of foreign affairs authority to

the President and appropriations powers to the Congress, as well as common sense. Any other

conclusion would, as discussed further below, invite the courts to make the type of political

decisions they are not institutionally competent to make. See infra Part IV.

     The Federal Defendants are aware of only one reported decision that addresses whether a

private cause of action exists under the AECA or FAA. See Clark v. United States, 609 F. Supp.

1249 (D. Md. 1985). There, the court found that no private cause of action exists, stating:

> The Foreign Assistance Act, however, specifically Section 2304 [containing the
> limitation on assistance to nations with a record of human rights abuses] does not
> create standing for any taxpayer *or any private party* to sue for its enforcement. It
> is a section clearly enacted to effect the relationship between the Congress and the
> President over disbursing foreign aid funds in light of an official policy of concern
> for human rights. The only parties with standing to seek adjudication under
> Section 2304 are the executive and legislative branches. One need only read the
> plain language of the section to reach this conclusion.

Id at 1251. The same reasoning applies to the AECA as well. Cf. AT&T v. United States, __

F.3d __, 2002 WL 31246051, at *2-3 (Fed. Cir. 2002) (reporting requirement under Defense

Department appropriations bill "envisions enforcement, if any, though legislative procedures" and "does not create a cause of action inviting private parties to enforce the provision in courts").

Because both the text and structure of the Acts make it clear that Congress did not intend to create a private cause of action to enforce the reporting requirements at issue here, Plaintiffs fail to state a claim.

**B.     The APA Does Not Provide Plaintiffs With a Cause Of Action.**

Moreover, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. – upon which Plaintiffs do not rely in their Complaint – does not provide Plaintiffs with a cause of action. While the Supreme Court has recognized that, in appropriate circumstances, the APA can provide the basis for a cause of action, see Japan Whaling Association v. American Cetacean Society, 478 U.S. 221, 230 n.4 (1986) (where applicable, APA provides private right of action), the APA is inapplicable in this case because: (i) the President is not subject to the APA, (ii) the failure to issue the AECA report or to include additional factual information in the FAA human rights report does not constitute the requisite "final agency action" necessary for the APA to apply, and (iii) Plaintiffs are not aggrieved persons under the Act. Id.; 5 U.S.C. §§ 702, 704.[16]

**1.     The President is Not Subject to the APA.**

As an initial matter, the Supreme Court has expressly held that the APA does not apply to the President. Franklin v. Massachusetts, 505 U.S. 788, 800-01 (1992); Dalton v. Spencer, 511 U.S. 462, 470 (1994) ("actions of the President . . . are not reviewable under the APA"); see also

---

[16] In addition to failing to state a claim for relief, Plaintiffs have also failed to identify any applicable waiver of sovereign immunity necessary for the injunctive claim to proceed. U.S. v. Mitchell, 445 U.S. 535, 538 (1980). While the APA would provide such a waiver, it is inapplicable for the reasons discussed below.

18

Armstrong v. Bush, 924 F.2d 282, 288-89 (D.C. Cir. 1991). Plaintiffs' claim against President Bush must therefore be dismissed as this Court lacks jurisdiction to hear it.[17] The claim against Secretary Powell must also be dismissed for the reasons discussed below.

### 2.    The Reports at Issue Do Not Constitute Final Agency Action.

The actions (or failures to act) challenged here are also not susceptible to review under the APA because "the prerequisite to review under the APA – 'final agency action' – is lacking." Dalton, 511 U.S. at 469; see 5 U.S.C. § 704 (only final agency action reviewable).

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

Bennet v. Spear, 520 U.S. 154, 177-78 (internal citations omitted).

Assuming (though not conceding) that the first of these conditions is met in the instant case, it is clear that the second is not. The reports to Congress about which Plaintiffs complain determine no "rights or obligations" and have no "legal consequences." As discussed above, the AECA requires, with respect to military assistance provided thereunder, that the President report to Congress in the event that he believes that a substantial violation of a bilateral agreement under the Act may have occurred. 22 U.S.C. §§ 2753(c)(2). The FAA requires an annual report by the Secretary of State regarding the human rights practices of countries receiving security assistance (including ESF aid under the FAA and sales and exports of defense articles and services under the AECA) each year, id. § 2304(b); the statute does not provide for the report to address specifically countries that are considered to be engaged in a consistent pattern of gross

---

[17] See also infra Part V.

19

violations of internationally recognized human rights. It is the absence of such an AECA report

regarding Israel, and the absence of some unspecified information in the FAA human rights

report with respect to Israel, that forms the basis of Plaintiffs' claim. Compl., ¶¶ 226, 228, 232-

33, 560. These reports, however, do not trigger any automatic cessation of aid. Rather, the

AECA specifically envisions a separate determination – by either the President or Congress –

before a particular country is in fact deemed ineligible for additional assistance, while the FAA

contemplates that the assistance ban would be based on a decision separate from the human

rights report.

     The Supreme Court has repeatedly held that the issuance of similar reports – which in

their own right trigger no specific actions or consequences – do not constitute "final agency

action" under the APA. Thus, in Dalton, the Court addressed whether the Defense Base Closure

and Realignment Commission's report recommending the closure of certain military bases

constituted "final agency action." The Court held that it did not because the report "'carri[ied] no

direct consequences' for base closings," 511 U.S. at 469, quoting Franklin, 505 U.S. at 798, as

the President retained the authority to either accept or reject the report (and Congress, in turn,

retained the authority to accept or reject the President's decision). See Dalton, 511 U.S. at 465,

467 (describing "joint decisionmaking among the Secretary, Commission, President and

Congress"). Similarly, in Franklin, the Court held that the Secretary of Commerce's report to the

President tabulating the decennial census did not constitute "final agency action" because the

report itself "carries no direct consequences for the reapportionment," as it was the President's

subsequent transmittal of a statement to Congress that established the reapportionment. 505 U.S.

at 798;[18] see also id. at 798-99 (distinguishing Japan Whaling, 478 U.S. 221, because certification at issue there automatically triggered sanctions).

The reports about which Plaintiffs complain "carry no direct consequences" for the continued provision of military assistance to Israel. "No matter what [they] say[] or how much [they] say[], the report[s] [are] simply . . . document[s] submitted to Congress that Congress has no obligation to consider, let alone act upon." Guerrero v. Clinton, 157 F.3d 1190, 1194 (9th Cir. 1998). It is only a specific determination of ineligibility by the President or Congress under the AECA, or a separate decision under the FAA that a country falls within the purview of Section 2304(a)(2), that carries such direct consequences, and neither of those acts would be reviewable under the APA in any event. See 5 U.S.C. § 701(b)(1)(A) (definition of "agency" does not include Congress). Thus, there is no "final agency action" and the APA is inapplicable.[19]

---

[18] In both cases, the Court also held that the President's actions – which did carry consequences – were not subject to review under the APA. Dalton, 511 U.S. at 470; Franklin, 505 U.S. at 800-01.

[19] Plaintiffs have not phrased their claim as challenging the actual disbursement of funds to Israel (as opposed to the alleged failure to issue the reports to Congress under the Acts). See, e.g., Committee of United States Citizens Living in Nicaragua v. Reagan ("Committee of U.S. Citizens"), 859 F.2d 929, 942 (D.C. Cir. 1988) ("presumably, the agency action that appellants challenge is the disbursement of funds to the Contras"). Any such claim would necessarily fail. Any claim targeted at Congressional appropriations would not be subject to the APA. 5 U.S.C. § 701(b)(1)(A). And any claim targeted at the State Department's actual disbursement of funds pursuant to such appropriations would fail on the merits, as such disbursement is not only "in accordance with the law," 5 U.S.C. § 706; Committee of U.S. Citizens, 859 F.2d at 942, but in fact required by the law specifically appropriating funds to Israel (even if such funding would otherwise violate the provisions of the AECA or the FAA – a point not conceded here). See id. at 936 (discussing doctrine of *lex posterior derogat priori*, which holds that more recent law prevails over inconsistent earlier law).

21

3.    **Plaintiffs Are Not Aggrieved Persons Under the APA.**

In addition to identifying some "final agency action" for which review is sought, a "party seeking review under [the APA] must show that he either [(1)] has 'suffer[ed] legal wrong' because of the challenged agency action, or [(2)] is 'adversely affected or aggrieved' by that action 'within the meaning of a relevant statute.'" Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990), quoting 5 U.S.C. § 702. These requirements are more demanding than the constitutionally-based requirement that plaintiffs demonstrate injury-in-fact in order to establish standing. Clarke v. Securities Industry Assn., 479 U.S. 388, 395 (1987) (Section 702 "not intended to allow suit by every person suffering injury in fact"); Research Consulting Assocs. v. Electric Power Research Institute, Inc. 626 F. Supp. 1310, 1313 n.2 (D. Mass. 1986).

With respect to the first prong of the APA requirement, "[a] legal wrong is defined as 'the invasion of a legally protected right.'" Farmer v. Hawk, No. 94-CV-2274 (GK), 1996 WL 525321, at *4 (D.D.C. Sept. 5, 1996), quoting Pennsylvania R. Co. v. Dillon, 335 F.2d 292, 294 (D.C. Cir.1964). Clearly, Plaintiffs have no "legally protected right" in having the President report to Congress that a substantial violation of a bilateral agreement under the AECA may have occurred or in having the Secretary of State include any specific factual information in a FAA human rights report. Because Plaintiffs cannot seriously contend that they have suffered any "legal wrong" as a consequence of the Federal Defendants' failure to issue the AECA report or include additional factual information in the FAA human rights report, they must meet the second prong of Section 702's requirement – that is, they must be adversely affected or aggrieved within the meaning of a statute.

[T]o be "adversely affected or aggrieved . . . within the meaning" of a

statute, the plaintiff must establish that the injury he complains of (*his aggrievement*, or the adverse effect *upon him*) falls within the "zone of interests" sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.

Lujan, 497 U.S. at 883.

"The relevant statute, of course, is the statute whose violation is the gravamen of the complaint," in this case the AECA and the FAA. Lujan, 497 U.S. at 886. Moreover, the "essential inquiry" in undertaking the "zone of interest" test "is whether Congress intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law." Clarke, 479 U.S. at 399 (internal quotations omitted). That is, "[t]he 'zone of interest' test is a guide for deciding whether . . . a particular plaintiff should be heard to complain of a particular agency decision." Id.

Applying the above principles to the allegations set forth in the Complaint, it is abundantly clear that Plaintiffs' alleged injuries do not fall within the zone of interest sought to be protected by the AECA and FAA's reporting requirements. The interests those requirements seek to protect are the legislative prerogatives of Congress. The Acts require the President and the Secretary of State to furnish the reports at issue so that Congress can make whatever determinations it deems appropriate – either pursuant to the specific provisions of the AECA and the FAA or pursuant to its power of the purse. The reports are not intended for the benefit of individuals – even those individuals allegedly harmed by American arms used by American allies. Rather, the reporting requirements – directed as they are to *Congress* – are clearly intended to ensure that Congress has the information it deems relevant to the exercise of its constitutional duty.

23

As the D.C. Circuit has made clear, such reporting requirements – imposed by Congress

upon the Executive Branch for Congress' benefit – are "not susceptible of judicial review."

Natural Resources Defense Council v. Hodel ("Hodel"), 865 F.2d 288, 317 (D.C. Cir. 1988).

Although Hodel did not explicitly rely on the APA's "aggrieved person" requirement in reaching

this conclusion, its reasoning is applicable here and bears quoting at some length.  After noting

the ubiquity of Congressional reporting requirements in federal law, id. at 317 & n.30, the Hodel

court held that:

> Executive responses to congressional reporting requirements of the kind presented
> here represent . . . an entirely different sort of agency action. . . .  Lacking a
> provision for judicial review, the measure before us embodies a requirement that
> by its nature seems singularly committed to *congressional* discretion in measuring
> the fidelity of the Executive Branch actor to legislatively mandated requirements.
> . . . If the Secretary's response has indeed been deemed inadequate . . . by its
> recipient, then it is most logically for the recipient of the report to make that
> judgment and take what it deems to be the appropriate action.  It scarcely bears
> more than passing mention that the most representative branch is not powerless to
> vindicate its interests or ensure Executive fidelity to Legislative directives. . . .
> Generally, congressional reporting requirements are, and heretofore have been, a
> management tool employed by Congress for its own purposes.  We decline to take
> the remarkable step, rife with the danger of flooding an already over-burdened
> judicial system with failure-to-report cases, of reviewing petitioners' . . . claim
> when Congress has not provided for judicial scrutiny of this aspect of the
> interbranch relationship.  Under these circumstances, the presumption of
> reviewability of agency action is woefully inapposite.

Id. at 318-19; see also Guerrero, 157 F.3d at 1196 (no judicial review of report submitted to

Congress by the Executive branch); Taylor Bay Protective Ass'n v. EPA, 884 F.2d 1073, 1080-

81 (8th Cir. 1989); NRDC v. Lujan, 768 F. Supp. 870, 881-83 (D.D.C. 1991).  For these same

reasons, Plaintiffs' claim should be dismissed.[20]

---

[20] Indeed, Congressional action has wholeheartedly supported the President's course of
conduct, as is evidenced both by ongoing authorizations of appropriations of aid specifically
targeted to Israel and Congressional resolutions expressing support for, and solidarity with, the

**III.    Plaintiffs Lack Standing to Assert Their Claim for Injunctive Relief.**

Plaintiffs also lack standing, as a constitutional matter, to assert their injunctive claim against the Federal Defendants. It is black-letter law that "standing is an essential and unchanging part of the case-or-controversy requirement of Article III," and therefore goes to the Court's very jurisdiction to hear the case. Lujan, 504 U.S. at 560. "[T]he irreducible constitutional minimum of standing contains three elements." Id.

> First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Id. at 560-61 (internal citations omitted).

"This triad . . . constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." Steel Company v. Citizens for a Better Environment, 523 U.S. 83, 103-104 (1998); see also New World Radio v. FCC, 294 F.3d 164, 170 (D.C. Cir. 2002) ("[t]he burden is on the party seeking judicial review 'clearly to allege facts demonstrating that he is a proper party to invoke judicial

---

State of Israel. See FRAA, §§ 115, 214, 215, 601-04, 1221; H. Res. 392 ("Expressing Solidarity with Israel in its Fight Against Terrorism"), 148 Cong. Rec. H2078-02, 2002 WL 833095 (May 2, 2002); S. Amend. 3389 to H.R. 3009, 148 Cong. Rec. S3795-02, at S3807, 2002 WL 833142 (May 2, 2002) (same); see also <http://www.cbsnews.com/stories/2002/05/02/politics/main 507899.shtml> (discussing resolutions); cf. Haig v. Agee, 453 U.S. 280, 300-01 (1981) (discussing Congressional acquiescence in Presidential conduct of foreign affairs); Committee of U.S. Citizens, 859 F.2d at 951 ("the political branches face difficult foreign policy choices, and when they make those choices–particularly, when both branches act together–they are entitled to great deference").

resolution of the dispute and the exercise of the court's powers.'") (internal citations omitted).

"[A] deficiency on any one of the three prongs suffices to defeat standing." <u>US Ecology, Inc. v.</u> <u>U.S. Dep't of the Interior</u>, 231 F.3d 20, 24 (D.C. Cir. 2000). Here, Plaintiffs fail on all three prongs.

### A.    Injury in Fact

Plaintiffs have failed to allege facts sufficient to demonstrate the type of injury in fact necessary for the injunctive relief they seek. While Plaintiffs have alleged *past* harms in their voluminous Complaint, such harms alone are insufficient to confer standing for claims seeking prospective injunctive relief. "'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . .'" <u>National Resources Defense Council v.</u> <u>Pena</u> ("<u>NRDC</u>"), 147 F.3d 1012, 1022 (D.C. Cir. 1998), <u>quoting</u> <u>O'Shea v. Littleton</u>, 414 U.S. 488, 495-96 (1974); <u>see also</u> <u>NRDC</u>, 147 F. 3d at 1022 (citing cases). Rather, "'[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate – as opposed to merely conjectural or hypothetical – threat of *future* injury.'" <u>Id.</u> (emphasis added), <u>quoting</u> <u>Church v. City of</u> <u>Huntsville</u>, 30 F.3d 1332, 1337 (11th Cir. 1994).

This Plaintiffs have failed to do, as the Complaint utterly fails to allege any facts sufficient to infer any imminent *future* harm to Plaintiffs (let alone harm caused by the failure to issue the reports they seek). Indeed, Plaintiffs simply refer to some unspecified "future injury to their persons and property." Compl., ¶ 559. Such an assertion is too vague and attenuated to meet the constitutional standing requirement with respect to a claim for injunctive relief.

As the D.C. Circuit has made clear, with respect to claims of future injury:

> the injury alleged cannot be "'*conjectural' or 'hypothetical*,'" City of Los Angeles
> v. Lyons, 461 U.S. 95, 102 (1983), "*remote*," Warth v. Seldin, 422 U.S. 490, 507
> (1975), "*speculative*," Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26,
> 42-46 (1976), or "*abstract*," O'Shea v. Littleton, 414 U.S. 488, 494 (1974).

National Treasury Employees Union v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1996)

(emphasis added) (internal parallel citations omitted).  Rather, Plaintiffs must establish that the

injury is:

> "*certainly* impending," Lujan, 504 U.S. at 564 n.2 (emphasis in original).  It is not
> enough for the [Plaintiff] to assert that [he] might suffer an injury in the future, or
> even that [he] is likely to suffer an injury at some unknown future time.  Such
> "someday" injuries are insufficient. Cf. id. at 564.

J. Roderick MacArthur Found. v. FBI, 102 F.3d 600, 606 (D.C. Cir. 1996); see also Whitmore v.

Arkansas, 495 U.S. 149, 158 (1990) ("Allegations of possible future injury do not satisfy the

requirements of Art. III.  A threatened injury must be "'certainly impending'" to constitute injury

in fact.") (citing cases); Lyons, 461 U.S. at 101-02 ("Abstract injury is not enough. The plaintiff

must show that he . . . 'is immediately in danger of sustaining some direct injury' . . . and the . . .

threat of injury must be both 'real and immediate'"), 105-07 (past use of choke-hold by police

officer insufficient to establish standing for injunctive relief in light of speculative nature of

claim regarding future use of choke-hold against plaintiff).  Because Plaintiffs have failed to

allege facts demonstrating any "certainly impending" injury, they fail to meet the injury in fact

prong of the standing requirements and their injunctive claim must be dismissed.

**B.     Causation**

Plaintiffs also lack standing to assert their injunctive claim because the conduct they

complain of – the Federal Defendants' failure to issue the AECA report or to include additional

factual information in the FAA human rights report – is not the cause of any Plaintiffs'

27

injuries.  Those harms – as described in the Complaint – were allegedly caused by the actions of

the Israeli Defendants, who are independent third parties.  There is simply no causal link between

the reports about which Plaintiffs complain and the injuries they claim to have suffered.

As the Supreme Court has recognized, such "indirectness of injury, while not necessarily

fatal to standing, 'may make it substantially more difficult to meet the minimum requirement of

Art. III: [I.e.,] [t]o establish that, in fact, the asserted injury was the consequence of the

defendants' actions, or that prospective relief will remove the harm.'"  Simon v. Eastern

Kentucky Welfare Rights Org., 426 U.S. 26, 44-45 (1976), quoting Warth v. Seldin, 422 U.S.

490, 505 (1975).  As the Court has elsewhere explained:

> When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful
> regulation (or lack of regulation) of *someone else*, much more is needed.  In that
> circumstance, causation and redressability ordinarily hinge on the response of the
> regulated (or regulable) third party to the government action or inaction – and perhaps on
> the response of others as well.  The existence of one or more of the essential elements of
> standing depends on the unfettered choices made by independent actors not before the
> courts and whose exercise of broad and legitimate discretion the courts cannot presume to
> control or to predict . . . .

Lujan, 504 U.S. at 562 (emphasis in original).  It is just such "unfettered choices made by

independent actors" that are at issue here and that undermine any claim of causation.

Presumably, Plaintiffs seek to connect the reports called for by the Acts to the provision

of military aid to Israel, and to further connect such aid to the harms they allege.  Neither of these

leaps of logic, however, withstands scrutiny as a constitutional matter.  As discussed above, the

mere issuance of an AECA report does not, without more, lead to the cessation of military aid.

Nor does the FAA human rights report by itself lead to such a result.  Rather, the AECA

envisions a political process by which the President or Congress could determine that a particular

recipient country is no longer eligible to receive military assistance under that Act, and the FAA

contemplates a decision concerning a country's falling within the purview of Section 2304(a)(2)

that is separate from the issuance of the State Department's annual human rights report. While

the reports about which Plaintiffs complain might be taken into account in any making these

separate decisions, they would not, in and of themselves, "cause" the cessation of military aid to

Israel.

Nor can it be reasonably inferred from the facts alleged in the Complaint that the

cessation of such aid would have prevented the injuries about which Plaintiffs complain. That is,

even if the issuance of the AECA report or the inclusion of additional factual information in the

FAA human rights report would have resulted in the cessation of military assistance, there is no

basis to conclude that the Israeli Defendants would have acted differently so that the Plaintiffs

would not have suffered the harms they allege. Those harms were allegedly caused by the

security forces of a sovereign nation undertaking actions in furtherance of its own security, and

there is simply nothing in the Complaint to support the conclusion that those actions would not

have been taken (or that future actions will not be taken) had American aid been stopped at some

undefined point in the past. Indeed, in many instances, Plaintiffs fail to even allege a connection

between the harms about which they complain and U.S. origin weaponry. See, e.g., Compl., ¶¶

234-340 (describing allegations regarding Plaintiffs John Doe I - VII), 353-57 (John Does X and

XI), 370-413 (John Does XIV-XVII & Jane Doe I).

The D.C. Circuit addressed a similar issue in Committee of U.S. Citizens, where the court

held that the mere provision of aid to the Contras could not render the United States liable for

allegedly tortious acts committed by them against American citizens in Nicaragua. Although the

court did not phrase the issue as one of standing, its reasoning is applicable here. As is the case with respect to Plaintiffs' claim, "[t]he only alleged fact" in Committee of U.S. Citizens "that link[ed] our government to the actions that . . . harmed [plaintiffs] [was] Congress' appropriation of money . . . ." 859 F.2d at 946. The court noted further that "the[] complaint [did] not allege that the United States has participated in any way in the targeting of injuries against Americans or their property [overseas]. Nor [did it] allege that such injuries are intended consequences of our government's support for the Contras." Id. at 945. After noting that the Supreme Court has "expressly held that such government funding, by itself, does not suffice to convert actions by private parties into 'state action,'" id. at 946, citing Blum v. Yaretsky, 457 U.S. 991 (1982), the court held that the United States could not be held responsible for actions undertaken by the Contras. Similar reasoning supports the conclusion that Plaintiffs here lack standing to assert their claim against the Federal Defendants because the causal link between the provision of military assistance to Israel and the harms about which Plaintiffs complain is too attenuated to support standing.

Simply put, the Federal Defendants' failure to issue the AECA report to Congress or to include additional factual information in the FAA human rights report cannot reasonably be deemed to have "caused" the harms alleged in the Complaint. Similarly, there is no basis to infer that the failure to issue such reports in the future will cause whatever speculative harm Plaintiffs fear they may suffer at the hands of the Israeli security forces in the future. Absent such a causal link, Plaintiffs lack standing to bring this claim.

**C.    Redressability**

Plaintiffs also lack standing here because they cannot establish that the judgment they

seek would redress the injuries they have identified. "Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." Florida Audobon Society v. Bentsen, 94 F.3d 658, 663-64 (D.C. Cir. 1996) (en banc). As with the requirement that Plaintiffs demonstrate injury and causation, the purpose of the redressability prong of the standing test is to ensure that the proper parties (i.e., those who will be aided by a successful judgment) are before the court.

In this action, Plaintiffs seek an injunction halting further military aid to Israel until the Federal Defendants issue certain reports to Congress. Compl., ¶¶ 561, 563(d). To satisfy the redressability component of standing, Plaintiffs would have to allege (and ultimately prove) that it is "likely," as opposed to merely "speculative," Lujan, 504 U.S. at 561, that such an injunction would redress their injuries. This they cannot do.[21]

An "adequate examination" of redressability requires that the Court first "identify the components of [plaintiffs'] alleged harm." Freedom Republicans, Inc. v. Federal Election Comm'n, 13 F.3d 412, 416 (D.C. Cir. 1994). With respect to the past harms allegedly suffered

---

[21] Even were Plaintiffs to succeed on their claim, the relief to which they would be entitled would be significantly narrower than that which they seek. A remedy is intended, as the term suggests, to cure a particular wrong. Here, the alleged wrong is the failure to issue the AECA report to Congress and the failure to include additional factual information in the FAA human rights report. The appropriate cure would be an order directing that such a report be issued, or that such information be included, rather than an order halting further military aid to Israel in the interim. See Crockett v. Reagan, 558 F. Supp. 893, 899 (D.D.C. 1982) (appropriate relief for War Powers Resolution violation would be order directing that report be issued to Congress), aff'd, 720 F.2d 1355 (D.C. Cir. 1983); cf. Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (relief granted should be no more than necessary to afford complete relief to plaintiffs). The mismatch between the alleged violation and the remedy sought by Plaintiffs further demonstrates the lack of a connection between the harm they allege and the acts about which they complain. Because even the broader relief sought by Plaintiffs would not redress their injuries, however, the Court need not reach this issue.

31

by the Plaintiffs – the physical abuse that forms the basis of their Complaint – it is clear that the prospective remedy sought by the Plaintiffs will not redress these alleged injuries. See NRDC, 147 F.3d at 1022 (noting "mistaken[] assum[ption] that injunctive relief redresses past [statutory] violations"). An injunction halting further military aid to Israel will neither prevent these past harms (which have already occurred) nor provide redress for Plaintiffs' alleged injuries. As discussed above, "'[p]ast exposure to illegal conduct does not itself show a present case or controversy regarding injunctive relief . . . .'" Id., quoting O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974); see also NRDC, 147 F. 3d at 1022 (citing cases). Because the relief sought by Plaintiffs would not in any way redress the past harms they allege, they lack standing to assert their injunctive claim against the Federal Defendants.

Nor would the relief sought by Plaintiffs prevent the future, speculative harm to which they refer in their Complaint. Compl., ¶ 559 (referencing unspecified "future injury to [Plaintiffs'] persons and property"). Plaintiffs' contention is not that the Federal Defendants *directly* have caused – or will cause – them any harm. Instead, they allege that the Israeli Defendants caused their alleged injuries (and may do so again in the future), in some cases using U.S. origin weapons. To satisfy the minimum requirements of Article III, however, Plaintiffs must demonstrate that it is "likely," and not merely "speculative," Lujan, 504 U.S. at 561, that the prospective relief they seek (an injunction halting future military assistance to Israel until such time as the Federal Defendants issue certain reports to Congress) will result in the removal of the future harm they fear (presumably, further actions by Israeli forces that harm them). See Steel Company, 523 U.S. at 107 ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability

requirement."). This they cannot do.

As discussed above, Plaintiffs cannot even demonstrate that they face *any* imminent harm. They certainly cannot demonstrate any likelihood that a favorable judgment in this action would alleviate that harm. That is, Plaintiffs cannot demonstrate that their requested injunction would have any substantial impact on decisions by the Israeli Defendants with respect to future actions even were this Court to issue such an injunction. Such future actions by a foreign sovereign would result from the "exercise of broad and legitimate discretion [of third parties that] the courts cannot presume either to control or to predict . . . ." Lujan, 504 U.S. at 562. Any conclusion to the contrary would be "pure speculation" and insufficient to establish standing. Freedom Republicans, 13 F.3d at 419 ("pure speculation" to predict impact of requested relief); see also US Ecology, 231 F.3d at 21, 24-25; University Medical Center v. Shalala, 173 F.3d 438, 441-42 (D.C. Cir. 1999); cf. Linda R.S. v. Richard D., 410 U.S. 614, 618 (1973) (discussing speculative nature of redressability). As in each of the cited cases, this Court can not predict, nor can Plaintiffs establish, how third parties might respond to a favorable decision for the Plaintiffs. Accordingly, Plaintiffs lack standing to pursue their claim.

In sum, Plaintiffs have completely failed to establish any likelihood of future injuries, the alleged injuries about which they complain were not caused by the Federal Defendants' actions, the relief that Plaintiffs seek would not redress such injuries. For all of these reasons, Plaintiffs lack standing to assert their injunctive claim against the Federal Defendants.

## IV.    Plaintiffs' Claim Raises Non-Justiciable Political Questions.

Plaintiffs' claim should also be dismissed because it would require the Court to rule on nonjusticiable political questions that are textually committed to the political branches and

outside the unique competencies of the judiciary. "The political question doctrine excludes from

judicial review those controversies which revolve around policy choices and value

determinations constitutionally committed for resolution to the halls of Congress or the confines

of the Executive Branch." Japan Whaling, 478 U.S. at 230. The doctrine arises from two key

constitutional principles of our system of government: the separation of powers among the three

coordinate branches and the inherent limits of judicial competence. See, e.g., Baker v. Carr, 369

U.S. 186, 210-11 (1962); Chicago & Southern Airlines, Inc. v. Waterman Steamship Corp., 333

U.S. 103, 111-12 (1948).

     The Supreme Court has set forth the factors a court is to consider in determining whether

a particular claim raises nonjusticiable political questions:

> Prominent on the surface of any case held to involve a political question is found
> a textually demonstrable constitutional commitment of the issue to a coordinate
> political department; *or* a lack of judicially discoverable and manageable
> standards for resolving it; *or* the impossibility of deciding without an initial policy
> determination of a kind clearly for nonjudicial discretion; *or* the impossibility of a
> Court's undertaking independent resolution without expressing lack of respect due
> coordinate branches of government; *or* an unusual need for unquestioning
> adherence to a political decision already made; *or* the potentiality of
> embarrassment from multifarious pronouncements by various departments on one
> question.

Baker, 369 U.S. at 217 (emphasis added). See also Nixon v. United States, 506 U.S. 224, 228

(1993) (controversy is nonjusticiable where there is textually demonstrable commitment to

coordinate political branch or lack of judicially discoverable and manageable standards). The

existence of any one of these factors indicates the existence of a political question, see Baker,

369 U.S. at 217, and most of them apply here.

     As the Fifth Circuit held in rejecting a challenge to the constitutionality of aid to Israel

over 25 years ago, with reasoning recently adopted by Judge Walton of this Court:

> [Such a challenge] is a challenge to the power of the President and Congress to conduct the foreign affairs of the United States. Both the Congress and the President have determined that military and economic assistance to the State of Israel is necessary at this time . . . . We hold that a determination of whether foreign aid to Israel is necessary at this particular time is a 'question uniquely demand[ing] [of a] single-voiced statement of the Government's views,' Baker, 369 U.S. at 211, and a decision 'of a kind for which the Judiciary has neither the aptitude, facilities nor responsibility . . . .' Chicago & Southern Air Lines, 333 U.S. at 111.

Dickson v. Ford, 521 F.2d 234, 236 (5th Cir. 1975) (dismissing challenge on political question grounds), quoted in Mahomer, __ F. Supp. 2d at __, 2002 WL 31084938 at *5; see also id. at *4 ("it is abundantly clear that plaintiff's claim concerning the Executive Branch's ability to conduct . . . foreign affairs [by providing aid to Israel] [is a] nonjusticiable political question[]"). As a closer examination of this matter reveals, the Dickson and Mahomer courts were correct in holding that the question of aid to Israel is quintessentially a political one that does not belong in court. See also Adams v. Vance, 570 F.2d 950, 954-55 (D.C. Cir. 1978) (plaintiffs must make "extraordinarily strong showing" when "requested . . . injunctive relief deeply intrudes into the core concerns of the executive branch," including "[a] request for an order directing action by the Secretary of State in foreign affairs").

### A.    The Conduct of Foreign Affairs Is Constitutionally Entrusted to the Political Branches.

Under the Constitution, the conduct of American diplomatic and foreign affairs – including the provision of military aid to foreign countries – is entrusted to the political branches of the federal government. See, e.g., Haig v. Agee, 453 U.S. 280, 292 (1981); Chicago & Southern Airlines, 333 U.S. at 111; United States v. Pink, 315 U.S. 203, 222-23 (1942); United

35

States v. Curtiss-Wright Export Corp., 299 U.S. 304, 316-20 (1936).  As articulated by the Court

in Baker, there is a "textually demonstrable constitutional commitment" of U.S. diplomacy and

foreign policy to the political branches of the government.  369 U.S. at 217.  Indeed, as the

Supreme Court has observed:

> The conduct of the foreign relations of our government is committed by the
> Constitution to the executive and legislative–'the political'–departments of the
> government, and the propriety of what may be done in the exercise of this political
> power is not subject to judicial inquiry or decision.

First National City Bank v. Banco Nacional De Cuba, 406 U.S. 759, 766 (1972), quoting Oetjen

v. Central Leather Co., 246 U.S. 297, 302 (1918); see also Harisiades v. Shaughnessy, 342 U.S.

580, 588-89 (1952) (matters "vitally and intricately interwoven with contemporaneous policies in

regard to the conduct of foreign relations . . . are so exclusively entrusted to the political branches

of government as to be largely immune from judicial inquiry or interference").  Thus, the

Judiciary's refusal to review foreign policy decisions properly shows deference to the

prerogatives committed to the political branches under the Constitution, as well as the practical

limitations on the role of the Judiciary.  Chicago & Southern Airlines, 333 U.S. at 111.

   To undertake the review sought by Plaintiff here would entangle the Court in just the type

of diplomatic judgments uniformly committed to the political branches.  As discussed above,

both the AECA and the FAA recognize the obvious – that the provision of aid, and particularly

military aid, to foreign states is an important aspect of American foreign policy.  22 U.S.C. §§

2301 (FAA) ("[i]n enacting this legislation, it is . . . the intention of the Congress to promote the .

. . foreign policy . . . of the United States"), 2751 (AECA) (arms "sales [should] be approved

only when they are consistent with the foreign policy interests of the United States").  Similarly,

36

decisions regarding the continued provision of aid to a particular country – particularly where, as discussed below, such decisions are based on the exercise of political and diplomatic judgments regarding whether a foreign state's actions are undertaken in its self-defense – uniquely implicate the Nation's foreign policy interests, and are therefore reserved for the political branches of government. To state this point is to state the obvious – the United States' policy of providing military and economic assistance to the State of Israel is an essential component of U.S. foreign policy in the Middle East. See Dickson, 521 F.2d at 236.

Congress itself clearly recognized both the foreign affairs implications of the aid at issue, as well as the unique role afforded to the political branches in determining to whom, and when, such aid such should be issued. Thus, as described above, both the AECA and the FAA provide for a mechanism by which the President and Congress – but not the Courts – can make determinations respecting the eligibility of states to continue receiving foreign assistance. This statutory structure reflects the constitutional textual commitment of foreign affairs matters to the political branches of government and further supports a finding that these matters are nonjusticiable political questions.

The relief sought by Plaintiffs – an injunction barring further military aid to Israel – would require this Court to entrench upon this area of exclusive Executive and Congressional authority and upset long-standing U.S. policy. Indeed, in order to award the Plaintiffs the relief they seek the Court would have to make findings and determinations respecting the nature and appropriateness of Israeli actions undertaken in the midst of an ongoing armed conflict abroad that the United States (through its political branches) is attempting to resolve. Such findings – which would have to assess the context and appropriateness of Israeli actions – themselves would

37

intrude upon the foreign policy prerogatives of the political branches; the relief sought would do so in an unprecedented manner.

As the D.C. Circuit has stated in a similar context:

> It is difficult to think of an area less suited for judicial action than that into which Appellant would have us intrude. The fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy . . . ; these matters are plainly the exclusive province of Congress and the executive.

Luftig v. McNamara, 373 F.2d 664, 665-66 (D.C. Cir. 1967) (citing cases); see also Holtzman v. Schlesinger, 484 F.2d 1307, 1311-12 (2d Cir. 1973) (refusing to adjudicate the constitutionality of military decisions concerning Cambodia). Because Plaintiffs are asking this Court to take actions that would so clearly intrude upon the foreign affairs powers of the United States, their claim should be dismissed as a nonjusticiable political question.

**B.    There are No Judicially Discoverable and Manageable Standards for Resolving Plaintiffs' Claim.**

Resolution of Plaintiffs' claim is also non-justiciable because there are no "judicially discoverable and manageable standards for resolving" them. Baker, 369 U.S. at 217. The AECA requires that American military assistance be used for, inter alia, "internal security" and "legitimate self-defense," 22 U.S.C. § 2754, and the FAA requires that no security assistance be provided to any country that "engages in a consistent pattern of gross violations of internationally recognized human rights." Id., § 2304(a)(2). A resolution of Plaintiffs' injunctive claim, therefore, would require the Court to determine whether the complained-of Israeli actions are properly deemed actions in furtherance of "internal security" or "legitimate self-defense," and whether Israel "engages in a consistent pattern of gross violations of internationally recognized

human rights" for purposes of these Acts. Such determinations, however, are quintessentially within the purview of the political branches (and specifically the Executive branch), insofar as the responsibility and authority to conduct the foreign policy of the United States rests with the President, and the facts needed for the relevant decisionmaking are developed in the course of the conduct of foreign policy. See Chicago & Southern Airlines, 333 U.S. at 111-12; Holtzman, 484 F.2d at 1311-12. Hence, the judiciary is not positioned to make such decisions.

What constitute legitimate actions in furtherance of Israel's internal security or self-defense for purposes of the AECA (and the bilateral agreements entered into thereunder) are determinations for the President to make, taking into account complex historical, diplomatic, military and factual circumstances that are only developed and accessible through the conduct of the Nation's diplomatic and military relationships. The same is true with respect to any assessments of Israel's human rights record. All such determinations, at core, include value-laden judgments based on complex factual circumstances that the President is uniquely qualified to make and that the courts are, as an institutional matter, uniquely unqualified to make in these circumstances. See Japan Whaling, 478 U.S. at 230 (political question doctrine includes matters involving policy choices and value determinations). Accordingly, the courts are not the proper forum in which such determinations should be made or reviewed.

The requirements set forth in the AECA and the FAA embody U.S. foreign policy goals and provide benchmarks by which Congress and the President can make determinations as to whether particular countries are deserving of American assistance. But these requirements do not establish any precise, detailed standards based on facts that would be accessible to the Court by which to assess a particular country's compliance. As Judge Silberman put it in discussing

39

whether a particular situation constitutes "hostilities" for purposes of the War Powers Resolution, "the statutory . . . standard is not precise enough and too obviously calls for a political judgment to be one suitable for judicial determinations." Campbell v. Clinton, 203 F.3d 19, 25 (D.C. Cir. 2000) (Silberman, J., concurring) (citing cases). The same is clearly true here.

Just as the there is no "constitutional test for what is war," id. at 25, there is likewise no judicially-manageable test for what constitutes "internal security," "self defense," or "a consistent pattern of gross violations of internationally recognized human rights" in the context of these Acts. Indeed, courts have repeatedly held that similar policy judgments lack judicially discoverable facts and manageable standards and are therefore not reviewable. In United States v. Mandel, for example, the Ninth Circuit held that a determination regarding what items are placed on a commodity export control list was a non-reviewable political question because in making such a determination the Secretary of Commerce is required to "consider such things as whether the imposition of export controls would be detrimental to the foreign policy or national security interests of the United States." 914 F.2d 1215, 1223 (9th Cir. 1990); see also United States v. Helmy, 712 F. Supp. 1423, 1429 (E.D. Cal. 1989) (decision to place items on U.S. Munitions List pursuant to AECA non-reviewable; "the court is of the view that it is singularly ill-equipped to delve into pure foreign policy determinations"). Similarly, the Second Circuit has held that a determination as to whether the United States' immigration policy is a failure is a nonjusticiable political question because "the question is . . . largely a matter of opinion." Padavan v. United States, 82 F.3d 23, 27 (2d Cir. 1996).[22] For similar reasons, this Court too is

---

[22]  See also Aktepe v. United States, 105 F.3d 1400, 1404 (11th Cir. 1997) (negligence claim against military nonjusticiable because "courts lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of

not equipped to review decisions made by the President and Secretary of State, based on the their

conduct of the Nation's foreign policy, as to whether Israel may be in violation of agreements it

has entered into with the United States under the AECA or the FAA's human rights provisions.[23]

Because the decision to continue appropriating funds for, and providing assistance to,

Israel, is exquisitely a matter of foreign policy that is political in nature, this Court should abstain

from hearing Plaintiffs' claim.

**V.      This Court Lacks the Power to Enter an Injunction Against the President of the
          United States.**

Plaintiffs' Motion should also be denied to the extent that it seeks an order enjoining the

President – something this Court lacks the power to do.  Recognizing the separation of powers

that is fundamental to our constitutional structure, the Supreme Court has long recognized that

the federal courts "'ha[ve] no jurisdiction of a bill to enjoin the President in the performance of

his official duties.'"  Franklin, 505 U.S. at 803 (plurality opinion), quoting Mississippi v.

---

life"); Tiffany v. United States, 931 F.2d 271, 277-79 (4th Cir. 1991) (same); Ange v. Bush, 752
F. Supp. 509, 514 (D.D.C. 1990) (determinations regarding whether "war" or "imminent
hostilities" exist beyond judicial competence); Sanchez-Espinoza v. Reagan, 568 F. Supp. 596,
601-02 (D.D.C. 1983) (court lacks standards to assess U.S. actions in Nicaragua), aff'd, 770 F.2d
202 (D.C. Cir. 1985); Crockett v. Reagan, 558 F. Supp. 893, 899-900 (D.D.C. 1982) (court lacks
standards to assess nature of U.S. involvement in El Salvador), aff'd, 720 F.2d 1355 (D.C. Cir.
1983).

[23] In addition to the reasons discussed above, the claim at issue is also a political question
because of "the impossibility of deciding [it] without an initial policy determination of a kind
clearly for nonjudicial discretion," and because of the other factors set forth in Baker.  Baker, 369
U.S. at 217.  See Greenham Women Against Cruise Missiles v. Reagan, 755 F.2d 34, 37 (2d Cir.
1985) (determination regarding deployment of cruise missiles nonjusticiable because it requires
initial policy determination); see also Holtzman, 484 F.2d at 1310 (issues presented require
resolution of "precisely the questions of fact involving military and diplomatic expertise not
vested in the judiciary, which make the issue political and thus beyond the competence of . . . this
court to determine"); Lowry v. Reagan, 676 F. Supp. 333, 340 (D.D.C. 1987) (noting potentiality
of embarrassment that would result from multifarious pronouncement on matters at issue).

41

Johnson, 71 U.S. (4 Wall.) 475, 501 (1867); see also Franklin, 505 U.S. at 826 (Scalia, J.,

concurring in judgment) ("I think it clear that no court has authority to direct the President to take

an official act"); Swan v. Clinton, 100 F.3d 973, 976-79 & n.1 (D.C. Cir. 1996) (noting

Franklin's admonition that even when ministerial tasks are involved, "injunctive relief against

the President personally is an extraordinary measure not lightly to be undertaken"). Put another

way, "[t]he President of the United States is not amenable to suit in his official capacity where an

injunction is sought that would affect the performance of the non-ministerial duties of his office."

Committee to Establish the Gold Standard v. United States, 392 F. Supp. 504, 506 (S.D.N.Y.

1975) (dismissing claim against the President sua sponte) (citing cases).

  Although the Supreme Court has left open the question whether the President may be

subject to a judicial injunction requiring a purely "ministerial" duty, Franklin, 505 U.S. at 802,

the actions challenged by the Plaintiffs here are not ministerial. A ministerial duty in this context

is "one in respect to which nothing is left to discretion. It is a simple, definite duty, *arising under*

*conditions admitted or proved to exist*, and imposed by law." Mississippi, 71 U.S. (4 Wall.) at

498 (emphasis added); see also Swan, 100 F.3d at 977 ("A ministerial duty is one that admits of

no discretion, so that the official in question has no authority to determine whether to perform the

duty."). Because the military and foreign relations duties of the President in this case involve

official discretion and the assessment of complex facts with respect to whether Israeli actions are

in accordance with the requirements of the AECA and the FAA (and the bilateral agreements

entered into pursuant to those acts), they are non-ministerial and thus not subject to injunctive

judicial action.

  The specific context of Mississippi v. Johnson is instructive on this point. The duties at

issue in that case called for the President to "assign generals to command in the several military districts, and to detail sufficient military force to enable such officers to discharge their duties" during Reconstruction. 71 U.S. (4 Wall.) at 499. These Presidential duties were held to be "in no just sense ministerial," and "purely executive and political." Id. Like the President's determinations in <u>Mississippi v. Johnson</u> regarding what constituted "sufficient military force," so too the President's determination as whether Israel might be in violation of bilateral agreements entered into pursuant to the AECA or the FAA – a conclusion necessarily based on the exercise of discretion and judgment – is an "executive and political" duty that is "in no just sense ministerial." Accordingly, Plaintiffs' claim for injunctive relief against the President must be dismissed.

## CONCLUSION

For the reasons discussed above, the Federal Defendants' Motion should be GRANTED and the claims against the Federal Defendants in their official capacities should be DISMISSED.

Dated:  October 31, 2002.                    Respectfully submitted,

                                             ROBERT D. McCALLUM, JR.
                                             Assistant Attorney General

                                             ROSCOE C. HOWARD, JR.
                                             United States Attorney

                                             VINCENT M. GARVEY
                                             Deputy Branch Director


                                             _____
                                             ORI LEV, DC # 452565
                                             Trial Attorney

United States Department of Justice
Civil Division, Federal Programs Branch
Mail: P.O. Box 883, Washington, DC  20044
Delivery: 901 E St. NW, Rm 940
Washington, DC 20004
Tel: (202) 514-2395
Fax: (202) 616-8202

Attorneys for Defendants
George W. Bush and Colin Powell
in their official capacities

44

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of FEDERAL DEFENDANTS' MOTION TO DISMISS OFFICIAL CAPACITY CLAIMS and the Memorandum of Points and Authorities in support thereof was served this 31st day of October, in the manner indicated, on the following:

> Stanley L. Cohen, Esq.
> 351 Broadway
> Suite 300
> New York, NY  10013
> facsimile: (212) 995-5574
> facsimile: (845) 482-3484
> (via federal express)
>
> Maher Hanania, Esq.
> 1510 H Street NW
> Suite 20
> Washington, DC  20005
> (via U.S. Mail)

 

                             _____

                             ORI LEV

# EXHIBIT B

1  ROBERT D. McCALLUM, JR.
   Assistant Attorney General
2  VINCENT M. GARVEY
   Deputy Branch Director
3  ALISON N. BARKOFF
   Trial Attorney, Civil Division
4  Federal Programs Branch
   U.S. Department of Justice
5  Post Office Box 883, Room 1020
   Washington, D.C.   20044
6  Telephone:   (202) 514-5751
   Facsimile:   (202) 616-8470
7
   Attorneys for the United States
8

FILED

2002 SEP 27 AM 10: 25

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9          UNITED STATES DISTRICT COURT

10      FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12  JANE DOE I, et al.,                No. C 02 0672 CW (EMC)
                                        No. C 02 0695 CW (EMC)
13       Plaintiffs,
                                        STATEMENT OF INTEREST
14           v.                         OF THE UNITED STATES

15  LIU QI, et al.,

16       Defendants.

17  PLAINTIFF A, et al.,

18       Plaintiffs,

19           v.

20  XIA DEREN, et al.,

21       Defendants.

22

23       By letter dated May 3, 2002, and by order dated August 5,

24  2002, this Court "solicit[ed] the Department of State's opinion

25  on a number of issues" related to the above-captioned cases,

26  including whether the cases are barred by the Foreign Sovereign

27  Immunities Act, 28 U.S.C. §§ 1330, 1605-07, or are nonjusticiable

28
   STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW(EMC), C 02 0695 CW(EMC)

1  under the act of state doctrine. See Letter from U.S. Magistrate

2  Judge Edward M. Chen to William Howard Taft, IV of May 3, 2002;

3  Court's Aug. 5, 2002 Order.  Pursuant to 28 U.S.C. §§ 516-617,

4  the Attorney General, on behalf of the Department of State,

5  hereby submits the following.

6      Attached hereto as Exhibit A is a letter, dated September

7  25, 2002, from William H. Taft, IV, Legal Advisor, U.S.

8  Department of State, to Robert D. McCallum, Jr., Assistant

9  Attorney General, which explains the Department of State's views

10  on the issues raised by the Court.

11

12                          Respectfully submitted,

13                          ROBERT D. McCALLUM, JR.
                            Assistant Attorney General
14

15                          _Alison N. Barkoff_
                            VINCENT M. GARVEY
16                          Deputy Branch Director
                            ALISON N. BARKOFF
17                          Trial Attorney, Civil Division
                            Federal Programs Branch
18                          U.S. Department of Justice
                            Post Office Box 883, Room 1020
19                          Washington, D.C.  20044
                            Telephone:  (202) 514-5751
20                          Facsimile:  (202) 616-8470
                            Attorneys for the United States
21

22  Dated:   September 26, 2002
    ///
23  ///

24  ///

25  ///

26  ///

27  ///

28
    STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW(EMC), C 02 0695 CW(EMC)

## CERTIFICATE OF SERVICE

1
2      I am over the age of 18 years and not a party to the within
3  action.  I am employed by the United States Department of
4  Justice, Civil Division, Federal Programs Branch.  My business
5  address is 901 E Street, N.W., Washington, D.C. 20004.
6
7      On September 26, 2002, I served STATEMENT OF INTEREST OF THE
8  UNITED STATES on the persons named below, by enclosing a copy in
9  an envelope addressed as shown below and placing the envelope for
10 collection and mailing on the date and at the place shown below
11 following our ordinary business practices.  I am readily familiar
12 with the practice of this office for collection and processing
13 correspondence for mailing.  On the same day that correspondence
14 is placed for collection and mailing, it is deposited in the
15 ordinary course of business within the United States Postal
16 Service in a sealed envelope with postage fully prepaid.
17     Date of mailing: September 26, 2002.  Place of mailing:
18 Washington, D.C.  Persons to whom mailed:
19     Joshua Sondheimer
       The Center for Justice & Accountability
20     870 Market Street, Suite 684
       San Francisco, CA  94102
21     Attorney for plaintiffs in Doe v. Liu Qi
22     Terri E. Marsh
       1333 Connecticut Ave., N.W.
23     Suite 608
       Washington, D.C.  20008
24     Attorney for plaintiffs in Doe v. Liu Qi
25     Paul Hoffman
       Schonbrun DeSimone Seplow Harris & Hoffman LLP
26     723 Ocean Front Walk
       Venice, CA  90291
27 /// Attorney for plaintiffs in Doe v. Liu Qi
28

STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW(EMC), C 02 0695 CW(EMC)

Karen Parker
154 5th Avenue
San Francisco, CA 94118
Attorney for plaintiffs in <u>Plaintiff A v. Xia Deren</u>

Morton Sklar
World Organization Against Torture USA
1725 K St., N.W., Suite 610
Washington, D.C. 20006
Attorneys for plaintiffs in <u>Plaintiff A v. Xia Deren</u>

I declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct.

Executed on <u>September 26, 2002</u>, at Washington, D.C.

_Alison N. Barkoff_
Alison N. Barkoff

A

THE LEGAL ADVISER

DEPARTMENT OF STATE

WASHINGTON

September 25, 2002

Honorable Robert D. McCallum
Assistant Attorney General
Civil Division
United States Department of Justice
10th Street & Constitution Avenue, N.W.
Washington, D.C. 20530

　　　Re:  *Doe, et al. v. Liu Qi, et al.*, and *Plaintiff A,
　　　et al. v. Xia Deren*, Civil Nos. C 02-0672 CW
　　　(EMC) and C 02-0695 CW (EMC) (N.D. Cal.)

Dear Mr. McCallum:

　　　By letter dated May 3, U.S. Magistrate Judge Edward M.
Chen of the Northern District of California solicited the
Department of State's views on several issues in connection
with the above-captioned case.  Encl 1.  Magistrate Chen
asked that we respond before July 5, either by letter or
statement of interest pursuant to 28 U.S.C. § 517.  On June
25, the Department of Justice sought and received an
extension of time to August 9.  On July 25, the District
Court consolidated proceedings in the *Plaintiff A v. Xia
Deren* case with *Liu*, and referred that case also to
Magistrate Judge Chen.  On August 5, Magistrate Chen
vacated the previous briefing schedule, and invited the
State Department to provide its views on either or both of
these cases by September 27.  We ask that you please file a
copy of this response to these requests with Magistrate
Chen in whatever manner you deem most appropriate under the
circumstances.

　　　In *Liu*, the gravamen of plaintiffs' complaint is that
the defendant, as Mayor of Beijing, People's Republic of
China ("PRC"), either knew or should have known about
various human rights abuses that were allegedly perpetrated
against adherents to the Falun Gong movement in Beijing,
and that he was under a duty under both Chinese and

international law to prevent such actions.[1]  The complaint
alleges that Defendant Liu "planned, instigated, ordered,
authorized, or incited police and other [PRC] security
forces to commit the abuses suffered by Plaintiffs, and had
command or superior responsibility over, controlled, or
aided and abetted such forces in their commission of such
abuses.  The acts alleged herein...were carried out in the
context of a nationwide crackdown against Falun Gong
practitioners." Compl., ¶ 2.

In Liu, all but one of the plaintiffs are aliens; four
apparently reside in the United States.  Federal subject
matter jurisdiction is alleged to lie under customary
international law, the Torture Victims Protection Act
(TVPA), 28 U.S.C. § 1350, note, the Alien Tort Statute
(ATS), 28 U.S.C. § 1350, and 28 U.S.C. § 1331.  Id., ¶ 3.

As noted in Magistrate Chen's May 3 letter, a default
was entered in favor of the plaintiffs on March 12.
Plaintiffs subsequently moved for judgment by default.  In
reviewing that motion, the Court has asked for the
Department's views on two questions: (1) whether the case
is barred under the Foreign Sovereign Immunities Act
("FSIA"), and (2) whether the Court should find the case
"nonjusticiable" under the Act of State doctrine.  We
address these issues in turn.

Before turning to the questions posed by the Court, we
would note Magistrate Chen's subsequent invitation to
provide the Department's views in the Xia case.  From our
review of that complaint, we conclude, as did Magistrate
Chen in his August 5 order, that the relevant issues
involved in both cases are "similar, if not identical."  In
these circumstances, we see no need to comment separately
on the Xia case; the views as expressed below regarding Liu
may be taken to apply mutatis mutandis to Xia.  At the same
time, we note that the complaint in Xia is unambiguous in
asserting that the defendant was acting in his official
capacity.

We also stress our deep concern about the human rights
abuses that have been alleged in these complaints.  The
United States has repeatedly made these concerns known to
the Government of the PRC and has called upon it to respect

---

[1] We note that the Complaint caption refers to "Liu Qi, And Does 1-5,
inclusive," but we have not found specific reference in the complaint
to any defendants other than Mr. Liu.

- 3 -

the rights of all its citizens, including Falun Gong practitioners. Our critical views regarding the PRC Government's abuse and mistreatment of practitioners of the Falun Gong movement are a matter of public record and are clearly set forth in the Department's annual human rights reports, the most recent version of which may be found at http://www.state.gov/drl/rls/hrrpt/2001/eap/8289.htm.

With respect to the FSIA, Magistrate Chen asked specifically whether the exception to immunity under 28 U.S.C. § 1605(a)(7) applies to the case against Liu. In our considered opinion, the exception under 28 U.S.C. § 1605(a)(7) does not apply by its terms, since the Peoples' Republic of China has never been designated as a state sponsor of terrorism within the meaning of subsection (A) of that provision. Nor, in our view, does the "tort" exception under 28 U.S.C. § 1605(a)(5) apply since none of the acts in question occurred in the United States. It does not appear to us that any other exception of the FSIA would be relevant to the facts alleged in the complaint. Therefore, if the FSIA is the appropriate legal framework for determining the issue, the action would have to be dismissed. See 28 U.S.C. §§ 1330, 1604 (immunity unless there is exception under 28 U.S.C. §§ 1605-1607).

Whether the FSIA applies to this case presents a number of issues for the Court to determine. We understand that, since Chuidian v. Philippine National Bank, 912 F.2d 1095 (9th Cir. 1990), the practice in the 9th Circuit has been to evaluate claims brought against individual foreign government officials in United States federal courts according to whether the allegations giving rise to the suit were performed in an official capacity. Where the conduct is found to be official, the courts have deemed the action to be, in effect, a claim against the foreign state, and have applied the analytical framework of the FSIA. Other jurisdictions have also adopted this approach. See, e.g., Byrd v. Corporacion Forestal Y Industrial de Olancho S.A., 182 F.3d 380, 388-89 (5th Cir. 1999); El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996).[3]

The following considerations may be relevant given this framework. As noted above, the only named defendant in Liu is Beijing's Mayor, Mr. Liu Qi. The allegations of

_____

[3] The Executive Branch has not specifically endorsed the approach of Chuidian, but recognizes that it is controlling law in the 9th Circuit in which these cases arise.

the complaint are directed solely towards actions he allegedly took, or failed to take, as a senior official of the Chinese Government, in implementation of official policy. What is at issue, in the words of the complaint, is the "Chinese government's crackdown on Falun Gong," and more particularly the "[a]buses being committed by police and security forces in Beijing against the Falun Gong." Compl., ¶¶ 31, 32. The acts and omissions attributed to Mayor Liu are characterized as part of this "widespread governmental crackdown"; the duties he is said to have violated derived from his official position. The complaint specifically alleges that "[a]s the Mayor of the City of Beijing, Defendant Liu held and holds the power not only to formulate all important provincial policies and policy decisions, but also to supervise, direct and lead the executive branch of the city government, which includes the operation of the Public Security Bureau of Beijing, under which the police operate, and other security forces." Id., ¶ 34.[2]

It is noteworthy in this regard that the 9th Circuit has previously held that the FSIA is not rendered inapplicable because of alleged violations of customary international law by the officials of a foreign state defendant. Siderman de Blake v. Argentina, 965 F.2d 699 (9th Cir. 1992), cert. denied, 507 U.S. 1017 (1993). See also Argentine Republic v. Amerada Hess, 488 U.S. 428 (1989)(FSIA is exclusive basis for suit against foreign state notwithstanding alleged violations of international law by its officials). Because suits against current officials may well constitute the "practical equivalent" of suits against the sovereign, and because denial of immunity in such circumstances would allow "litigants to accomplish indirectly what the [FSIA] barred them from doing directly," Chuidian, supra at 1101-02, we believe the courts should be especially careful before concluding that the FSIA is inapplicable to a suit against a current official relating to the implementation of government programs. Cf., Saudi Arabia v. Nelson, 507 U.S. 349, 361 (1993)("the intentional conduct alleged here (the Saudi Government's wrongful arrest, imprisonment and torture of

---

[2] As is described more fully below, this is one of a series of suits in U.S. courts against Chinese officials for actions allegedly taken against Falun Gong practitioners. This pattern may reinforce the inference from the complaint that, at bottom, this suit is directed at PRC government policies rather than past conduct of a specific official.

Nelson) ... boils down to abuse of the power of its police
by the Saudi Government, and however monstrous such abuse
undoubtedly may be, a foreign state's exercise of the power
of its police has long been understood ... as peculiarly
sovereign in nature"). Otherwise, plaintiffs could evade
the FSIA altogether by the simple expedient of naming a
high level foreign official as a defendant rather than a
foreign state.

We acknowledge the expanding body of judicial
decisions under the TVPA holding _former_ foreign government
officials liable for acts of torture and extrajudicial
killing despite (or indeed because of) the fact that the
defendants abused their governmental positions. _See, e.g.,
Xuncax v. Gramajo_, 886 F. Supp. 162 (D.Mass. 1995); _Hilao
v. Estate of Marcos_, 103 F.3d 767 (9th Cir. 1996); _Cabello
Barreuto v. Fernández Larios_, 205 F.Supp.2d 1325 (N.D.Fla.
2002). The principal aim of the TVPA was to codify the
decision of the Second Circuit in _Filartiga v. Pena-Irala_,
630 F.2d 876 (2d Cir. 1980), by providing an explicit
statutory basis for suits against former officials of
foreign governments over whom U.S. courts have obtained
personal jurisdiction, for acts of torture and
extrajudicial killing committed in an official capacity.
The Senate Report on the TVPA states that "[b]ecause all
states are officially opposed to torture and extrajudicial
killing ... the FSIA should normally provide no defense to an
action taken under the TVPA against a _former_ official"
(emphasis supplied).[6]

At the same time, the TVPA was _not_ intended to
override otherwise existing immunities from U.S.
jurisdiction, as courts have recognized in suits brought
under these statutes against _current_ or _sitting_ foreign
governmental officials.[7] _See, e.g., Saltany v. Reagan_, 702

---

[6] As this sentence indicates, Congress anticipated that, although it
would not normally be so, in some cases involving officials who had
left office, exercise of jurisdiction under the TVPA would still be
inappropriate. _See, e.g._, S. Rep. No. 102-249, at *8 ("To avoid
liability by invoking the FSIA, a former official would have to prove
an agency relationship to the state, which would require that the state
admit some knowledge or authorization of relevant acts.")(internal
quotation marks omitted). The cases before Magistrate Chen do not pose
the question of how _Chiudian_ should be applied to such former
officials.
[7] Dealing with sitting officials is a component of the President's power
over the nation's foreign relations. _See, e.g., United States v.
Curtiss-Wright Corp._, 299 U.S. 304, 320 (1936) (describing "the very
delicate, plenary and exclusive power of the President as the sole

- 6 -

F. Supp. 319 (D.D.C. 1988); *Lafontant v. Aristide*, 844 F.
Supp. 128 (E.D.N.Y. 1994); *Tachiona v. Mugabe*, 169
F.Supp.2d 259 (S.D.N.Y. 2001). These cases are consistent
with relevant international authority, such as the
decisions of the International Court of Justice in the
*Yerodia* case (*Case Concerning the Arrest Warrant of 11
April 2000 - Democratic Republic of the Congo v. Belgium*,
Judgment of Feb. 14, 2002) and the European Court of Human
Rights in *Al-Adsani v. The United Kingdom* (No. 35763/97,
Judgment of Nov. 21, 2001).

In response to Magistrate Chen's second set of
questions ("Should the Court find the case nonjusticiable
under the Act of State doctrine? What effect will
adjudication of this suit have in the foreign policy of the
United States?"), we respectfully offer the following
observations for the Court's consideration.

Litigation in U.S. courts challenging the legality of
a foreign government's actions, or inactions, taken within
its own territory, can present sensitive dimensions, as
recognized in a number of decisions of the U.S. Supreme
Court. <u>See</u>, <u>e.g.</u>, *Underhill v. Hernandez*, 168 U.S. 250,
252 (1897); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S.
398, 428 (1964); *W.S. Kirkpatrick & Co.; Inc. v.
Environmental Tectonics Corporation, Int'l*, 493 U.S. 400,
405 (1990)). <u>Cf</u>. *Baker v. Carr*, 362 U.S. 186 (1962). The
Court has recognized that the judiciary should approach
such litigation with the utmost care and circumspection.

We note that *Liu* is only one of several recent cases
brought in U.S. federal courts by Falun Gong adherents
against high-level PRC officials--typically, under the ATS
and the TVPA. The case just added to these proceedings,
*Plaintiff A et al. v. Xia Deren*, is but the most recent
example. <u>See also</u>, <u>e.g.</u>, *Peng, et al. v. Zhao*, No. 01
Civil 6535 (DLC) (SDNY) (default judgment in nominal amount
of $1 entered, December 26, 2001; defendant Zhao Zhifei was
said to be the Department Head of the Public Security

---

organ of the federal government in the field of international
relations"). If Congress intended to alter the balance of power
between the Executive and Legislative Branches in the area of foreign
policy, Congress would be required to adopt a clear statement of that
intent. "[T]he 'clear statement' rule," which "was originally
articulated to guide interpretation of statutes that significantly
alter the federal-state balance," should also be applied to "statutes
that significantly alter the balance between Congress and the
President." *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C.Cir. 1991).

Bureau of Hubei Province); *Jin, et al. v. Ministry of State
Security*, et al., No. 02-CV-627 (DDC)(case pending); *Petit,
et al. v. Ding*, No. CV 02-00295 (D. HI)(case pending)
(defendant Ding Guangen is said to be the Deputy Chief,
Falun Gong Control Office, and Minister for Media and
Propaganda, Central Committee of the Chinese Communist
Party of the PRC). In our judgment, adjudication of these
multiple lawsuits, including the cases before Magistrate
Chen, is not the best way for the United States to advance
the cause of human rights in China.

The United States Government has emphasized many times
to the Chinese Government, publicly and privately, our
strong opposition to violations of the basic human rights
of Falun Gong practitioners in China. We have made clear,
on repeated occasions, our absolute and uncompromising
abhorrence of human rights violations such as those alleged
in the complaint, in particular torture, arbitrary
detention, interference with religious freedom, and
repression of freedom of opinion and expression. The
Executive Branch has many tools at its disposal to promote
adherence to human rights in China, and it will continue to
apply those tools within the context of our broader foreign
policy interests.

We believe, however, that U.S. _courts_ should be
cautious when asked to sit in judgment on the acts of
foreign officials taken within their own countries pursuant
to their government's policy.[6] This is especially true when
(as in the instant cases) the defendants continue to occupy
governmental positions, none of the operative acts are
alleged to have taken place in the United States, personal
jurisdiction over the defendants has been obtained only by
alleged service of process during an official visit, and
the substantive jurisdiction of the court is asserted to

_____

[6] As the Department of State testified before the Senate Committee on
the Judiciary during its consideration of the TVPA, "From a foreign
policy perspective, we are particularly concerned over the prospect of
nuisance or harassment suits brought by political opponents or for
publicity purposes, where allegations may be made against foreign
governments or officials who are not torturers but who will be required
to defend against expensive and drawn-out legal proceedings. Even when
the foreign government declines to defend and a default judgment
results, such suits have the potential of creating significant problems
for the Executive's management of foreign affairs. ... We believe that
inquiry by a U.S. court into the legitimacy of foreign government
sanctions is likely to be viewed as highly intrusive and offensive."
S. Hrg. 101-1284 on S. 1629 and H.R. 1662 (June 22, 1990) at 28
(Prepared Statement of David P. Stewart).

- 8 -

rest on generalized allegations of violations of norms of customary international law by virtue of the defendants' governmental positions. Such litigation can serve to detract from, or interfere with, the Executive Branch's conduct of foreign policy.

We ask the Court in particular to take into account the potential for reciprocal treatment of United States officials by foreign courts in efforts to challenge U.S. government policy. In addressing these cases, the Court should bear in mind a potential future suit by individuals (including foreign nationals) in a foreign court against U.S. officials for alleged violations of customary international law in carrying out their official functions under the Constitution, laws and programs of the United States (e.g., with respect to capital punishment, or for complicity in human rights abuses by conducting foreign relations with foreign regimes accused of those abuses). The Court should bear in mind the potential that the United States Government will intervene on behalf of its interests in such cases.

If the Court finds that the FSIA is not itself a bar to these suits, such practical considerations, when coupled with the potentially serious adverse foreign policy consequences that such litigation can generate, would in our view argue in favor of finding the suits non-justiciable. However, if the Court were to determine that dismissal is not appropriate, we would respectfully urge the Court to fashion its final orders in a manner that would minimize the potential injury to the foreign relations of the United States.

Sincerely,

William H. Taft, IV

Enclosures:
   As stated.

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES COURTHOUSE
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CA 94102



CHAMBERS OF
EDWARD M. CHEN
UNITED STATES MAGISTRATE JUDGE

MAY 16 2002

May 3, 2002

The Honorable William Howard Taft, IV
Office of the Legal Adviser
United States Department of State
2201 C Street N.W.
Washington, DC 20520

Re:    *Jane Doe I, et al. v. Liu Qi, et al.*, C-02-0672 CW (EMC) (Northern District of
       California)

Dear Mr. Taft:

On February 2, 2002, six individual plaintiffs, each of whom is a Falun Gong practitioner,
brought suit against Liu Qi, who has served as the mayor of Beijing of the People's Republic of
China since February, 1999. The plaintiffs are citizens of various countries, including the
People's Republic of China, France, Sweden, Israel, and the United States. Four currently reside
in the United States. The suit contends that each of the plaintiffs was subject to arrest and
detention under harsh conditions, including the use of unreasonable force and torture, in
connection with China's crackdown on the Falun Gong practitioners. The suit contends that the
City of Beijing has been a focal point of the repression and persecution against the Falun Gong
and that the defendant Liu knew or should have known that Beijing police and other security
forces were engaged in a pattern and practice of severe human rights abuses against Falun Gong
practitioners. The complaint asserts that defendant Liu had a duty both under customary
international law and Chinese law to prevent police and other security forces under his authority
from engaging in abuses. The complaint asserts five causes of action under the Torture Victim
Protection Act and Alien Tort Claims Act. Enclosed is a copy of the complaint filed herein.

Defendant Liu was served while passing through San Francisco International Airport, apparently
on his way to the Winter Olympics. Having failed to respond to the complaint, the Court entered
a default on March 12, 2002. Plaintiffs now move for judgment by default. This motion has
been assigned to me by the District Judge in this case for a Report and Recommendation.
Enclosed is a copy of the plaintiffs' motion for judgment by default.

Having reviewed the complaint and plaintiffs' motion, the Court has determined that it would be appropriate to solicit the Department of State's opinion on a number of issues. In particular, the Court would appreciate the Department of State's views on the following issues:

1.    Is this case barred under the Foreign Sovereign Immunities Act ("FSIA")? Please address, *inter alia*:

      a.    Whether the exception from immunity under 28 U.S.C. § 1605(a)(7) applies.

      b.    In determining both whether the FSIA applies and whether 28 U.S.C. § 1605(a)(7) applies, what law and facts must be demonstrated to establish defendant Liu was acting within or outside the scope of his authority? Must the court determine defendant's scope of his authority under Chinese law; if so the Court requests translated version of all applicable law material to this determination.

2.    Should the Court find the case nonjusticiable under the Act of State doctrine? What effect will adjudication of this suit have in the foreign policy of the United States?

If the Department of State believes a response to some or all of the above questions from the People's Republic of China is appropriate, it may invite the appropriate representative thereof to submit its written views to the Court as well.

The Court would appreciate your consideration of this matter and your communication of the State Department's position regarding these issues. The Court leaves to your discretion whether your response is best submitted in the form of a letter or a Statement of Interest filed pursuant to 28 U.S.C. § 517. A copy should be sent to plaintiffs' counsel. The Court would appreciate a response by July 5, 2002.

Thank you for attention and cooperation.

Yours very truly,

Edward M. Chen
U.S. Magistrate Judge.

EMC/ld
Enc.
cc:    Joshua Sondheimer, Esq., The Center for Justice & Accountability, 870 Market Street, Suite 684, San Francisco, CA 94102 (*Plaintiffs' counsel*)
Michael S. Sorgen, Esq., Law Offices of Michael Sorgen, 240 Stockton Street, 9th Floor, San Francisco, CA 94108(*Plaintiffs' counsel*)
Terri Marsh, Esq., Law Offices of Terri Marsh, 3133 Connecticut Avenue, NW, Suite 608, Washington, DC 20008 (*Plaintiffs' counsel*)