# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALI SAADALLAH BELHAS, et al., ) ) ) | |
| Plaintiffs, ) | No. 1:05-cv-2167 (PLF) |
| ) | |
| v. ) | |
| ) | HEARING REQUESTED |
| MOSHE YA'ALON, ) | |
| ) | |
| Defendant ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

Judith Brown Chomsky
Michael Poulshock
LAW OFFICES OF JUDITH BROWN
CHOMSKY
P.O. Box 29726
Elkins Park, PA 19027
Phone: (215) 782-8367
Fax: (215) 782-8368

Maria LaHood
Jennie Green
William Goodman
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Phone: (212) 614-6434
Fax: (212) 614-6499

James R. Klimaski (243543)
**Klimaski & Associates, P.C.**
**1819 L Street NW, 7th Floor**
**Washington, DC  20036**
**Phone: (202) 296-5600**
**Fax: (202) 296-5601**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iv

INTRODUCTION ................................................................. 1

ARGUMENT ..................................................................... 3

  I.  THE STANDARD OF REVIEW AND PLAINTIFFS'
     RIGHT TO DISCOVERY ................................................... 3

 II.  DEFENDANT IS LIABLE UNDER THE TVPA: THE FSIA
     DOES NOT PROVIDE IMMUNITY FROM
     PLAINTIFFS' CLAIMS UNDER THE TVPA ................................... 5

    A.  Defendant's Burden of Proof ......................................... 5

    B.  Defendant Is Not Entitled to Immunity Even If He Acted
       with Actual Authority ............................................... 6

    C.  The FSIA Does Not Provide Defendant with Immunity from
       Claims under the ATS Because He Acted Outside the Scope
       of His Authority ................................................... 10

    D.  Defendant's Conduct Was Not Within the Scope of his
       Lawful Authority .................................................. 12

       1.  Defendant acted outside the scope of his authority under
          international law norms ......................................... 15

           a.  Attacks on the United Nations as war crimes ................. 15
           b.  The prohibition against extrajudicial killing ................. 17
           c.  Attacks on civilians as war crimes ......................... 18
           d.  Crimes against humanity .................................... 19

       2.  Defendant acted outside the scope of his authority
          under Israeli law .............................................. 21

           a.  Israeli law incorporates customary international law ......... 22

           b.  Israeli law cannot authorize conduct in derogation
              of binding principles of international law (*jus cogens*) ................... 23

    E.  Discovery is Required to Permit Resolution of Factual
       Disputes Raised by Defendant ...................................... 26

i

III.  PLAINTIFFS' CLAIMS DO NOT IMPLICATE THE
       POLITICAL QUESTION DOCTRINE  ........................................ 28

   A.  Under the ATS, Courts Have Routinely Adjudicated
       Claims Touching Upon Issues of Foreign Policy  ...................................... 29

   B.  Courts Have Adjudicated Claims Relating to Political and
       Military Decisions, the Middle East, and Other Sensitive
       Regions of the World  ........................................................................ 30

   C.  The Defendant Has Failed to Show that Any of the
       *Baker v. Carr* Factors Are Present  ............................................. 35

       1.  There is a clear textual commitment of this issue
           to the judicial branch  ............................................................ 36

       2.  There are judicially discoverable and manageable
           standards for resolving the issues in this case  ...................................... 37

       3.  *Baker* Factors Three Through Six  ...................................... 38

IV.  THE ACT OF STATE DOCTRINE DOES NOT BAR
      PLAINTIFFS' CLAIMS  ............................................................ 40

   A.  Defendant Has Not Met His Burden to Prove an Act of State  .................. 40

   B.  Defendant Has Failed to Prove that the Validity of an
       Official "Act of State" Within Sovereign Territory Is at Issue  ................ 40

       1.  The act of state doctrine does not apply because the act
           alleged occurred outside of Israel's sovereign territory  ...................... 41

       2.  The act of state doctrine does not bar Plaintiffs' claims
           because Defendant failed to establish an "official" act of state  ......... 42

       3.  The act of state doctrine does not bar plaintiffs' claims
           because they do not require the Court to declare an
           official act invalid  ............................................................ 44

   C.  Even if an Act of State Were at Issue, the *Sabbatino* Factors
       Would Counsel Against Application of the Doctrine  .............................. 45

D.  Defendant Need Not Have Ordered the Attack on the
United Nations Compound to Be Held Liable  .......................................  47

CONCLUSION  ...........................................................................................  48

# TABLE OF AUTHORITIES

* Indicates those cases upon which Plaintiff chiefly relies

## Federal Cases

*A.T.&T. v. Iowa Utilities Bd.*, 525 U.S. 366 (1999) .......................................................... 8

*Adickes v. S.H.Kress Co.*, 398 U.S. 144 (1970) ................................................................ 7

*Aktepe v. US*, 105 F.3d 1400 (11th Cir. 1997) ................................................................ 33

*Alejandre v. Republic of Cuba*, 996  F. Supp. 1239 (S.D. Fla. 1997) ...................... 17, 18

*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976) ............. 40, 42

*Alperin v. Vatican Bank*, 410 F.3d 532 (9th Cir. 2005)  .................................................. 30

*American International Group, Inc. v. Islamic Republic of Iran*, 493 F. Supp. 522
  (D.D.C. 1980)  ........................................................................................................... 15

*Antolok v. United States*, 873 F.2d 369 (D.C. Cir. 1989) ................................................ 30

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) ................. 25

*Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F.Supp. 289 (S.D.N.Y.1987) ........... 6

*\*Baker v. Carr*, 369 U.S. 186 (1962) .................................................................. 28, 35, 38

*Barnhart v. Sigmon Coal Company*, 524 U.S. 438 (2002) ................................................ 8

*Barrett v. United States*, 646 F. Supp. 1345 (S.D.N.Y. 1986) ........................................ 28

*Biton v. Palestinian Interim Self Gov't Auth.*, 310 F. Supp. 2d 172 (D.D.C. 2004) ("*Biton
  I"*) .............................................................................................................................. 30

*Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1 (D.D.C. 2005) ("*Biton
  II*") ................................................................................................... 31, 38, 41, 43

*Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814) .................................................. 34

*Byrd v. Corporacion Forestal y Indus. de Olancho S.A.*, 182 F.3d 380 (5th Cir. 1999)   10

*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) ....................................... 48

*Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189 (S.D.N.Y. 1996) ............................ 13, 14

*Caminetti v. United States*, 242 U.S. 470, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917) ......... 9

*Carmichael v. United Tech. Corp.*, 835 F.2d 109 (5th Cir. 1988) .................................. 48

*Central Trust Co., Rochester N.Y. v. Offical Creditors' Committee of Geiger Co. Inc.*, 454 U.S. 354 (1982) .............................................................. 9

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948) ................. 30

*Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095 (9th Cir. 1990) .............................. 10

*Conley v. Gibson*, 355 U.S. 41 (1957) ............................................................. 4

*Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005) ......................... 32

*Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437 (1987) .................................. 8

*\*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ..................... 40-41, 44-46

*Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2006) ...................................... 6

*Denegri v. Republic of Chile*, No. Civ. A. 86-3085, 1992 WL 91914 (D.D.C. Apr. 1992) ..................................................................................... 25

*Doe v. Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005) ................................................ 10, 11, 32

*Doe I v. Liu Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004) .............................................. 13

*Doe v. Saravia*, 348 F. Supp. 2d 1112 (E.D. Cal. 2002) ............................................... 17

*Doe v. Unocal Corp.*, 963 F. Supp. 880 (C.D. Cal. 1997) ....................................... 43, 46

*El-Fadl v. Central Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996) ......................... 10, 12

*\*El-Hadad v. Embassy of the United Arab Emirates*, 69 F. Supp. 2d 69 (D.D.C. 1999) ...................................................................................... 41

*El-Shifa Pharmaceutical Ind. Co. v. United States*, 402 F. Supp. 2d 267 (D.D.C. 2005) ................................................................................... 32, 33

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) .............................................. 37, 43

*\*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998) ...................... 41, 43

*Flynt v. Rumsfeld*, 245 F. Supp. 2d 94 (D.D.C. 2003) ...................................... 34

*Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283 (11th Cir. 2002) ......................... 47

*Forti v. Suarez-Mason*, 672 F. Supp. 1531 (N.D. Cal. 1987) .................................. 17, 47

*Galu v. SwissAir*, 873 F.2d 650 (2d Cir. 1989) ................................................ 42

*Gilmore v. Palestinian Interim Self-Gov't Auth.*, -- F. Supp. 2d --,
2006 WL 711264 (D.D.C. 2006) ................................................................. 31

*Gordon v. National Youth Work Alliance*, 675 F.2d 356 (D.C. Cir. 1982) ..................... 4

*Gould v. Pechiney Ugine Kuhlmann*, 853 F.2d 445 (6th Cir.1988) ............................. 26

*Guidry v. Sheet Metal Workers Nat. Pension Fund.*, 493 U.S. 365 (1998) .................... 8

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ....................................................... 33

*Hatahley v. United States*, 351 U.S. 173 (1956) ............................................... 7

*Herbert v. National Academy of Sciences*, 974 F.2d 192 (D.C.Cir.1992) .................... 26

*\*Hilao v. Estate of Marcos*, 25 F.3d 1467, 1472 (9th Cir. 1994) ................ 11, 13, 14, 17

*Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996) ......................................... 47, 48

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ............................................... 6

*Hwang Geum Joo*,  413 F.3d 45 (D.C. Cir. 2005) ........................................... 32

*\*Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (D.D.C. 2005) ............................. 34, 35, 48

*In re Agent Orange Product Liability Litigation*, 373 F. Supp. 2d 7
(E.D.N.Y. 2005) ................................................................. 24, 34, 37, 38, 48

*In re Yamashita*, 327 U.S. 1 (1946) ....................................................... 23, 47

*Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221 (1986) ...................... 36

*Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249 (D.C. Cir. 2005) ......................... 4

*Jimenez v. Aristegueita*, 311 F.2d 547 (5th Cir. 1962), *cert. denied*,
373 U.S. 914 (1963) ................................................................. 43

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F. 3d 1020
(D.C. Cir. 1997) ..................................................................... 10-12, 26

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) .................... 17-18, 29-30, 35-38, 43, 45

*Keller v. Nigerian Bank*, 277 F.3d 811 (6th Cir. 2003) .................................................... 13

*Kilburn v. Socialist People's Libyan Arab Jamahiriyi*, 376 F.3d 1123
(D.C. Cir. 2004) ....................................................................... 5

*Kinetic Instruments, Inc. v. Lares*, 802 F. Supp. 976 (S.D.N.Y. 1992) ......................... 27

*Klieman v. Palestinian Authority*, 2006 U.S. Dist. LEXIS 13797
(D.D.C. 2006) .................................................................. 30, 36, 37

*Klinghoffer v. S.N.C. Achille Lauro*, 739 F. Supp. 854 (S.D.N.Y. 1990) ...................... 29

*Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d  (S.D.N.Y. 1990) ....................... 31, 36-38

*Knox v. PLO*, 306 F. Supp. 2d 424 (S.D.N.Y. 2004) ....................................... 31

*Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992) .................................... 34

*Kowal v. MCI Communications Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) .......................... 6

*Linde v. Arab Bank*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005) ............................... 31

*Linder v. Portocarrero*, 963 F.2d 332 (11th Cir. 1992) ........................................ 35, 43

*Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989) ......................................... 42, 46

*Mehinovic v. Vukovic*, 198 F. Supp. 2d 1322 (N.D. Ga. 2002) ....................... 24

*Moran v. Saudi Arabia*, 27 F.3d 169 (5th Cir. 1994) .................................... 26

*Morton v. Mancari*, 417 U.S. 535 (1974) ...................................................... 8

*Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal. 2005) ..... 17, 24

*National Coalition Gov't of Union of Burma (NCGUB)*, 176 F.R.D. 329
(C.D. Cal. 1997) ............................................................... 24, 44

*Neitzke v. Williams*, 490 U.S. 319 (1989) .......................................... 6

*New v. Rumsfeld*, 350 F. Supp. 2d 80 (D.D.C. 2004) ...................................................... 28

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ........................................... 34

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) ............................................. 27

*Park v. Shin*, 313 F.3d 1138 (9th Cir. 2002) .................................................................. 12

*The Paquete Habana*, 175 U.S. 677 (1900) ............................................................. 25, 34

*Paul v. Avril*, 901 F. Supp. 330 (S.D. Fla. 1994) ........................................................... 47

*\*Phoenix Consulting Co. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000) .. 6, 26, 27

*Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385 (1972) ......................... 9

*Prakash v. American Univ.*, 727 F.2d 1174 (D.C. Cir. 1984) ..................................... 4, 27

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289 (S.D.N.Y. 2003) ("Presbyterian I") ....................................................................... 18, 23, 35-39, 43

*Presbyterian Church of Sudan v. Talisman Energy, Inc*, 374 F. Supp. 2d 331 (S.D.N.Y. 2005) ("Presybterian II") ............................................................................................ 23

*Princz v. Federal Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994) ......................... 6

*Ramirez de Arellano v. Weinberger*, 788 F.2d 762 (D.C. Cir. 1986) ............................. 34

*Ramirez de Arellano v. Weinberger*, 745 F.2d 1500 (D.C. Cir. 1984), *vacated*, 471 U.S. 1113 (1985) ............................................................................................................ 40

*Rasul v. Bush*, 542 U.S. 466 (2004) ............................................................................. 33

*Republic of Austria v. Altmann*, 541 U.S. 677 (2004) ............................................... 3, 41

*Republic of Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988), *cert. denied*, 490 U.S. 1035 (1989) .............................................................................. 37

*Risk v. Kingdom of Norway*, 707 F. Supp. 1159 (N.D. Cal. 1989), *aff'd*, 936 F. 2d 393 (9th Cir. 1991) .......................................................................... 42

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) .............................................................. 8

*Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073 (C.D. Cal. 1999) ........................................ 44

*Saltany v. Reagan*, 702 F. Supp. 319 (D.D.C. 1988)  ....................................... 44

*Sarei v. Rio Tinto Plc*, 221 F. Supp. 2d 1116 (C.D. Cal. 2002)  ....................................... 43

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)  ............................................. 6, 25

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005)  .................................... 33

*Sharon v. Time*, 599 F. Supp. 538 (S.D.N.Y. 1984) ...................................... 31, 43, 45, 46

*\*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)  ............................. 18, 26, 29, 30, 36, 45

*Tachiona v. United States*, 386 F.3d 205 (2d Cir. 2004) ........................................... 16-17

*Taylor v. F.D.I.C.*, 132 F.3d 753 (D.C. Cir. 1997) ............................................. 3

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) ............................... 36

*Trajano v. Marcos*, 978 F.2d 493 (9th Cir. 1992) ...................................... 13, 25

*Transaero, Inc. v. La Fuerza Aero Boliviana*, 30 F.3d 148 (D.C. Cir. 1994) ................ 25

*Transamerican S.S. Corp. v. Somali Democratic Republic*,
767 F.2d 998 (D.C. Cir. 1985)  ........................................................................ 6

*Underhill v. Hernandez*, 168 U.S. 250 (1897)  ................................................... 40, 41, 43

*Ungar v. Palestinian Liberation Org.*, 402 F. 3d 274 (1st Cir. 2005) ........................... 31

*United States v. Montreal Trust Co.*, 358 F.2d 239 (2d Cir. 1966) ............................... 28

*United States v. Estate of Romani*, 523 U.S. 517 (1998)  .................................... 8

*Velasco v. Government of Indonesia*, 370 F.3d 392 (4th Cir. 2004)  ........................... 10

*W. S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*,
493 U.S. 400 (1990)  ............................................................................ 41, 44, 45

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004)  ........................................ 4

*Wilderness Soc. v. Griles*, 824 F.2d 4 (D.C. Cir. 1987)  ..................................... 4

*Wiwa v. Royal Dutch Petroleum*, 226 F.3d 88 (2d Cir. 2000)  ................................... 17, 36

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995) .................... 13-14, 17-18, 35, 47

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ..................................... 33

## Federal Statutes and Legislative History

*Alien Tort Statute (ATS) (28 U.S.C. § 1350) ......................................................... passim

Anti-Terrorism Act (ATA) (18 U.S.C. § 2331) .................................................. 36, 38, 39

Foreign Sovereign Immunities Act (FSIA) (28 U.S.C. §§ 1602-11) ......................... 3-27

S. Rep. No. 249, 102nd Cong., (1st Sess. 1991) ............................................ 9, 43, 47, 48

*Torture Victim Protection Act (TVPA) (28 U.S.C. § 1350 note) ......................... passim

## Rules

*Fed. R. Civ. Proc., Rules 12(b)(1), (6) ........................................................ 3, 4, 6, 27, 40

## Restatements

Restatement (Third) of Agency **§ 2.01 (Tentative Draft No. 2, 2001)** ............................ 7

Restatement (Third) of Agency **§ 2.03 (Tentative Draft No. 2, 2001)** ........................... 7

Restatement (Third) of Agency **§ 8.09 cmt. b (Tentative Draft No. 6, 2005)** ............... 7

Restatement (Second) of Foreign Relations Law § 41 (1962) ........................................ 43

Restatement (Third) of Foreign Relations Law of the United States
§ 102 cmt. k. (1986) ..................................................................................... 24

Restatement (Third) of Foreign Relations Law of the United States § 702(c) (1986) .... 17

## Foreign and International Cases

*Aita v. Regional Commander of Judea and Samaria*, HCJ 69/81
(High Ct. 1983) (Israel) ..................................................................................... 22

*The Beit Sourik Case*, HCJ 2056/04 (High Ct.2004) (Israel) .......................................... 22

*Mara'abe v. The Prime Minister of Israel,* HCJ 7957/04 (High Ct. 2005) (Israel) ......... 22

*Physicians for Human Rights, et al., v. Commander of the IDF Forces
in the Gaza Strip*, HCJ 4764/04 (High Ct. 2004) (Israel) ................................................. 23

*Yassin v. Commander of Kziot Military Camp*, HCJ 5591/02 (High Ct. 2002) (Israel) . 22

*Prosecutor v. Hadzihasanovic*, IT-01-47-AR72 (ICTY) (16 July 2003) ........................ 47

### International Documents

Additional Protocol to the Geneva Conventions of 12 August 1949,
and relating to the Protection of Victims of International Armed Conflicts,
8 June 1977 (Protocol I), available at http://www.genevaconventions.org/
(last visited May 14, 2006) ........................................................................... 1, 14, 19, 47

American Declaration of the Rights and Duties of Man, May 2, 1948, OEA/ser.L/V/II.23,
doc. 21, rev. 6 (1979) ................................................................................................ 17

Charter of the International Military Tribunal, Aug. 8, 1945, 82 U.N.T.S. 279 (1945), *in
The Nurnberg Trial*, 6 F.R.D. 69 (Int'l. Milit. Trib.1946) .......................................... 21

Charter of the United Nations (Oct. 24, 1945), *available at* http://www.un.org ........... 16

Control Council Law No. 10, Punishment of Persons Guilty of War Crimes, Crimes
Against Peace and Humanity, December 20, 1945, 3 Official Gazette Control Council
for Germany 50-55 (1946), *quoted in United States v. Flick*, 6 Trials of War Criminals
Before the Nuremberg Military Tribunals Under Control Council Law No. 10, 1191
(1949) ...................................................................................................................... 21

Convention on the Safety of United Nations and Associated Personnel (1994), G.A. res.
49/59, 49 U.N. GAOR Supp. (No. 49) at 299, U.N. Doc. A/49/49 (1994) ................. 17

Geneva Conventions of Aug. 12, 1949, 6 U.S.T. 3516, 75 U.S.T.S. 287 (Convention for
the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the
Field; Convention for the Amelioration of the Condition of Wounded, Sick and
Shipwrecked Members of Armed Forces at Sea; Convention Relative to the Treatment
of Prisoners of War; Convention Relative to the Protection of Civilian Persons in Time
of War) ..................................................................................................................... 18

\* Geneva Convention for the Protection of Civilians in Time of War,
Aug. 12, 1949, 6 U.S.T. 3516 (Fourth Geneva Convention) ................................. passim

Hague Conventions (International Convention With Respect to the
Laws and Customs of War by Land (1899); Convention Concerning the
Laws and Customs of War on Land (1907)), *available at*
http://www.yale.edu/lawweb/avalon/lawofwar/hague04.htm ................................. 18, 20

International Committee of the Red Cross, Customary International Humanitarian Law
  Study, II Jean-Marie Henckaerts & Louise Doswald-Beck, <u>Customary International
  Humanitarian Law: Practice</u> (2005) ..................................................................... 16, 19

International Covenant on Civil and Political Rights, Dec. 16, 1966, G.A. Res. 2200,
  U.N. GAOR, 21st Sess., Supp. No. 16, U.N. Doc. A/6316, 999 U.N.T.S. 171 ........... 15

International Military Tribunal (Nuremberg), Judgment and Sentences (1946), *reprinted
  in 41 Am. J. Int'l L. 172, 221* (1947) ........................................................................... 26

Rome Statute of the International Criminal Court (1998), U.N. doc. A/CONF. 183/9\*,
  July 17, 1998, *available at* http://www.icc-
  cpi.int/library/about/officialjournal/Rome_Statute_120704-EN.pdf .................... 16, 21

UN General Assembly, Res. 50/22 C, 25 April 1996 ..................................................... 15

UN Secretary-General, Report of the Secretary-General Pursuant to Paragraph 2 of
  Security Council Resolution 808, U.N. Doc. S/25704 (May 3, 1993), adopted by the
  Security Council, S.C. Res. 827 (May 25, 1993) .................................................... 19, 21

UN Secretary-General, Report dated 1 May 1996 of the Secretary-General's Military
  Adviser concerning the shelling of the United Nations compound at Qana on 18 April
  1996, UN Doc. S/1996/337, 7 May 1996 ............................................................... 1, 21

UN Security Council, Res. 587, 23 September 1986 ...................................................... 16

UN Security Council, Res. 467, 24 April 1980 ............................................................... 16

Statute of the International Tribunal for the Former Yugoslavia, S/25704/Ann.1, 32
  I.L.M. 1192, *adopted* S/Res/827, 32 I.L.M. 1203 (May 25, 1993) ............................. 18

Statute of the International Tribunal for Rwanda, S/RES/955/Ann.1, 33 I.L.M 1602 (Nov.
  8, 1994) ....................................................................................................................... 21

Universal Declaration of Human Rights, Dec. 10, 1948, G.A. Res. 217A(III), U.N. Doc.
  A/810 ........................................................................................................................... 17

Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 (entered into force Jan. 27, 1980) ........................................................................................ 24


**Other**

M. Cherif Bassiouni, CRIMES AGAINST HUMANITY IN INTERNATIONAL CRIMINAL LAW (1999) ........................................................................................................................ 15

M. Cherif Bassiouni, "Crimes Against Humanity" in Roy Gutman and David Rieff, eds., *Crimes of War: What the Public Should Know*, W.W. Norton (1999), *available at www.crimesofwar.org/ thebook/crimes-against-humanity.html (last visited May 11, 2006*) .................................................................................................................... 20

Derek Brown, "Gunners' cover is blown," *The Guardian* (May 11, 1996) ................... 27

Antonio Cassese, The Geneva Protocols of 1977 on the Humanitarian Law of Armed Conflict and Customary International Law, 3 UCLA Pac. Basin L. J. 55 (1984) ........ 14

Commentary on the Additional Protocols to the Geneva Conventions, Theodor Meron, *The Geneva Conventions as Customary Law*, 81 AM. J. INT'L L. 348 (1987) ................. 19

Barbara G.B. Ferguson, "US committed to peace process, Clinton assures Arab-Americans," *Saudi Gazette* (Aug. 8, 1996) ................................................................. 39

Christopher Greenwood, Customary Law Status of the 1977 Geneva Protocols, in Humanitarian Law of Armed Conflict: Challenges Ahead 93 (Astrid J.M. Delissen & Gerard J. Tanja eds., 1991) ...................................................................................... 14

Jean-Marie Henckaerts & Louise Doswald-Beck, <u>Customary International Humanitarian Law: Rules</u> (2005) ................................................................................................... 19

*Law of War Booklet* (Israel) (1986) ................................................................................. 19

Memorandum for the United States Submitted to the Court of Appeals for the Second Circuit in *Filártiga v. Peña-Irala*, 19 I.L.M. 585, reprinted in 12 Hastings Int'l & Comp. L. Rev. 34 (1988) ........................................................................................... 29

*United States Air Force Pamphlet* (1976) ...................................................................... 19

U.S. Dep't of State Daily Press Briefing (Apr. 19, 1996), *available at* http://www.hri.org/docs/statedep/ 1996/96-04-19.std.html ..................................... 5, 39

**INTRODUCTION**

On April 18, 1996, shells were fired at the United Nations station in Qana, Lebanon.  Over one hundred villagers who had taken refuge there were killed and even more were injured.  Most of the civilians sheltered in the UN compound were women, children, and elderly people.    Fijian soldiers stationed with the UN mission were also injured.  A UN review of the incident concluded that it was "unlikely that the shelling of the United Nations compound was the result of a gross technical and/or procedural error."  Exhibit 1 to the Declaration of James Klimaski (Klimaski Dcl.) at ¶13.[1]  The decision to attack the United Nations compound was made with the participation of Defendant Moshe Ya'alon, who at that time was head of the intelligence branch of the Israeli military.[2]  Intentional and indiscriminate attacks on civilians are a violation of the law of nations and a war crime, as are attacks on UN facilities.

It is clear that the attack on the United Nations compound and upon the displaced Lebanese civilians was prohibited by Israeli law and policies.  Exhibit 1 at ¶8.  Indeed, the submissions by Defendant only seek to excuse it as accidental, an excuse which is contradicted by the official UN report quoted above.  Even if the assault on the United Nations compound were accidental, the killing and injuring of the civilians there would be war crimes because of failure to take "constant care" to spare civilians.  Protocol Additional to the Geneva Conventions of 12 August 1949 ("Protocol I"), Chap. IV, Art. 57, (Protocol I), June 8, 1977, 1125 U.N.T.S. 3   Nothing submitted by Defendant

[1] Report dated 1 May 1996 of the Secretary General's Military Advisor concerning the shelling of the United Nations Compound on at Qana on 18 April 1996 and Addendum dated 7 May 1996 at ¶3 ("Report to Security Council").
[2] Plaintiffs' claims against Defendant are based on allegations of direct responsibility, aiding and abetting liability, and command responsibility. Complaint at ¶¶ 2, 22.

suggests that an attack on unarmed civilians and on a United Nations installation was legal under either Israeli or international law.

Defendant's recitation concerning the designation of Hezbollah as a terrorist organization is irrelevant to the issue of the attack on a United Nations compound or the killing of unarmed civilians who had taken refuge there.  None of the diplomatic activities alluded to by Defendant provided or were intended to provide a remedy for those killed and injured at Qana.  This case is not about the military conflict between Hezbollah and Israel or about Israel's occupation of Southern Lebanon.  This case deals only with the question of liability for an attack on a target which was prohibited by international humanitarian law, which binds all nations and individuals without exception.  The complaint alleges that Defendant had direct, aiding and abetting and command responsibility for the violations.

The fact that this incident occurred in the Middle East and the fact that Defendant is a former head of Israeli military intelligence may generate strong emotions but it does not create a nonjusticiable political question.  The fact that, at other times and in other places, Israelis suffer death and injury does not justify the intentional murder of Lebanese civilians or the assault on a United Nations compound that had given them shelter and humanitarian relief.

Despite Defendant Ya'alon's repeated assertions to the contrary, he is not the government of Israel and is not entitled to a presumption of immunity.  Although wrapped in rhetorical flourishes and references to events unrelated to the issue before the Court, Defendant's Motion raises three core issues.  First, Defendant is not entitled to immunity.  The Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350 (note),

-2-

provides liability for extrajudicial killing even if Defendant's conduct was authorized.

Further, the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602-11, does not

apply to those acting outside the scope of their authority under the applicable domestic

law or international law, and does not preclude claims against officials for war crimes,

crimes against humanity, extrajudicial killing, and cruel, inhuman, or degrading

treatment or punishment.  Thus, Plaintiffs' claims under the Alien Tort Statute (ATS), 28

U.S.C. § 1350, are justiciable.  Second, this suit is not barred by the political question

doctrine because the issue of liability raised here is committed, by constitution and

statute, to the courts, and is otherwise justiciable.  Third, the suit is not barred by the act

of state doctrine because the act occurred outside Israel's sovereign territory and was not

an official act authorized by law.

## ARGUMENT

### I.    THE STANDARD OF REVIEW AND PLAINTIFFS' RIGHT TO DISCOVERY.

Defendant moves to dismiss under Rule 12(b)(1), based on sovereign immunity

and political question grounds, and under Rule 12(b)(6), based on the act of state

doctrine, which is  non-jurisdictional.  *See, Republic of Austria v. Altmann*, 541 U.S. 676,

679 (2004) (contrasting act of state as a substantive defense with a claim of sovereign

immunity which is jurisdictional).   For purposes of a motion to dismiss under Rule

12(b)(6), the well-pleaded factual allegations of the complaint are accepted as true, and

all inferences are drawn in favor of the plaintiffs.  *Taylor v. F.D.I.C*, 132 F.3d 753, 762

(D.C. Cir. 1997).  Dismissal is appropriate only when "it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to

relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Warren v. District of Columbia,*
353 F.3d 36, 37 (D.C. Cir. 2004). Thus, Defendant's motion to dismiss based on the act
of state doctrine must be considered on the basis of the pleadings alone.

While the district court may consider materials outside the pleadings in deciding
whether to grant a motion to dismiss for lack of jurisdiction, the court must still accept all
of the factual allegations in the complaint as true. *Jerome Stevens Pharms., Inc. v. FDA*,
402 F.3d 1249, 1253-54 (D.C. Cir. 2005). When a court decides under either Rule
12(b)(1) or Rule 12(b)(6) to consider matters outside the pleadings, it should so inform
the parties and set a schedule for submitting additional affidavits and documents if the
parties wish. *Gordon v. National Youth Work Alliance*, 675 F.2d 356, 361 (D.C. Cir.
1982). *See also*, *Wilderness Soc. v. Griles*, 824 F.2d 4, 16 n.10 (D.C. Cir. 1987) (under
Rule 12(b)(1), a district court "must give the plaintiff the opportunity to discover
evidence relevant to his jurisdictional claim"); *Prakash v. American Univ.*, 727 F.2d
1174, 1179-80 (D.C. Cir. 1984) (court must afford party not moving for subject-matter
dismissal "an ample opportunity to secure and present evidence relevant to the existence
of jurisdiction.").

Herein, Defendant relies extensively on material outside the pleading to support
each of his grounds for dismissal.[3] Much of his motion attempts to controvert facts
alleged in the Complaint. For example, Defendant argues that the attack on the United
Nations compound and the killing of the civilians who had taken refuge there was simply

---

[3] Plaintiffs contend that much of the evidence upon which Defendant relies is
incompetent and/or irrelevant. Plaintiffs' objections are filed concurrently with this
Memorandum.

an unfortunate error.[4]  Memorandum of Points and Authorities in Support of Moshe

Ya'alon's Motion to Dismiss the Complaint (Memo.) at 2, 6.  Plaintiffs allege that it was

deliberate.  Complaint at ¶¶ 18, 96.  As set forth below, if the shelling of the compound

was deliberate or carried out in a manner inconsistent with the duty of constant care for

civilians, it violated both international and Israeli law.  *See infra* at IID.  Defendant's

claim that he is entitled to immunity is entirely dependent on the assertion that he acted

within the scope of his authority.  Thus, at the least, Plaintiffs should be entitled to

discover the factual basis of this claim.[5]

## II.    DEFENDANT IS LIABLE UNDER THE TVPA: THE FSIA DOES NOT PROVIDE IMMUNITY FROM PLAINTIFFS' CLAIMS UNDER THE TVPA.

### A.  Defendant's Burden of Proof.

"'In accordance with the restrictive view of sovereign immunity reflected in the

FSIA,' the defendant bears the burden of proving that the plaintiff's allegations do not

bring its case within a statutory exception to immunity."  *Kilburn v. Socialist People's*

---

[4] The statement by then President Clinton regretting the "tragic misfiring" (Memo. at 2) was made before the United Nations investigation, which refuted the claim of accident, was completed. In a subsequent statement, the White House denied that the U.S. had reached a conclusion about Qana. *See, e.g.,* "What the President did was, rather than engage in any kind of blame-laying on one side or another, he underscored what's got to happen now, looking proactively at the situation." U.S. Department of State Daily Press Briefing (Apr. 19, 1996), http://www.hri.org/docs/statedep/1996/96-04-19.std.html. While the President spoke of the diplomatic role for the executive after the Qana bombing, he never advocated or even suggested that the innocent victims of the Qana bombing should not be compensated for their injuries or the deaths of family members. Nothing in the President's statements call for the judiciary to abdicate its role of deciding questions of liability for an individual official involved in the attack.

[5] Because the incident at Qana was the subject of an investigation by the military advisor to the Secretary-General of the United Nations, Israel's security would not be compromised by discovery.

*Libyan Arab Jamahiriyi,* 376 F.3d 1123, 1131 (D.C. Cir. 2004) quoting *Phoenix*

*Consulting Co. v. Republic of Angola,* 216 F.3d 36, 40 (D.C. Cir. 2000), quoting

*Transamerican S.S. Corp. v. Somali Democratic Republic,* 767 F.2d 998, 1002 (D.C. Cir.

1985); *see also, Princz v. Federal Republic of Germany,* 26 F.3d 1166, 1171 (D.C. Cir.

1994).  In *Daliberti v. Republic of Iraq,* 97 F. Supp. 2d 38, 42-43 (D.D.C. 2006)

(Friedman, J.), this Court reviewed the burden of proof on a Rule 12(b)(1) motion relying

on the FSIA.:

> A court may dismiss a complaint brought under the FSIA only if it
> appears beyond doubt that plaintiffs can prove no set of facts in support of
> their claims that would entitle them to relief.  *See Neitzke v. Williams,* 490
> U.S. 319, 326-27 (1989) (quoting *Hishon v. King & Spalding,* 467 U.S.
> 69, 73 (1984); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276
> (D.C. Cir. 1994); *cf. Saudi Arabia v. Nelson,* 507 U.S. at 351, 113 S.Ct.
> 1471 (in reviewing dismissal under FSIA, court accepts all factual
> allegations as true).   Once plaintiff has produced evidence that an
> exception applies, defendant must produce evidence of its entitlement to
> immunity; "[i]f any of the exceptions appears in the pleadings or is not
> refuted by the foreign state asserting the defense, the motion to dismiss the
> complaint must be denied."  *Baglab Ltd. v. Johnson Matthey Bankers Ltd.,*
> 665 F.Supp. 289, 294 (S.D.N.Y. 1987).

Again, Plaintiffs should be afforded the opportunity to take limited discovery of

issues raised under Rule 12(b)(1), including evidence of the factual and legal authority on

which Defendant relies to support his claim that he was acting within the scope of his

authority.

### B.  Defendant Is Not Entitled to Immunity Even If He Acted with Actual Authority.

The unambiguous language of the TVPA provides for liability where an

"individual who, under **actual** or apparent authority or color of law, of any foreign

nation...subjects an individual to extrajudicial killing...." 28 U.S.C. § 1350 (note), Sec.

-6-

2(a)(2) (emphasis added). Each term used in the statute to describe those who may be liable under the TVPA has distinct meaning. The term "actual authority" has well-established meaning (*see, e.g., Hatahley v. United States*, 351 U.S. 173, 180-181 (1956)): actual authority "arises from a manifestation of consent from principal to agent." As described in the RESTATEMENT (THIRD) OF AGENCY: "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." RESTATEMENT (THIRD) OF AGENCY **§§ 2.01 (TENTATIVE DRAFT NO. 2, 2001), 8.09 CMT. B (TENTATIVE DRAFT NO. 6, 2005).**

On the other hand, "apparent authority" is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations. RESTATEMENT (THIRD) OF AGENCY **§ 2.03 (TENTATIVE DRAFT NO. 2, 2001).** "A private person acts 'under color of' a state statute or other law when he, like the official, in some way acts consciously pursuant to some law that gives him aid, comfort, or incentive; or when he acts in conjunction with a state official." *Adickes v. S.H.Kress Co.*, 398 U.S. 144, 212 (1970). Thus, the TVPA unambiguously intended to extend liability even to government officials with "actual authority," that is, to those who acted with the consent of the state or an agency of the state.

In this context, even if Defendant were to provide evidence that he was "authorized" to participate in an "extrajudicial killing" (*i.e.*, that he had "actual" authority) by the Israeli government, he would not be immune under the TVPA.

Defendant offers no separate analysis of the terms of the TVPA and offers no interpretation of the term "actual authority."  "Actual" authority cannot be read to mean "outside the scope of authority."  Ignoring the explicit language of the TVPA, Defendant argues that officials of foreign governments are immune from liability if they are acting in their official capacities.  Memo. at 10-16.

The Court's role in interpreting an unambiguous statute is clear:  "As in all statutory construction cases, we begin with the language of the statute.   The first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *Barnhart v. Sigmon Coal Company,* 534 U.S. 438, 450 (2002), quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997).  The inquiry ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Id.*

The FSIA makes no reference to the sovereign immunity of foreign officials. It is a fundamental rule of statutory construction that a later, more specific statute will trump a more general one.  *United States v. Estate of Romani,* 523 U.S. 517, 530-33 (1998).  *See also*, *A.T.&T.  v.  Iowa Utilities Bd.*, 525 U.S. 366 410 (1999), quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 445 (1987) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."); *Guidry v. Sheet Metal Workers Nat. Pension Fund*. 493 U.S. 365.375 (1998) quoting *Morton v. Mancari,* 417 U.S. 535, 550-551 (1974) ("It is an elementary tenet of statutory construction that '[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one...'").

-8-

Here, the TVPA specifically provides that those with **actual** authority (*i.e.*, officials acting within the scope of their authority) can be sued, whereas the FSIA does not specifically exclude officials (that meaning has been read into an "agency or instrumentality of a foreign state"). On that basis alone, Defendant's argument that inferences drawn from the FSIA negate the clear language of the TVPA must be rejected. Further, the TVPA is the later of the two statutes, and therefore should take precedence.

Defendant cannot rely on the legislative history to contradict the unambiguous statutory language. Where the language is unambiguous, it is improper to look to statements from particular representatives or senators. Such statements "cannot amend the clear and unambiguous language of a statute." *Id.* at 457. The court should not look beyond the statute to provide an interpretation inconsistent with its plain meaning. "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms." *Central Trust Co., Rochester N.Y. v. Official Creditors' Committee of Geiger Co. Inc.,* 454 U.S. 354, 359-60 (1982), quoting, *Caminetti v. United States*, 242 U.S. 470, 485 (1917). *See also, Pipefitters Local Union No. 562 v. U.S.*, 407 U.S. 385, 466 (1972). Even if it were necessary to look to the legislative history, it confirms that "the phrase 'actual or apparent authority or under color of law' is used to denote torture and extrajudicial killings committed by officials both within and outside the scope of their authority." S. Rep. No. 102-249, at 7 (1991).

Only one case cited by Defendant involves claims under the TVPA, *Doe v. Israel,* 400 F. Supp. 2d 86 (D.D.C. 2005). That case involved claims under the ATS and the TVPA against Israel, its agencies, Prime Minister Sharon and other officials in their "official" and "individual" capacities, but it contained no distinct analysis of the applicability of immunity to officials for claims under the TVPA. In the absence of any analysis of the TVPA, *Doe v. Israel* cannot support an analysis of the TVPA which is so at odds with its clear statutory meaning.

### C. The FSIA Does Not Provide Defendant with Immunity from Claims under the ATS Because He Acted Outside the Scope of His Authority.

In the circumstances of this case, where there was a lethal military attack on unarmed civilians who were then internally displaced persons within the protection of the United Nations, Defendant's acts could not fall within the scope of his lawful authority. Thus, he is not entitled to immunity pursuant to the FSIA.

The FSIA may immunize officials of foreign governments only where they act within the scope of their lawful authority. *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F. 3d 1020, 1027 (D.C. Cir. 1997); *El-Fadl v. Central Bank of Jordan,* 75 F.3d 668, 671 (D.C. Cir. 1996). *See also*, *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1101-03 (9th Cir. 1990); *Velasco v. Government of Indonesia,* 370 F.3d 392, 398-99 (4th Cir. 2004); *Byrd v. Corporacion Forestal y Industrial de Olancho S.A.,* 182 F.3d 380, 388 (5th Cir. 1999).

*Jungquist* makes clear that foreign officials who act within the authority of their official positions but contrary to law, are not immune. In *Jungquist,* 115 F.3d at 1028, the court found that a defendant was *not* entitled to immunity under the FSIA for entering

into a contract to pay for medical treatment through a government program in exchange

for the plaintiff's silence. Although that defendant was authorized to enter into a contract

for medical care, his "corrupt bargain" for silence could not have been authorized. The

mere fact that the conduct was within the powers of Defendant's official position does

not mean that such conduct was within the scope of his lawful authority. Thus, under

*Jungquist*, the first step in the analysis of defendant's claim to immunity is whether the

conduct alleged was within the **lawfu**l scope of his authority.

Defendant relies heavily on *Doe v. Israel* to argue that an official must act from

personal motive to place his conduct outside the scope of his authority. However,

*Jungquist* clearly mandates that the "relevant inquiry in determining whether an

individual was acting in an official capacity focuses on the nature of the individual's

alleged actions, rather than the alleged motives underlying them." 115 F.3d at 1028. The

analysis required by *Jungquist* is binding on the Court. As a policy matter, the subjective

test would create a standard difficult to interpret. Under a subjective standard, the court

would have been required to determine if Marcos' authorization of torture was motivated

by his desire for personal power or his understanding of the needs of the state. However,

in *Hilao,* 25 F.3d at 1472, the court concluded that Marcos' acts of torture, execution, and

disappearance were not consistent with Philippine laws and therefore were clearly acts

outside of his authority as President. The court should more properly consider the nature

of the conduct and whether or not the conduct at issue was a lawful exercise of

defendant's authority. The distinction between private and public function made in

*Jungquist* cannot be based on motive because *Jungquist* specifically rejected that

subjective standard. *Jungquist* is best read as distinguishing between conduct which is

authorized by law and official policy and that which is not. In *Jungquist*, the Court assumed that defendant's "corrupt bargain" was contrary to Saudi policy and law.

*El-Fadl,* and *Park v. Shin,* 313 F.3d 1138, 1144 (9th Cir. 2002), on which Defendant relies, are inapposite to this case. At issue in *El-Fadl* was a wrongful termination claim and a dispute regarding whether the terminating official was acting in his governmental capacity or in his private capacity with a privately owned bank to which he had been appointed to in order to liquidate the subsidiary. 75 F.3d at 670-71. The Court concluded that there was no evidence that the conduct at issue was not taken within the defendant's capacity as a government official. *Id.* at 670. In *Park*, the court concluded that a deputy consular official was not acting in his official capacity when " he hired [a domestic servant] as a personal family employee, paid her with family funds, and required her to perform work benefitting the Consulate only on a few days each month." Neither *El-Fadl* nor *Park* addressed the issue of whether, acting as a government official, defendant was properly authorized to do the alleged acts. The issue herein, as in *Jungquist*, is the nature of the official's conduct, that is, whether it was authorized by law.

**D. Defendant's Conduct Was Not Within the Scope of his Lawful Authority.**

It is clear that, according to the facts alleged, Defendant's participation in the attack on the United Nations compound, which had given refuge to unarmed villagers, was outside the scope of his authority because the attack violated the law of nations and the laws of Israel. An attack on unarmed civilians is a war crime and one of the crimes against humanity recognized as binding on all nations. Defendant has failed to present evidence that acts alleged were within the scope of his lawful authority.

-12-

In *Hilao v. Estate of Marcos*, the court determined that the acts of former Philippine president Marcos were not immunized by the FSIA because they "were not taken within any official mandate."  25 F.3d at 1470.  The court concluded that "the illegal acts of a dictator are not 'official acts' unreviewable by federal courts."  *Id.* at 1471.  *See also, Trajano v. Marcos*, 978 F.2d 493, 496-77 (9th Cir. 1992); *Xuncax v. Gramajo*, 886 F. Supp. 162, 175-76 (D. Mass. 1995); *Keller v. Central Bank of Nigeria*, 277 F.3d 811, 815 (6th Cir. 2002); *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1197 (S.D.N.Y. 1996).

In *Cabiri*, the court found that the FSIA does not apply to a foreign government official alleged to have committed torture, as torture could not fall with the scope of his authority, nor be permitted by domestic law, since no government asserts a right to torture.  921 F. Supp. at 1198. In *Doe I v. Liu Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004), Chinese government officials were found not to be immune under the FSIA because the alleged conduct – torture – was inconsistent with Chinese law.  An officer  actions beyond the limitations of state law are to be considered individual and not sovereign actions; the officer is not empowered by the sovereign to commit those acts.  *Id.  Qi* explicitly addressed the issue of whether a government could authorize conduct which was contrary to its own law.  *Qi* concluded that *ultra vires* actions are not subject to sovereign immunity and that only acts within the official  legal grant of authority can be immunized.  *Id.* at 1287.  Thus, even if the defendant had provided competent evidence that he was authorized or directed to commit the alleged violations of the law of nations, his burden would not be met.  Defendant must show that he had *legal* authority.  Although *Qi* looked to domestic law to determine whether the official acted within the

scope of his authority, *Id*. at 1283, other courts have looked to both domestic and international law, finding that officials *cannot* be authorized to commit *jus cogens* violations. *See, e.g., Hilao,* 25 F.3d at 1472; *Cabiri,* 921 F. Supp. at 1198; *Xuncax,* 886 F. Supp. at 176.

In *Qi*, *Cabiri*, and *Hilao*, the events at issue involved purely domestic conduct, to wit, the treatment by foreign officials of their own citizens within that state's borders. Here, however, the conflict was international and the events at issue occurred outside Israel's borders. International law, including international humanitarian law, the Geneva Convention Relative to the Protection of Civilian Persons in the Time of War of August 12, 1949 ("Fourth Geneva Convention"), and Additional Protocol I to the Geneva Conventions of 12 August 1949, all of which constitute customary international law, govern international conflicts. *See*, Fourth Geneva Convention, Art. 2; Antonio Cassese, The Geneva Protocols of 1977 on the Humanitarian Law of Armed Conflict and Customary International Law, 3 UCLA Pac. Basin L. J. 55, 70-71, 108 (1984) (Additional Protocol I constitutes customary international law); Christopher Greenwood, Customary Law Status of the 1977 Geneva Protocols, in Humanitarian Law of Armed Conflict: Challenges Ahead 93 (Astrid J.M. Delissen & Gerard J. Tanja eds., 1991) (same). Thus, Defendant's conduct must be considered in the context of international law. However, even under Israeli law, Defendant's attack of unarmed civilians and on the United Nations compound violated Israeli law and policy.

### 1. Defendant acted outside the scope of his authority under international law norms.

The illegality of the attack on Qana under international law was recognized by the United Nations General Assembly. *See,* General Assembly Resolution, A/RES/50/22 C, 25 April 1996, condemning "the Israeli military attacks against the civilian population in Lebanon, especially against the United Nations base at Qana, which violate the rules of international humanitarian law pertaining to the protection of civilians, and expresses its grave concern and sorrow over the loss of lives and serious injuries to innocent men, women and children" (Attached as Exhibit 2 to Klimaski Dcl.). Such a resolution by the General Assembly is evidence of international customary law. *See, e.g., American International Group, Inc. v. Islamic Republic of Iran,* 493 F. Supp. 522, 524 (D.D.C. 1980). Defendant was acting outside the scope of his authority if his conduct violated customary international law. This is so under both international and Israeli law. *See, infra.* Indeed because the conduct alleged violated *jus cogens* norms, Israel could not derogate from them.

### a. Attacks on the United Nations as war crimes.[6]

The attack on the United Nations facility and personnel is a clear violation of international law. The inviolability of envoys is so ancient a principle that it was acknowledged by Herodotus in the 5th century BC. M. Cherif Bassiouni, CRIMES AGAINST HUMANITY IN INTERNATIONAL CRIMINAL LAW 49, 50 (1999) (quoting Coleman Phillipson, 1 THE INTERNATIONAL LAW AND CUSTOM OF ANCIENT GREECE AND ROME 59 (1911) (citing Herodotus, History)) ("[T]he slaughter of the Persian envoys by the

---

[6] *See* Declaration of William Aceves, filed concurrently, at 10-14, on the international humanitarian law protecting humanitarian facilities and peacekeeping missions.

Athenians and Spartans was confessedly a transgression of the [laws of men], as a law of the human race generally").

The doctrine finds modern expression in the Charter of the United Nations, Art. 2(4), which states that, "All Members shall refrain...from the...use of force in any...manner inconsistent with the Purposes of the United Nations."  Certainly, deliberately attacking a UN facility is "inconsistent" with those purposes.  The Rome Statute of the International Criminal Court (1998), Art. 8(2), which codified war crimes, included within that definition "intentionally direct[ed] attacks against personnel, installations, material, units or vehicles involved in a...[United Nations] peacekeeping mission."  Under Article 7(1) of the 1994 Convention on the Safety of United Nations and Associated Personnel, "United Nations and associated personnel, their equipment and premises shall not be made the object of attack or of any action that prevents them from discharging their mandate."  G.A. Res. 49/59, 49 U.N. GAOR Supp. (No. 49) at 299, U.N. Doc. A/49/49 (1994).  Numerous Security Council (SC) Resolutions have condemned attacks on UN peacekeeping operations, including specifically attacks on the UNIFIL mission in Lebanon.  *See, e.g.,* UN Security Council, Res. 467, 24 April 1980, § 2 (condemning attacks on UNIFIL); UN Security Council Res. 587, 23 September 1986, §§ 1 and 2 (referring to attacks on UNIFIL as "criminal"); II Jean-Marie Henckaerts & Louise Doswald-Beck, CUSTOMARY INTERNATIONAL HUMANITARIAN LAW: PRACTICE (2005) Ch. 9, §§ 1-127 (authoritative compilation of the International Committee of the Red Cross cataloging sources of law indicative of norm prohibiting attacks on personnel and objects involved in peacekeeping missions).  *See also, Tachiona v. United States,*

386 F.3d 205, 221-23 (2d Cir. 2004) (holding that it is universally recognized that, under international law, envoys are inviolable from attacks on their person.

### b.  The prohibition against extrajudicial killing.

Extrajudicial killings (summary executions) have long been recognized as a violation of the law of nations.  *See, Kadic*, 70 F.3d at 243; *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1179 (C.D. Cal. 2005); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1153 (E.D. Cal. 2002);  *Xuncax*, 886 F. Supp. at 184; *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1542 (N.D. Cal. 1987); *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887 at **4, 6 (S.D.N.Y. 2002); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 702(c) (1986) ("A state violates [customary] international law if, as a matter of state policy, it practices, encourages, or condones ... the murder or causing the disappearance of individuals.").  *See also, Hilao*, 25 F.3d at 1475 (describing the "prohibition against summary execution" as a "similarly universal, definable, and obligatory" norm).

So widespread is the consensus against extrajudicial killing that "every instrument or agreement that has attempted to define the scope of international human rights has 'recognized a right to life coupled with a right to due process to protect that right.'"[7]  *Alejandre v. Republic of Cuba*, 996  F. Supp. 1239, 1252 (S.D. Fla. 1997),

---

[7] International instruments proscribing extrajudicial killings, to cite only a few, include the following: Universal Declaration of Human Rights, Dec. 10, 1948, art. 3, G.A. Res. 217A(III), U.N. Doc. A/810; International Covenant on Civil and Political Rights, Dec. 16, 1966, art. 6(1), G.A. Res. 2200, U.N. GAOR, 21st Sess., Supp. No. 16, U.N. Doc. A/6316, 999 U.N.T.S. 171; American Declaration of the Rights and Duties of Man, May 2, 1948, art. I, OEA/ser.L/V/II.23, doc. 21, rev. 6 (1979).

citing *Xuncax,* 886 F. Supp. at 185 (citation omitted).  The ban on extrajudicial killing

thus rises to the level of *jus cogens,* a norm of international law so fundamental that it is

binding on all members of the world community. *Alejandre,* 996 F. Supp. at 1252.

Indeed, in *Alejandre,* the court looked to several factors to conclude that the killings

occurred in a context applicable here: they were premeditated and intentional, outside of

[the state's] territory, wholly disproportionate, and executed without warning or process.

*Id.* at 1253.

### c.  Attacks on civilians as war crimes.[8]

The prohibition against war crimes has long been recognized as a human rights

norm.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 762  (2004) (Breyer, J., concurring);

*Kadic,* 70 F.3d 232 at 242; *Presbyterian Church of the Sudan,* 244 F. Supp. 2d at 305.

That prohibition provides for the protection of civilians.[9]   These protections are largely

codified in the Hague Conventions,[10] the Fourth Geneva Convention[11] and the two

Protocols.[12]   These basic international agreements detailing the laws of war have

---

[8] *See* Declaration of William Aceves, filed concurrently, at 1-10, on the international humanitarian law protecting civilian populations.

[9] The four Geneva Conventions of 1949 have been ratified by over 190 nations, including the United States.  Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field; Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea; Convention Relative to the Treatment of Prisoners of War; Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.S.T.S. 287 (Fourth Geneva Convention).

[10] The Hague Conventions include the 1899 International Convention With Respect to the Laws and Customs of War by Land and the 1907 Convention Concerning the Laws and Customs of War on Land.

[11] *See* footnote 9.

[12] Protocol on the Protection of Victims of International Armed Conflicts; Protocol on the Protection of Victims of Non-International Armed Conflicts.

"beyond a doubt become part of customary international law." *Report of the Secretary-General Pursuant to Paragraph 2 of Security Council Resolution 808*, U.N. Doc. S/25704 at 9, ¶ 35 (May 3, 1993), adopted by the Security Council, S.C. Res. 827 (May 25, 1993); II Jean-Marie Henckaerts & Louise Doswald-Beck, CUSTOMARY INTERNATIONAL HUMANITARIAN LAW: PRACTICE (2005) at 2061-2105; Theodor Meron, *The Geneva Conventions as Customary Law*, 81 AM. J. INT'L L. 348 (1987).   As further evidence of their customary law status**,** many of the rules governing the conduct of war have also been incorporated into domestic laws around the world.  The prohibition of war crimes has been included in the military manuals throughout the world including specifically in the United States, *Air Force Pamphlet* (1976) §§5-3 (a)1(a) and 5-3(b) and in Israel, *Law of War Booklet* (1986), ch. 13.

As noted above, the prohibition against war crimes includes the duty of constant care. Chap. IV, Art. 57, Protocol I.  *See also* I Jean-Marie Henckaerts & Louise Doswald-Beck, CUSTOMARY INTERNATIONAL HUMANITARIAN LAW: RULES (2005) at 51-52; II Jean-Marie Henckaerts & Louise Doswald-Beck, CUSTOMARY INTERNATIONAL HUMANITARIAN LAW: PRACTICES (2005) at 336-44 (summarizing international and national laws and practice).  "An indiscriminate attack amounts in practice to an attack on civilians…."  I Jean-Marie Henckaerts & Louise Doswald-Beck, CUSTOMARY INTERNATIONAL HUMANITARIAN LAW: RULES (2005) at 189.  Launching an attack without attempting to aim properly at a military target or in such a manner as to hit civilians amounts to an indiscriminate attack." *Id.*

### d.  Crimes against humanity.

The prohibition of crimes against humanity is longstanding and widely accepted among the community of nations. Indeed, according to international law expert, Cherif Bassiouni, *Crimes Against Humanity*, in Roy Gutman and David Rieff, eds.*, C*RIMES OF W*AR: W*HAT THE P*UBLIC S*HOULD K*NOW, (1999), *available at www.crimesofwar.org/* thebook/crimes-against-humanity.html (last visited May 11, 2006):

> crimes against humanity have existed in customary international law for over half a century and are also evidenced in prosecutions before some national courts. The most notable of these trials include those of Paul Touvier, Klaus Barbie, and Maurice Papon in France, and Imre Finta in Canada. But crimes against humanity are also deemed to be part of *jus cogens* - the highest standing in international legal norms. Thus, they constitute a non-derogable rule of international law.

"The term [crimes against humanity] originated in the 1907 Hague Convention preamble, which codified the customary law of armed conflict." *Id.* In 1945, the Allied Powers drafted the Nuremberg Charter for the International Military Tribunal, Charter of the International Military Tribunal, Aug. 8, 1945, art. 6(c) 1544, 1547, 82 U.N.T.S. 279, 288 (1945) (Nuremberg Charter) and enacted Control Council Law No. 10, Punishment of Persons Guilty of War Crimes, Crimes Against Peace and Humanity, December 20, 1945, 3 Official Gazette Control Council for Germany 50-55 (1946), which condemned crimes against humanity and set forth basic definitional requirements. The Nuremburg Tribunals established that crimes against humanity encompass:

> atrocities and offenses, including but not limited to murder, extermination, enslavement, deportation, imprisonment, torture, rape, or other inhumane acts committed against any civilian population, or persecutions on political, racial or religious grounds . . .

Control Council Law No. 10, Art. II(1)(c), *quoted in United States v. Flick*, 6 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, 1191 (1949). Time and again, the international community has defined crimes against humanity in virtually identical terms to those used in Control Council Law No. 10.[13]

The conduct alleged, attacking a United Nations peacekeeping force and killing unarmed civilians, constitutes summary execution, war crimes and crimes against humanity in violation of international law. If, as alleged, Defendant violated international law, Defendant could not have acted within the scope of his lawful authority.

## 2. Defendant acted outside the scope of his authority under Israeli law.

Applying the laws of Israel would reach the same conclusion. In their statements to the investigator appointed by the Secretary General, "Israeli officials emphasized that it was not Israeli policy to target civilians or the United Nations." UN Secretary-General, Report dated 1 May 1996 of the Secretary-General's Military Adviser concerning the shelling of the United Nations compound at Qana on 18 April 1996, UN Doc. S/1996/337, 7 May 1996, §§ 7-8. *See also,* Addendum at 2.g.

---

[13] *E.g.,* Charter of the International Military Tribunal, Art. 6(c), *in The Nurnberg Trial*, 6 F.R.D. 69, 130 (Int'l. Milit. Trib.1946); Statute of the International Tribunal for Rwanda, Art. 3, S/RES/955/Ann.1, 33 I.L.M 1602, 1603 (Nov. 8, 1994); Statute of the International Tribunal For the Former Yugoslavia, Art. 5, S/25704/Ann.1, 32 I.L.M. 1192, 1194, *adopted* S/Res/827, 32 I.L.M. 1203 (May 25, 1993); Rome Statute of the International Criminal Court, U.N. doc. A/CONF. 183/9*, July 17, 1998, Article 7.

### a. Israeli law incorporates customary international law.

Under Israeli law, customary international law constrains the conduct of Israeli officials.  As the Israeli High Court of Justice (HCJ) held: "Indeed, every Israeli soldier carries in his pack the rules of customary public international law regarding the law of war, and the fundamental rules of Israeli administrative law."[14]  Israel's incorporation of customary international law into Israeli law is automatic, unless customary international law conflicts with an existing domestic statute; if there is a conflict, statutes are to be read, whenever possible, as consistent with international law.[15]  Defendant presents no evidence that any such conflicting statute exists.  Israel also observes the humanitarian portions of the Fourth Geneva Convention.[16]

Defendant violated standards of conduct imposed by customary international law and these specific instruments.  Specifically, as explained by the High Court of Justice, Israeli military personnel are under an affirmative duty, based on the Fourth Geneva

---

[14] *Mara'abe v. The Prime Minister of Israel,* HCJ 7957/04, para. 14 (High Ct. 2005) (Israel) (available at http://elyon1.court.gov.il/files_eng/04/570/079/a14/04079570.a14.pdf).

[15] *Aita v. Regional Commander of Judea and Samaria*, HCJ 69/81, para. 12 (High Ct. 1983) (Israel) (available at http://elyon1.court.gov.il/files_eng/81/690/000/z01/81000690.z01.pdf).

[16] *Mara be*, CJ 2506/04, para. 57; *The Beit Sourik Case*, HCJ 2056/04, paras. 23-24 (High Ct.2004) (Israel) (available at http://elyon1.court.gov.il/files_eng/04/560/020/a28/04020560.a28.pdf); *Yassin v. Commander of Kziot Military Camp*, HCJ 5591/02, para. 12 (High Ct. 2002) (Israel) (available at http://elyon1.court.gov.il/files_eng/02/910/055/a03/02055910.a03.pdf) (Fourth Geneva Convention applies).

Convention, to protect civilians from harm.[17]  The assault on the United Nations compound and unarmed civilians is clearly contrary to the laws which Israel itself views as binding. As such, Defendant acted outside the scope of his lawful authority and is not immune.

None of the materials submitted by Defendant support the contention that the assault on the Qana United Nations compound and the civilian internally displaced persons within it was within the scope of Israeli law or policy.  At most, Israeli authorities claim that the violations were the result of an accident.  *See, e.g.* Memo. at 13, n.16.  The UN report found that the physical evidence was inconsistent with the Israeli official descriptions of the event.  Exhibit 1 at ¶13a.  As already mentioned, the report further found that it was "unlikely that the shelling of the United Nations compound was the result of a gross technical and/or procedural error."  Exhibit 1, Addendum to Report at 13.  Of course, at this stage, this Court cannot and need not resolve the differing versions of the event since none of those versions claim that the conduct was consistent with Israeli or international law.

> **b. Israeli law cannot authorize conduct in derogation of binding principles of international law (*jus cogens*).**

Because, as noted above at Section II D(1), the conduct alleged violates *jus cogens* norms, Israel could not have authorized it.[18]  Since at least Nuremberg, it has been

---

[17] *Physicians for Human Rights, et al., v. Commander of the IDF Forces in the Gaza Strip*, HCJ 4764/04 paras. 19-22, 58, 66-68 (High Ct. 2004) (Israel) (available at http://elyon1.court.gov.il/files_eng/04/640/047/a03/ 04047640.a03.pdf).; *accord, In re Yamashita*, 327 U.S. 1, 16 (1946) (commander had "an affirmative duty to take such measures as were within his power and appropriate in the circumstances to protect prisoners of war and the civilian population").

[18] *See, e.g., Presbyterian Church*, 244 F.Supp.2d at 345 (war crimes and extrajudicial killing are *jus cogens* violations); *Presbyterian Church*, 374 F.Supp.2d 331, n.2

clear that foreign officials can be called to account for violations of the law of nations. *The Nuremberg Trial 1946*, 6 F.R.D. 69, 110 (1946, 1947) ("The principle of international law, which under certain circumstances, protects the representatives of a state, cannot be applied to acts which are condemned as criminal by international law. The authors of these acts cannot shelter themselves behind their official position in order to be freed from punishment in appropriate proceedings.")

The controlling status of certain international laws was described in *In re: "Agent Orange" Product Liability Litigation,* 373 F. Supp. 2d 7, 131 (E.D.N.Y. 2005). "A peremptory [*jus cogens*] norm, which by definition permits no derogation, prevails over and invalidates any prior conflicting international agreements or other rules of international law, and 'can be modified only by a subsequent norm of general international law having the same character.'"  *Id.*, citing the Vienna Convention on the Law of Treaties, May 23, 1969, art. 53, 1155 U.N.T.S. 331, 344 (entered into force Jan. 27, 1980); RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 102 cmt. k.   Because the conduct alleged violates *jus cogens* norms,[19] Israel could not authorize the acts alleged.

With regard to Defendant's assertion that the FSIA immunizes officials acting at

---

(S.D.N.Y. 2005) (extrajudicial killing);  *Mujica v. Occidental,* 381 F.Supp.2d 1164 (C.D. Cal. 2005) (murder); *NCGUB v. Unocal,*  176 F.R.D. 329 (C.D. Cal. 1997) (murder);  *see also, Mehinovic v. Vukovic,* 198 F. Supp. 2d 1322, 1351-52 (grave breaches, or non-derogable war crimes, include willful killing, torture or inhuman treatment, willfully causing great suffering).

[19] Assuming that any one of these norms is "customary" but not *jus cogens*, it could be modified within a state by subsequent legislation or a treaty.  *In Re: Agent Orange*, 373 F. Supp. at 131.  However, Israel has not abrogated the norm against extrajudicial killings, war crimes, crimes against humanity, or cruel inhuman and degrading treatment, and applies customary international law. *See supra,* sec. II.B.2.

the behest of governments who violate international human rights law, he erroneously

cites cases involving immunity available to the state itself. Memo. at 9-10. *Saudi Arabia*

*v. Nelson*, 507 U.S. 349 (1993), involved a claim against the government of Saudi

Arabia, a state agency of the government and a U.S. company which acted as its agent.

Although the Court found that the government and the agency were entitled to sovereign

immunity but it did not extend immunity to the U.S. agent. *Id.* at 375. *Transaero, Inc. v.*

*La Fuerza Aero Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994), was a suit against the

Bolivian air force. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428,

436 (1989), involved a claim against the government of Argentina. *Denegri v. Republic*

*of Chile*, No. Civ. A. 86-3085, 1992 WL 91914 (D.D.C. Apr. 1992), involved claims

against the Republic of Chile and its armed forces. Another case cited by Defendant,

*Trajano v. Marcos*, found that the individual defendant admitted that she had acted

without official authority. Memo. at 10; *Trajano*, 978 F.2d at 498. None addresses the

issue raised by Defendant's claim that he, as a former government official, is immune

under U.S. law without regard to prohibitions of international law. To the contrary,

"[i]nternational law is part of our law, and must be ascertained and administered by the

courts of justice of appropriate jurisdiction as often as questions of right depending upon

it are duly presented for their determination." *The Paquete Habana,* 175 U.S. 677, 700

(1900).

This position is bolstered by the Supreme Court's determination that the "Alien

Tort Statute by its terms does not distinguish among classes of defendants, and it of

course has the same effect after the passage of the FSIA as before *with respect to*

*defendants other than foreign states*." *Argentine Republic v. Amerada Hess Shipping*

*Corp.*, 488 U.S. 428, 438 (1989) (emphasis added) (deciding that jurisdiction over a foreign state must be under the FSIA). The ATS provides jurisdiction for claims of violations of international law norms with no less definite content and acceptance among civilized nations than when it was enacted. *Sosa,* 542 U.S. at 731-32. International law did not and does not extend immunity to government officials who violate the law of nations. Indeed, the sovereign immunity defense raised by Nazi war criminals at the Nuremberg trials was rejected. International Military Tribunal (Nuremberg), Judgment and Sentences (1946), *reprinted in 41 Am. J. Int'l L. 172, 221* (1947) ("The principle of international law, which under certain circumstances, protects the representatives of a state, cannot be applied to acts which are condemned as criminal by international law"). Following *Amerada Hess*, an official, even one acting within the scope of his authority, is no more entitled to immunity for violations of the law of nations than those tried at Nuremberg.

### E. Discovery is Required to Permit Resolution of Factual Disputes Raised by Defendant.

Defendant's FSIA challenge to the subject matter jurisdiction of the Court raises a mixed question of law and fact. *See Phoenix Consulting Co,* 216 F.3d at 41, citing, *Foremost-McKesson,* 905 F.2d at 448-49 (dispute whether person alleged to have harmed plaintiff was agent of sovereign). As the Court in *Phoenix* noted:

> Thus, the court must resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss. *See Jungquist,* 115 F.3d at 1027-28; *Foremost-McKesson,* 905 F.2d at 448-49; *see also, Filetech,* 157 F.3d at 932; *Moran v. Saudi Arabia,* 27 F.3d 169, 172 (5th Cir. 1994); *Gould v. Pechiney Ugine Kuhlmann,* 853 F.2d 445, 451 (6th Cir. 1988); *cf. Herbert v. National Academy of Sciences,* 974 F.2d 192,

197-98 (D.C.Cir. 1992) (affirming district court's resolution of disputed facts necessary for subject matter jurisdiction under Copyright Act).

*Id.* at 40.

If Defendant's challenge raises genuine issues of fact relevant to the issue of immunity, plaintiffs must be given "ample opportunity to secure and present evidence relevant to the existence of jurisdiction" under the FSIA. *Phoenix*, 216 F.3d at 40, quoting *Prakash v. American University*, 727 F.2d 1174, 1179-80 (D.C. Cir. 1984); *see also, Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13, (1978) ("discovery is available to ascertain the facts bearing on [jurisdictional] issues"). For the purpose of his motion to dismiss under Rule 12(b)(1), Defendant does not dispute the fact of the attack on the United Nations compound or the presence of civilians who had taken refuge there. He does not and cannot claim that this attack was consistent with any applicable law. Thus, his entire defense of sovereign immunity lies in his claim that the shelling was accidental.[20]  At a minimum, this question of fact must be subject to discovery.

A decision on jurisdiction should be deferred until the completion of discovery since the jurisdictional issues are so intertwined with the issues of Defendant's liability. In *Kinetic Instruments, Inc. v. Lares*, 802 F. Supp. 976 (S.D.N.Y. 1992), the court deferred determination of personal jurisdiction until after all discovery was completed

---

[20] As noted above, Defendant's conduct would still be a war crime if the assault was launched without "constant care" to safety of the civilian population. Defendant admitted that he was aware that civilians in southern Lebanon had been taking refuge in UN compounds. Complaint at ¶ 46; *see also*, Derek Brown, "Gunners' cover is blown," *Guardian*, May 11, 1996, attached as Exhibit 2 to Klimaski Dcl. (Ya'alon stated that the "fact that civilians are evacuated from the villages into U.N. facilities was known to us from the second day of the operation.  In the intelligence wing there was no discussion of whether there were two or six hundred civilians in Qana…. The relevant question is, was it correct to open fire in such circumstances?").

because the "inquiries into jurisdiction and liability can become entwined, and it is clear that jurisdictional discovery will substantially overlap with general discovery...." *Id.* at 988; *see also, Barrett v. USA,* 646 F. Supp. 1345, 1350 (S.D.N.Y. 1986) (even after discovery was complete, the court found that "[s]ince the question of jurisdiction and the merits of this action are so intertwined, plaintiff should not be required to establish jurisdiction by [a preponderance of the evidence] before trial"), *citing United States v. Montreal Trust Co.*, 358 F.2d 239, 242 (2d Cir. 1966).

## III.   PLAINTIFFS' CLAIMS DO NOT IMPLICATE THE POLITICAL QUESTION DOCTRINE.

The Supreme Court made clear in *Baker v. Carr* that: "[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." 369 U.S. 186, 211 (1962).   As this Court explained in *New v. Rumsfeld*, 350 F. Supp. 2d 80, 96 (D.D.C. 2004) (Friedman, J.): "*Baker* makes clear that the proper application of the doctrine turns not on the political nature of the action or decision being challenged, but on the nature of the particular legal challenge itself."   Nonetheless, Defendant argues that the controversial nature of the Israeli-Palestinian conflict renders the issues in this case political questions.   However controversial that conflict may be, the shelling of the United Nations' Qana compound, which was known to be sheltering civilians, has been condemned by the United Nations.   This case is about Defendant's liability for participating in the decision to launch that attack and his command responsibility, including the obligation to report and punish wrongdoers.   Through the ATS and the TVPA, Congress committed such matters to the judiciary.   An examination of the factors established in *Baker* makes evident that Defendant cannot meet his burden

of establishing that the claims against him are precluded by the political question
doctrine.  369 U.S. at 217.

### A.  Under the ATS, Courts Have Routinely Adjudicated Claims Touching Upon Issues of Foreign Policy.

Defendant cites no authority for his argument that the political question doctrine
has "particular force" in the area of foreign policy.  As described below, numerous cases
touching various aspects of U.S. foreign affairs have held to the contrary.  *See*, *Kadic*, 70
F.3d at 249 ( J]udges should not reflexively invoke doctrines to avoid difficult and
somewhat sensitive decisions in [the] context of human rights. .  There is a difference
between issues of foreign policy and decisions courts are highly competent to make
regarding liability for violations of law.  *See, e.g., Klinghoffer v. S.N.C. Achille Lauro*,
739 F. Supp. 854, 860 (S.D.N.Y. 1990).

As clearly stated by the U.S. Government in the landmark *Filártiga* case, "there is
little danger that judicial enforcement will impair our foreign policy efforts" given that
"courts are properly confined to determining whether an individual has suffered a denial
of rights guaranteed him as an individual by customary international law."[21]  The
Government stressed that, "to the contrary, a refusal to recognize a private cause of
action in these circumstances might seriously damage the credibility of our nation's
commitment to the protection of human rights."  *Id.*

*Sosa* explicitly limited ATS jurisdiction to universally accepted norms in part to
avoid risks of adverse foreign policy consequences.  542 U.S. at 728.  Defendant's

---

[21] Memorandum for the United States Submitted to the Court of Appeals for the Second
Circuit in *Filártiga v. Peña-Irala*, 19 I.L.M. 585, 602-04, reprinted in 12 HASTINGS INT'L
& COMP. L. REV. 34, 45-46 (1988) (footnote omitted).

position that the political question doctrine applies with "particular force" to claims involving foreign policy is inconsistent with *Sosa*'s endorsement of case-specific deference. 542 U.S. at 733 n.21. Defendant's reliance on *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948), is misplaced. Memo. at 17-18. That case, dealing with airline routes, related to the inappropriateness of judicial review of orders, promulgated by the U.S. president, that were based upon classified intelligence; it did not involve violations of the law of nations.

In short, a "politically charged" context does not transform claims into political questions. *See Kadic*, 70 F.3d at 249; *Alperin v. Vatican Bank*, 410 F.3d 532, 542, n.6 (9th Cir. 2005) (the "potential overtones that this case may have on relations with the [state] leadership do not…warrant dismissal") (citing *Antolok v. United States,* 873 F.2d 369, 392 (D.C. Cir. 1989) (Wald, C.J., concurring in judgment) ("focus should be on the particular issue presented" not "the ancillary effects…on political actors").

### B. Courts Have Adjudicated Claims Relating to Political and Military Decisions, the Middle East, and Other Sensitive Regions of the World.

Courts have recognized the justiciability of human rights claims for incidents occurring in the context of the Israel-Palestinian conflict. In *Klieman v. Palestinian Authority*, 2006 U.S. Dist. LEXIS 13797 at **19-24 (D.D.C. 2006) (Friedman, J.), this court found "unconvincing" the "basic argument...[that the lawsuit]...would burden the 'long running Middle East peace process.'" Similarly, in *Biton v. Palestinian Interim Self Gov't,* 310 F. Supp. 2d 172, 184 (D.D.C. 2004) (*Biton I*), the Court stated that: "Although the backdrop for this case – *i.e.*, the Israeli-Palestinian conflict – is extremely politicized, this circumstance alone is insufficient to make the plaintiffs' claims

nonjusticiable." *See also, Biton v. Palestinian Interim Self-Government Auth.*, 412 F. Supp. 2d 1, 6 (D.D.C. 2005) (*Biton II*)("the basic elements of the claim lie in tort, not in the relations between Palestine and Israel"); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, -- F. Supp. 2d --, 2006 WL 711264, at **2-3 (D.D.C. 2006) (no political question for "ordinary tort suit" brought under a statute "specifically designed to provide a civil cause of action in federal court"); *Knox v. PLO*, 306 F. Supp. 2d 424, 448-49 (S.D.N.Y. 2004) (no political question because court need not answer "intractable political questions which form the background to this lawsuit"); *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 at 49 (2d Cir. 1991) ("The fact that the issues before us arise in a politically charged context does not convert what is essentially an ordinary tort suit into a non-justiciable political question."); *Sharon v. Time*, 599 F. Supp. 538, 552 (S.D.N.Y. 1984) (libel suit regarding Sharon's role in the massacre of Palestinians was justiciable, even though the litigation touched upon "sensitive foreign affairs concerns"); *Linde v. Arab Bank*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005) (allowing claims by terror victims in Israel against bank used by Hamas).

In *Ungar v. Palestinian Liberation Org.*, 402 F. 3d 274, 280 (1st Cir. 2005), the court found no political question problem where the family of a U.S. citizen killed in Israel sued the Palestinian Authority:

> The reality is that, in these tempestuous times, any decision of a United States court on matters relating to the Israeli-Palestinian conflict will engender strong feelings. Be that as it may, the capacity to stir emotions is not enough to render an issue nonjusticiable. For jurisdictional purposes, courts must be careful to distinguish between political questions and cases having political overtones.

Defendant relies heavily on *Doe v. Israel* (Memo. at 18-20), in which that court held the case non-justiciable on political question grounds where plaintiffs sought damages, injunctive relief, and a declaration that Israel's "self-defense policies are tantamount to terrorism." 400 F. Supp. 2d at 112. In contrast, Plaintiffs here ask this Court to determine liability of a single former official for an act which is contrary to Israeli as well as international law. Defendant also cites *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005), *appeal docketed*, No. 05-36210 (9th Cir. Dec. 21, 2005), which found a political question because the court was asked to enjoin the sale of bulldozers to a foreign country where the political branches had refused to impose a ban. This case does not seek injunctive relief, nor relief contrary to any political branch decision.

Defendant next argues that courts have "avoided entanglement" (Memo. at 18) in cases involving political and military decisions, citing cases that, unlike this case, involve the U.S. military and implicating decisions textually committed to the executive. Memo. at 18-22. One case cited was against a foreign sovereign and concerned broad policy challenges to conduct during World War II. *See* Memo. at 17-18 and fn 23, citing *Hwang Geum Joo v. Japan,* 413 F.3d 45, 48-52 (D.C. Cir. 2005). However, the court in *Joo* held that the claims were non-justiciable because there had already been war claims settlement agreements by the U.S. political branches that explicitly resolved all claims arising out of Japan's actions during World War II. Defendant also cited *El-Shifa Pharmaceutical Ind. Co. v. U.S.*, 402 F. Supp. 2d 267 (D.D.C. 2005), an FTCA case (court held that U.S. government's decision to bomb Sudanese pharmaceutical plant was textually committed to executive and to allow suit would intrude on executive's war

powers). The court made passing reference to "law of nations" claims and stated only

that plaintiffs "implicitly assert jurisdiction pursuant to 28 U.S.C. 1350," *id* at 272; the

court did not analyze its ability to rule on questions of international law, which might

have been applicable to this case. In contrast to the instant case, in which there is

publicly available information such as the United Nations report, the *El-Shifa* court stated

that there was no judicially discoverable information and that the court could not evaluate

the truthfulness of the U.S. executive's own intelligence. *Id.* at 273. Similarly, in

*Aktepe v. US*, 105 F.3d 1400, 1404 (11th Cir. 1997), a case brought under two U.S.

statutes, the Public Vessels Act and the Death on the High Seas Act, that court held that it

could not rule on the parameters of training procedures for the U.S. forces in a negligence

claim against U.S. on behalf Turkish sailors injured during NATO exercise.[22]

   U.S. courts have adjudicated claims arising in the context of U.S. military

operations when they are not constitutionally committed to the Executive. *See*, *Rasul v.*

*Bush*, 542 U.S. 466 (2004); *Hamdi v. Rumsfeld*, 542 U.S. 507, 534 (2004) (finding that

"[t]he Constitution's allocation of war powers to the President and Congress does not

exclude the courts from every dispute that can arguably be connected to 'combat'" or

from reviewing military decision-making in connection with an ongoing conflict");

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) (judicial rejection of

---

[22] *See also*, *Bancoult v. McNamara*, 2006 U.S. App. LEXIS 10065, at *25 (D.C. Cir. 2006) (wide-ranging tort claims against U.S. government and officials for depopulating the island of Diego Garcia dismissed on political question grounds because "the political branches must 'determine whether drastic measures should be taken in matters of foreign policy and national security,'" quoting *Schneider v. Kissinger*, 412 F.3d at 197). In contrast to the case at bar, the decisions concerning matters of broad U.S. foreign policy and national security are committed to the executive branch. Herein issues of liability for violations of the law of nations by an individual foreign official in a single incident is committed to the courts by the enactment of the TVPA and ATS.

executive's claimed powers to seize steel mills during the Korean War); *New York Times Co. v. U.S.*, 403 U.S. 713 (1971) (rejecting foreign relations objections to publication of the Pentagon Papers); *Brown v. U.S.*, 12 U.S. (8 Cranch) 110 (1814) (rejecting executive power to seize domestic property of enemy alien during War of 1812); *Flynt v. Rumsfeld*, 245 F. Supp. 2d 94, 106-107 (D.D.C. 2003) (Friedman, J.) (reviewing Department of Defense guidelines regarding journalists' access to theater of war).

U.S. courts have often adjudicated *damage* claims arising in the context of U.S. military operations. *See, e.g., The Paquete Habana*, 175 U.S. 677 (reviewing the seizure of two Spanish ships by U.S. forces during Spanish American War); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1511-15 (D.C. Cir. 1984), *vacated,* 471 U.S. 1113 (1985), *dismissed on other grounds*, 788 F.2d 762 (D.C. Cir. 1986) (U.S. military's construction and operation of training camp on plaintiff's property in Honduras did not present political question); *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 16 (D.D.C. 2005) (no political question for torture and war crimes claims against U.S. military contractors); *Koohi v. United States*, 976 F.2d 1328, 1331 (9th Cir. 1992) (holding that "federal courts are capable of reviewing military decisions, particularly when those decisions cause injury to civilians" where heirs of passengers of Iranian civilian aircraft shot down by the U.S. military during the Iran-Iraq war sued U.S.); *In re Agent Orange*, 373 F. Supp. 2d at 64 (political question did not bar claims against U.S. corporations that manufactured and supplied herbicides to the U.S. and South Vietnam governments and that directly implicated military decisions).

Courts have also refused to dismiss claims on political question grounds even

-34-

when the claims arise during ongoing wars. *See, e.g., Ibrahim*, 391 F. Supp. 2d at 17; (Iraq); *Kadic*, 70 F.3d at 249-250 (former Yugoslavia); *Presbyterian Church*, 244 F. Supp. 2d at 347 (Sudan civil war). This is true even where the litigation had the potential to embarrass the U.S. and its allies. *See*, *Linder v. Portocarrero,* 963 F.2d 332, 337 (11th Cir. 1992) (complaint for the killing of a civilian by the Nicaraguan contras justiciable since it "challenges neither the legitimacy of the United States foreign policy toward the contras, nor does it require the court to pronounce who was right and who was wrong in the Nicaraguan civil war"); *Todd v. Panjaitan*, No. 92-12255, 1994 WL 827111 (D. Mass. Oct. 26, 1994) (judgment against Indonesian general for massacre in East Timor); *Xuncax*, 886 F. Supp 162 (judgment against Guatemalan general for murder, kidnaping, and torture). U.S. courts, then, have been willing to adjudicate claims involving foreign military decisions, and this is consistent with ATS jurisprudence, as claims for genocide, crimes against humanity, and war crimes – all recognized in cases brought under that statute – generally do not occur in the absence of some sort of military operation.

### C. The Defendant Has Failed to Show that Any of the *Baker v. Carr* Factors Are Present.

*Baker* lists six factors which can give rise to a political question if they are "inextricable" from the case. 369 U.S. at 217. The burden is on the party invoking the political question doctrine to demonstrate that at least one of the *Baker* factors is present. *Id*. Here, Defendant does not meet his burden of proving that any *Baker* factor would render this case nonjusticiable. Considering these factors in turn, it is clear that dismissal is not warranted.

### 1. There is a clear textual commitment of this issue to the judicial branch.

Congress passed the ATS and TVPA, both of which reflect an affirmative policy that fundamental human rights abuses occurring abroad should be heard in U.S. courts. As such, ATS and TVPA claims are textually committed to the judiciary. *Klinghoffer*, 937 F.2d at 49 ("The department to whom this [tort] issue has been 'constitutionally committed' is none other than our own -- the Judiciary"), *cited in Kadic*, 70 F.3d at 249; *see also, Presbyterian Church*, 244 F. Supp. 2d at 346-48; *Wiwa v. Royal Dutch Petroleum*, 226 F.3d 88, 103-04 (2d Cir. 2000).

As this Court made clear in *Klieman v. Palestinian Authority*, claims under the Anti-Terrorism Act (ATA) are justiciable because they arise under a legislative scheme created to provide a tort remedy for victims of certain kinds of terrorism.  2006 U.S. Dist. LEXIS at **19-24.  Claims under the ATS, a legislative tort scheme that remedies violations of the law of nations, are justiciable for exactly the same reasons.  Justice Edwards, who authored the *Tel Oren* concurrence which was endorsed by *Sosa*, 542 U.S. at 731-32, wrote that: "[T]he aim of section 1350 was to place in federal court actions potentially implicating foreign affairs...Indeed, the Supreme Court has at least twice cited section 1350 as a statutory example of congressional intent to make questions likely to affect foreign relations originally cognizable in federal courts."  *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 790, 797 (D.C. Cir. 1984) (Edwards, J., concurring).  Where the liability is created by a federal statute such as the TVPA, courts have an obligation to hear the dispute even where the claims have "significant political overtones." *Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 230 (1986).

Defendant's conclusory and unsupported claim that this case involves "quintessentially political judgments about foreign policy" fails to cite so much as a line of text demonstrating a clear commitment of the issues involved to the executive. Memo. at 22.

### 2. There are judicially discoverable and manageable standards for resolving the issues in this case.

*Kadic* made clear that claims under the ATS based on universally recognized norms of international law – at issue here – provide judicially discoverable and manageable standards:

> [O]ur decision in *Filartiga* established that universally recognized norms of international law provide judicially discoverable and manageable standards for adjudicating suits brought under the Alien Tort Act, which obviates any need to make initial policy decisions of the kind normally reserved for nonjudicial discretion. Moreover, the existence of judicially discoverable and manageable standards further undermines the claim that such suits relate to matters that are constitutionally committed to another branch.

70 F.3d at 249. *See also, Presbyterian Church*, 244 F. Supp. 2d at 347-49 ("Contrary to Talisman's assertions, the issues in this case are not political. The Court's function is to determine whether Sudan and Talisman violated international law by committing certain acts. The standards of behavior under international law are judicially-ascertainable"); *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir. 1988), *cert. denied,* 490 U.S. 1035 (1989); *In re Agent Orange,* 373 F. Supp. 2d at 67. Standards of liability for international torts turn on "familiar questions of responsibility for personal and property injuries," and should not be avoided because the case takes place in an international context. *Klinghoffer,* 739 F. Supp. at 860. *See also*, *Klieman*, 2006

U.S. Dist. LEXIS 13797 at **22 (similarly finding judicially manageable

standards under the ATA); *Biton II,* 412 F. Supp. 2d at 6 (finding judicially

manageable standards "from both existing ATA case law and traditional tort case

law").   As such, there are, contrary to Defendant's claims, judicially manageable

standards by which this dispute can be resolved.

### 3.  *Baker* Factors Three Through Six.

Defendant argues that these factors are "also compelling."  Memo. at 22.

*Compelling*, however, is not sufficient to establish the presence of a *Baker* factor.  It must

be *inextricable* from the case at bar.  *Baker*, 369 U.S. at 217.  Here, it is possible to

decide this case without an initial policy determination of a kind clearly for nonjudicial

discretion.  A finding that Defendant, in participating in the decision to bomb the United

Nations compound at Qana, violated the law of nations requires a determination of fact

and law, not of policy.  *See, e.g., In re Agent Orange*, 373 F. Supp. 2d at 71 (even a

determination of the President's conduct during war "is one of substantive international

law, not policy"); *Presbyterian Church*, 244 F. Supp. 2d at 346.

Further, it is possible for the Court to independently resolve this case without

coming into conflict with the other branches of government.  Factors four, five, and six

are only relevant if contradiction of a prior political branch decision would "seriously

interfere with important governmental interests." *Kadic*, 70 F.3d at 249; *see Presbyterian

Church*, 244 F. Supp. 2d at 346-349.  Adjudication of this matter would not exhibit a lack

of respect for the political branches, as no prior political decisions are even implicated by

this case.  *See*, *e.g.*, *Klinghoffer*, 937 F.2d at 50; *In re: Agent Orange*, 373 F. Supp. 2d at

72 (declining to apply the fifth *Baker* factor where "the Executive and the Legislature

have not made significant political decisions in the area being trod on by the instant

parties"); *see also, Biton II,* 412 F. Supp. 2d at 6 (through enactment of the ATA,

Congress made the initial policy determination that courts can resolve a defendant's

liability without expressing a lack of respect to the political branches).  Moreover, despite

the Ambassador of Israel's letter to the State Department, the Executive has not

submitted a statement of interest in this case.   The sixth factor is not called into play in

the absence of some contrary executive or legislative pronouncement, which does not

exist here.  *Id.*  President Clinton's ambivalent statements about Qana[23] and irrelevant

Executive utterances about U.S. diplomatic efforts[24] cannot seriously be accepted as

official policy positions, let alone those at risk of conflicting with this Court's

adjudication of the matter.

     If Defendant's argument were to prevail and every case in which the Executive

expressed some sort of view was rendered a political question, the ATS and TVPA would

be nullities.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d

289, 346 (S.D.N.Y. 2003) ("Indeed, as the world's foremost superpower, the United

---

[23] Compare Defendant's sources with Barbara G.B. Ferguson, "US committed to peace process, Clinton assures Arab-Americans," Saudi Gazette (Aug. 8, 1996) (reporting that Clinton stated that he was appalled about the bombing at Qana and that the nation's silence about it would never happen again).  Klimaski Dcl., Exhibit 3.

[24] Defendant cites U.S. Dep't of State Daily Press Briefing (Apr. 19, 1996), *at* http://www.hri.org/docs/statedep/ 1996/96-04-19.std.html, for the claim that the U.S. government did not address the Qana incident as a legal dispute.  Memo. at 24. However, nothing in that press briefing suggests that providing a tort remedy for the victims of Qana would put the Judiciary in conflict with the Executive, which was at the time concerned with de-escalating the violence between Israel and Lebanon, not adjudicating the matter of the attack on Qana.  Defendant also argues that a judicial finding that the Defendant acted deliberately in shelling the UN compound would conflict with Executive assertions to the contrary.  *Id.*  However, the baseless conclusions of U.S. officials about Defendant's state of mind during the attack are neither policy determinations nor meaningful executive pronouncements warranting dismissal.

States has complex diplomatic relationships with virtually every country. This fact, without more, does not militate in favor of dismissal.").

## IV. THE ACT OF STATE DOCTRINE DOES NOT BAR PLAINTIFFS' CLAIMS.

### A. Defendant Has Not Met His Burden to Prove an Act of State.

When the Act of State Doctrine (ASD) defense "is raised in connection with a motion to dismiss under Rule 12(b)(6), the court must be satisfied that there is no set of facts favorable to the plaintiffs and suggested by the complaint which could fail to establish the occurrence of an act of state." *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1534 (D.C. Cir. 1984) (en banc), *vacated on other grounds*, 471 U.S. 1113 (1985). Defendant must provide evidence of an "act of state" and bear the burden of proving that the doctrine applies. *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 691, 694-695 (1976). The act of state doctrine only applies if 1) there is an "act of state" at issue *and* 2) barring adjudication is found to be appropriate. *See, e.g., Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398 (1964). Defendant has failed to establish either, so his motion must be denied.

### B. Defendant Has Failed to Prove that the Validity of an Official "Act of State" Within Sovereign Territory Is at Issue.

Defendant argues that the act of state doctrine mandates dismissal without even identifying the Supreme Court's articulation of that doctrine: "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done *within its own territory*." *Underhill v. Hernandez,* 168 U.S. 250, 252 (1897) (emphasis added); *see also, Sabbatino,* 376 U.S. at 401. By avoiding citation to the test laid out in *Underhill*

and *Sabbatino*, Defendant seeks to obscure the indisputable fact that he cannot meet the basic requirement of the Doctrine, namely the fact that the conduct at issue must occur within the foreign state's own territory. Defendant failed to meet his burden because he failed to prove (or even argue) that the act at issue was in fact an "act of state," that is, an act 1) done within Israel's own sovereign territory that was 2) an official public act. *See, e.g., id.* at 401.

### 1. The act of state doctrine does not apply because the act alleged occurred outside of Israel's sovereign territory.

The act of state doctrine does not apply to acts outside of a sovereign's territory. *See Underhill*, 168 U.S. at 252; *Sabbatino,* 376 U.S. at 401; *W. S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l,* 493 U.S. 400, 405 (1990); *Republic of Aus. v. Altmann*, 541 U.S. 677, 700 (2004); *El-Hadad, v. Embassy of the United Arab Emirates*, 69 F. Supp. 2d 69, 81 (D.D.C. 1999) (refusing to apply the ASD to an act occurring in the U.S. because the ASD "applies only when the actions of the foreign state occur within that foreign state"); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 24 (D.D.C. 1998) ("Political assassinations ordered by foreign states *outside* their territory, however, are not valid acts of state which bar consideration of the case") (emphasis added). The attack which Plaintiffs (who are Lebanese citizens residing in Lebanon) complain of occurred in Lebanon, a sovereign nation, not within Israel's territory. Complaint at ¶¶ 7-13, 27, 33.

Defendant does not claim otherwise, admitting that the shelling occurred across Israel's borders. Memo. at 29. Instead, Defendant argues that he has satisfied the requirement that the act occurred within Israel because Plaintiffs did not allege that Defendant acted outside his offices in Jerusalem. Memo. at 28, n. 34. Despite bearing

the burden of proof, Defendant provides no factual or legal support for his argument; indeed, where an official approved an act is immaterial to where the act was done. *See, e.g., Risk v. Kingdom of Norway*, 707 F. Supp. 1159, 1168 (N.D. Cal. 1989), *aff'd*, 936 F. 2d 393 (9th Cir. 1991) (act of state doctrine does not apply to Norwegian officials' acts inside the U.S. even though approved by officials in Norway).

### 2. The act of state doctrine does not bar Plaintiffs' claims because Defendant failed to establish an "official" act of state.

Defendant fails to provide evidence of a "statute, decree, order, or resolution" of the Israeli Government authorizing the attack on Plaintiffs, which resulted in their injuries and the deaths of their loved ones. *Dunhill*, 425 U.S at 695; *Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir. 1989) (act of state doctrine burden requires "some evidence that the government acted in its sovereign capacity…"); *Galu v. SwissAir*, 873 F.2d 650, 654 (2d Cir. 1989) (defendant bears the burden "to establish foreign law to the extent necessary to establish its entitlement to the act of state defense.")  Defendant never argues that the attack was legal under Israeli law and provides no admissible evidence that his conduct constituted official acts of Israel.  A purported letter from the Ambassador of Israel asserting that the case challenges sovereign actions approved by Israel does not constitute evidence of such. (*See* Plaintiffs' Objection to Defendant's Submissions, filed simultaneously herewith.)

Even if Defendant had presented evidence of an official Israeli act authorizing the attack on the United Nations compound, the act of state doctrine would still not apply because war crimes, extrajudicial killings, and CIDTP can *never* be considered official acts of state.  "[*J*]*us cogens* violations are considered violations of peremptory norms,

-42-

from which no derogation is permitted. Acts of state to the contrary are invalid."

*Presbyterian Church,* 244 F. Supp. 2d at 345.  As the Second Circuit has confirmed:

"[W]e doubt that the acts of even a state official, taken in violation of a nation's

fundamental law and wholly unratified by that nation's government, could properly be

characterized as an act of state." *Kadic,* 70 F.3d at 250; *accord, Filartiga v. Pena-Irala*,

630 F.2d 876, 889 (2d Cir. 1980).  *See also, Linder,* 963 F.2d at 337 (only "acts of

legitimate warfare" are exempt from liability [under] *Underhill*); *Sarei v. Rio Tinto Plc,*

221 F. Supp. 2d 1116, 1189 (C.D. Cal. 2002) (9th Cir., argued June 23, 2005) (war

crimes cannot be deemed official acts of state because they are not legitimate acts of

warfare); *Flatow,* 999 F. Supp. at 24 ("acts of international terrorism are not valid acts of

state of the type which bar consideration"); *Biton II,*  412 F. Supp. 2d at 9 ("children are

not the proper targets of war").

  It "would be a rare case in which the act of state doctrine precluded suit under"

the ATS. *Kadic,* 70 F.3d at 250.  The TVPA's legislative history makes clear that since

"no state officially condones torture or extrajudicial killings," the act of state doctrine

cannot shield defendants from TVPA liability.  S. Rep. No. 102-249, at 6 (1991).

Moreover, acts outside an official's scope of authority cannot be acts of state because

they cannot "give effect to a State's public interests." *Sharon*, 599 F. Supp. at 544 (*citing*

RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW § 41 (1962)).  Violations of

international human rights, such as war crimes, extrajudicial killings, and CIDTP, cannot

be in the public interest.  *See Liu Qi*, 349 F. Supp. 2d at 1306; *Doe v. Unocal,* 963 F.

Supp. 880, 893 (C.D. Cal. 1997).  "It is only when officials having sovereign authority

act in an official capacity that the Act of State Doctrine applies." *Jimenez v. Aristegueita*,

311 F.2d 547, 557 (5th Cir. 1962), *cert. denied*, 373 U.S. 914 (1963) (citations omitted).

Defendant unpersuasively cites *Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073, 1078-1080 (C.D. Cal. 1999), which held only that the act of state doctrine barred a soldier from challenging an order by his superior officer to work without pay – an order that did not conflict with Burmese law, international law, or U.S. law.  The *Roe* court expressly refused to reconsider its holding in *National Coalition Gov't of Union of Burma* (*NCGUB*), 176 F.R.D. 329 (C.D. Cal. 1997), that abuses by the Burmese military were not acts of state.  *Roe*, 70 F. Supp. 2d at 1076, n. 1 (*citing NCGUB*, 176 F.R.D. at 349-57).  Like the conduct at issue in *NCGUB*, the act at issue here was illegal under international law, domestic law, and as argued herein, U.S. law.  *See supra* at II.B.2, discussing Israeli law.  Defendant's reliance on *Saltany v. Reagan*, 702 F. Supp. 319 (D.D.C. 1988), is also misplaced, as the claims against the United Kingdom *itself* were dismissed on act of state grounds because the plaintiffs *alleged* that Prime Minister Thatcher, acting as the *sitting head* of government and "speaking from its seat of government" (*not* outside the scope of authority), assented to a U.S. request to use air bases *in* its territory (Great Britain) to conduct a military mission.  *Id.* at 320-321.

### 3. The act of state doctrine does not bar plaintiffs' claims because they do not require the Court to declare an official act invalid.

Finally, even if Defendant could provide evidence of an act that is a "statute, decree, order, or resolution," Plaintiffs' claims do not implicate the act of state doctrine as they do not require the Court to declare the act *invalid.  See, e.g., Sabbatino*, 376 U.S. at 401.  In *W. S. Kirkpatrick*, the Supreme Court rejected the act of state doctrine since plaintiff "was not trying to undo or disregard the governmental action."  493 U.S. at 407.

This case does not seek to deny legal effect to any act of a foreign government, nor render it "null and void." *Id.* at 406 (citing *Sabbatino*). *W. S. Kirkpatrick* cited with approval the court's finding in *Sharon* that the "issue in this litigation is not whether [the alleged] acts are valid, but whether they occurred." 599 F. Supp. at 546. *Sharon* rejected the act of state doctrine because the issue was not whether acts condoning the massacre of unarmed noncombatant civilians were *valid*: "no one is suggesting that these acts…have validity in the sense that they cannot be attacked. All agree…such actions, if they occurred, would be illegal and abhorrent." *Id*.

### C. Even if an Act of State Were at Issue, the *Sabbatino* Factors Would Counsel Against Application of the Doctrine.

Ignoring the first issue of whether the conduct was "an act of state," Defendant relies on the factors set forth in *Sabbatino* that a court must consider to determine whether adjudication of an act of state should be permitted. Such factors, however, cannot transform an unofficial act or an act outside a sovereign's territory into an "act of state." *See W. S. Kirkpatrick,* 493 U.S. at 405 (inquiries unnecessary where "the factual predicate for application of the act of state doctrine does not exist). If an act of state were at issue here, the *Sabbatino* factors would support adjudication.

The first *Sabbatino* factor, the degree of international consensus concerning applicable legal principles, counsels against application of the act of state doctrine in this case. *Sabbatino*, 376 U.S. at 427-28. Plaintiffs' ATS claims, which must be based on specific, universal, and obligatory norms, by definition, reflect a high degree of international consensus. *See Sosa*, 542 U.S. at 748; *see also, Kadic*, 70 F.3d at 250 (unambiguous agreement regarding war crimes and summary execution principles); *Doe*

*v. Unocal,* 963 F. Supp. at 894-95 (*jus cogens* violations); *Qi,* 349 F. Supp. at 1296

(CIDTP); *Liu,* 892 F.2d at 1433 (murder).  The act of state doctrine should not be applied

here given the universality of the applicable CIL norms.

The second *Sabbatino* factor relates to the "implications of an issue…for our

foreign relations" and also weighs against application of the act of state doctrine.  376

U.S. at 428.  Defendant does not explain how adjudicating this case would detrimentally

affect U.S. foreign relations, much less produce evidence thereof.  To the extent that he

makes such arguments regarding the political question doctrine, Plaintiffs refute them

above.  Not surprisingly, Defendant fails to consider the principle of sovereignty and any

implications on U.S. foreign relations with regard to Lebanon, the sovereign nation

whose citizens suffered this grotesque attack in their own country.  The mere fact that

Defendant was formerly an official of the Israeli Government, an ally of the U.S., does

not weigh against adjudicating this action.  Even if this case were to have implications on

foreign relations, the act of state doctrine should not be used to deny application of

established principles of human rights.

> A consideration of such questions as the massacre of unarmed civilians no
> doubt touches "on national nerves," *Sabbatino,* 376 U.S. at 428, and raises
> the possibility of embarrassment to the United States and Israel. This case,
> of course, does not entail judicial scrutiny of the legitimacy of such acts.
> But even if it did, a court should not refuse to apply established principles
> of human rights because of a doctrine designed to keep courts out of the
> business of enforcing property rights in litigation affecting property within
> a foreign sovereign state. To the contrary, *Sabbatino* suggests -- and the
> most current authority proposes -- that the act of state doctrine need not be
> applied to bar review of the violation of well recognized human rights.

*Sharon,* 599 F. Supp. at 552.

### D. Defendant Need Not Have Ordered the Attack on the United Nations Compound to Be Held Liable.

Contrary to Defendant's command responsibility argument (Memo. at 29-30), the TVPA Senate Report makes clear that "a higher official need *not* have personally performed or ordered the abuses in order to be held liable." S. Rep. No. 102-249, at 9 (1st Sess. 1991) (emphasis added). Cases cited by Defendant confirm that a superior is responsible for failing to prevent or punish a subordinate's actions of which the superior knew or should have known. *See, e.g., Hilao*, 103 F.3d at 777; *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1288 (11th Cir. 2002); *accord, In re Yamashita*, 327 U.S. 1, 16 (1946). *See also, Forti v. Suarez-Mason*, 672 F. Supp. at 1537-38 (defendant found liable for abuses committed by soldiers under his command based on a finding that he had "authorized, approved and directed and ratified" the actions as part of a "policy, pattern and practice" which he had endorsed"); *Xuncax*, 886 F. Supp. at 171-175 (Guatemalan general found liable for ordering, directing program of human rights abuses and because he "was aware of and supported" the abuses committed by personnel under his command, and "refused to act to prevent such atrocities"); *Paul v. Avril*, 901 F.Supp. 330 (S.D. Fla. 1994) (defendant liable for torture committed by soldiers acting under his instructions, authority, direction and control and within the scope of authority granted by him). This doctrine is also well established under international law. *See, e.g.,* Additional Protocol I to the Geneva Conventions, Arts. 86, 87 (recognizing doctrine of command responsibility); *Prosecutor v. Hadzihasanovic*, IT-01-47-AR72 (ICTY) (16 July 2003) at ¶¶ 10-31 (recognizing the doctrine of command responsibility under customary international law).

Further, claims based on indirect liability are actionable under the ATS and the

TVPA.  *See Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157-58 (11th Cir. 2005) citing

*Hilao v. Estate of Marcos,* 103 F.3d 767, 776-77 (9th Cir. 1996).  "An examination of

legislative history indicates that the TVPA was intended to reach beyond the person who

actually committed the acts, to those ordering, abetting, or assisting in the violation."

*Cabello* at 776 1158, citing S.Rep. No. 102-249, at 8-9 (1991); *see also, In re Agent*

*Orange*, 373 F. Supp. 2d at 53-54; *Carmichael v. United Tech. Corp.,* 835 F.2d 109, 113-

14 (5th Cir. 1988).

Finally, Defendant's argument that Plaintiffs' future discovery will invade

Israel's sovereignty is speculative and premature.  Memo. at 30.  *See, Ibrahim*, 391 F.

Supp. 2d at 16 (rejecting speculation at the motion to dismiss stage about future clashes

with the United States' need for secrecy about its interrogation programs in Iraq).

Moreover, in the context of this case, much of the relevant information has already been

revealed in the course of the United Nations' investigation.  For example, while

Defendant posits that there would be intrusive discovery into the command structure, the

UN report indicates that Israel has already provided information on the role of the

Northern Command in the decision to fire on the compound at Qana. Klimaski Dcl.

Exhibit 1 at ¶6(b).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendant's Motion

to Dismiss be denied, and that if necessary, they be allowed the opportunity to conduct

jurisdictional discovery.

Dated: May 15, 2006                    Respectfully submitted,


                                       _____/s/_____
                                       James R. Klimaski (243543), Local Counsel
                                       Judith Chomsky, Maria LaHood, Michael
                                       Poulshock,
                                       Jennifer Green, and William Goodman
                                       ***Attorneys for Plaintiffs***