UNITED
NATIONS

S



# Security Council

Distr.
GENERAL

S/1996/337
7 May 1996

ORIGINAL: ENGLISH

LETTER DATED 7 MAY 1996 FROM THE SECRETARY-GENERAL
ADDRESSED TO THE PRESIDENT OF THE SECURITY COUNCIL

I have the honour to transmit to members of the Security Council the report submitted to me by my Military Adviser, Major-General Franklin van Kappen, following his mission to Lebanon and Israel. My decision to send the mission was taken in the light of the tragic events that took place at Qana on 18 April 1996, in which more than 100 Lebanese civilians were killed in the headquarters of the Fijian battalion of the United Nations Interim Force in Lebanon (UNIFIL).

Members of the Council will note that the mission sought to establish, to the extent possible, the facts surrounding those events. General van Kappen had extensive discussions with UNIFIL commanders, Lebanese and Israeli authorities, and eyewitnesses. As indicated in the report, while the possibility cannot be ruled out completely, the pattern of impacts in the Qana area makes it unlikely that the shelling of the United Nations compound was the result of technical and/or procedural errors. For their part, the Israel Defence Forces maintain that the incident was due to a sequence of operational mistakes and technical failures, compounded by chance.

I view with utmost gravity the shelling of the Fijian position, as I would hostilities directed against any United Nations peace-keeping position. But this incident is all the more serious because civilians, including women and children, had sought refuge in the United Nations compound at Qana.

I welcome the cease-fire agreement announced on 26 April 1996, and it is my earnest hope that the restoration of calm in the area will enhance the prospects for negotiations leading to a comprehensive peace settlement which would preclude further tragic events. In the meantime, I have instructed the Force Commander of UNIFIL, Major-General Stanislaw Wozniak, to enhance cooperation with the Government of Lebanon and the Lebanese Armed Forces in maintaining peace and stability in UNIFIL's area of operation. I have also given instructions for arrangements to be worked out with the Israeli authorities to see to it that United Nations positions in Lebanon are not fired upon in the future.

It remains of the greatest importance that the parties to this conflict should ensure that innocent civilians do not become victims of the hostilities.

In view of the seriousness of the events at Qana, I have decided to transmit the report to the Security Council.

(Signed)   Boutros BOUTROS-GHALI

/...

Annex

Report dated 1 May 1996 of the Secretary-General's Military
Adviser concerning the shelling of the United Nations
compound at Qana on 18 April 1996

Introduction

1.  On 18 April 1996, shortly after 1400 hours local time, the headquarters compound of the Fijian battalion of the United Nations Interim Force in Lebanon (UNIFIL) came under fire by Israeli artillery. At the time, more than 800 Lebanese had sought refuge inside the compound, which is located in the village of Qana. An estimated 100 persons were killed and a larger number wounded. Four United Nations soldiers were wounded. There was extensive damage.

2.  The same day, you directed that I travel to the area to investigate the incident and to identify steps that could be taken to prevent a recurrence.

3.  I left New York on the evening of 18 April and arrived on 20 April at UNIFIL headquarters at Naqoura, where I was briefed by Major-General Stanislaw Wozniak, UNIFIL Force Commander, and his staff. I was accompanied by Lieutenant-Colonel Geoffrey Dodds of my staff and assisted in the field by two UNIFIL officers with expertise in artillery and ordnance.

4.  My team and I visited the United Nations compound at Qana several times, met with the commanding officer of the Fijian battalion and interviewed eyewitnesses to the attack. These included members of the Fijian battalion, members of the Force Mobile Reserve, Lebanese army officers and others. A detailed survey of the area was carried out. In Beirut, I met with the Minister of Defence of Lebanon, Mr. Mohsen Dalloul, and with the commander of the Lebanese Army, General Emile Lahoud (both on 22 April).

5.  I held three meetings with representatives of the Israel Defence Forces: first, with the Deputy Chief of General Staff, Major-General Matnan Vilnai (21 April), and later with the Chief of General Staff, Lieutenant-General Amnon Shahak (25 April), and with the commander of the Northern Command, Major-General Amiram Levine (25 April). In addition, I visited the Israeli artillery battalion that had carried out the shelling (21 April).

Israeli account of events

6.  On 21 April, I met with Major-General Vilnai at Tel Aviv and visited the artillery battalion. On both occasions, the Director of Israeli artillery, Brigadier-General Dan Harel, was also present. He, I was told, had investigated the shelling incident. The Israeli officers gave the following account of the incident:

    (a)  In the early afternoon of 18 April, an Israeli patrol had come under fire emanating from Qana. The precise location of the patrol was not given, except that it was close to the "red line", which is a line on Israeli maps that

/...

marks the northern edge of the Israeli-controlled area in southern Lebanon. Mortar shells had fallen as close as 40 metres to the patrol, which had requested assistance. The Israeli forces had initiated rescue fire procedures.

(b) At 1352 and 1358 hours, respectively, Israeli locating radar had identified two separate targets in Qana from where fire had originated. The first target was located 200 metres or so south-west of the United Nations compound. The second target was located some 350 metres south-east of the compound. The data had been sent automatically to the Northern Command and to an artillery battalion located on the Israel-Lebanon border, about 12 kilometres from the sea. The battalion comprises three batteries with four guns each. It is equipped with M-109A2 guns (155-millimetre calibre). When the battalion received the data, it checked the targets on a map and found that one of the two locations was between 200 to 300 metres from the United Nations position at Qana. The commanding officer had therefore sought instructions from Northern Command, which rechecked the data and gave permission to fire. This decision had not been taken lightly; officers of some seniority had been involved.

(c) When the order to fire came, the first target had been engaged by one battery, using all four guns. Thirty-eight shells (high-explosive) had been fired, about two thirds with impact fuses and one third with proximity fuses. (Proximity fuses cause a round to explode in the air above the target; they are often used for anti-personnel fire.) The two types of fuses had been employed in random order. Convergence fire had been used so that the impacts would be concentrated in the target area. Regrettably, a few rounds had overshot and hit the United Nations compound.

(d) The commanding officer of the artillery battalion had no satisfactory explanation why so many shells had fallen some 200 metres north of the intended target (see the attached sketch). Asked if he had shifted fire during the shelling, he said he had not; he added that the mission had taken only three to four minutes (the time given by the Israeli forces was from 1407 to 1412 hours) and there would have been no time to change target data.

(e) We questioned the commanding officer about the procedures employed in the firing. His replies indicated a high professional standard.

(f) The second target had been engaged by another battery located in the same position. It had fired 40 rounds, from 1411 to 1417 hours.

(g) In response to repeated questions, the Israeli interlocutors stated that there had been no Israeli aircraft, helicopters or remotely piloted vehicles (RPV) in the air over Qana before, during or after the shelling. (These would have enabled the Israeli forces to observe the target area and adjust their fire.) However, at my request, General Vilnai promised on 21 April to look into this question again. On 26 April, Brigadier-General David Tzur, Chief Israeli Liaison Officer to Foreign Forces, confirmed in writing that there were "no choppers or Mini-RPVs flying above the area of Qana on 18 April, before or during the incident".

7. The Israeli officers stated that the Israeli forces were not aware at the time of the shelling that a large number of Lebanese civilians had taken refuge

/...

in the Qana compound. I did not pursue this question since I considered it irrelevant because the United Nations compound was not a legitimate target, whether or not civilians were in it.

8. The Israeli officers emphasized that it was not Israeli policy to target civilians or the United Nations. On the contrary, the Israeli forces had made every effort to avoid the loss of innocent lives. The incident at Qana was therefore all the more deeply regretted.

### Events prior to the shelling

9. My team and I questioned a number of witnesses on the activities of Hezbollah fighters in Qana prior to the incident. The following was found:

   (a) Between 1200 and 1400 hours on 18 April, Hezbollah fighters fired two or three rockets from a location 350 metres south-east of the United Nations compound. The location was identified on the ground.

   (b) Between 1230 and 1300 hours, they fired four or five rockets from a location 600 metres south-east of the compound. The location was identified on the ground.

   (c) About 15 minutes before the shelling, they fired between five and eight rounds of 120 millimetre mortar from a location 220 metres south-west of the centre of the compound. The location was identified on the ground. According to witnesses, the mortar was installed there between 1100 and 1200 hours that day, but no action was taken by UNIFIL personnel to remove it. (On 15 April, a Fijian had been shot in the chest as he tried to prevent Hezbollah fighters from firing rockets.)

   (d) The United Nations compound at Qana had taken in a large number of Lebanese seeking shelter from Israeli bombardments. By Sunday, 14 April, 745 persons were in the compound. On 18 April, the day of the shelling, their number is estimated to have been well over 800. When the Fijian soldiers heard the mortar being fired not far from their compound, they began immediately to move as many of the civilians as possible into shelters so that they would be protected from any Israeli retaliation.

   (e) At some point (it is not completely clear whether before or after the shelling), two or three Hezbollah fighters entered the United Nations compound, where their families were.

### Survey of impact area

10. The technical survey of the impacts of the Israeli shells yielded the following information:

   (a) Thirty-six impacts were found in the Qana area. Shell fragments of 155-millimetre calibre were found throughout the United Nations compound. The

/...

distribution of the impacts was uneven; there were two distinct areas where the impacts were concentrated and two "stray" impacts.

    (b) The first concentration of impacts was centred about 100 metres to the south of the United Nations compound, on a group of houses some 75 metres north-west of the mortar firing point. In all, 17 shells (16 with impact fuses, 1 with proximity fuse) landed south of the United Nations compound.

    (c) The second concentration of impacts was centred on the middle of the United Nations compound. Given the number and state of the casualties and the destruction caused by the shelling, a major clean-up operation had to be launched immediately after the end of the shelling. This resulted in the loss of important evidence. However, there was substantial evidence of multiple proximity-fused artillery ammunition detonating directly above the compound, covering a large portion of its area. While the exact number cannot be determined, the available evidence suggests that eight such projectiles detonated over the compound and one just outside it. There was also evidence that five high-explosive point-detonating projectiles detonated in the compound and three close to it. In sum, evidence was found of 13 detonations inside or directly above the compound and 4 very close to it.

    (d) Almost all the proximity fuses were used in the area of the United Nations compound.

    (e) Despite an extensive aerial and ground search, no impacts were found at the second target area identified by the Israeli forces (350 metres south-south-east of the United Nations compound), although evidence was found that rockets had been launched from a site nearby.

11. Several witnesses reported that during the shelling there had been a perceptible shift in the weight of fire from an area south-west of the compound (the mortar site) to the compound itself.

12. Several witnesses stated that they saw an RPV over the Qana area before, during and after the shelling. Two helicopters were seen 2 kilometres south-east of the United Nations compound during the shelling and one was observed close to the compound after the shelling had finished. The presence of one helicopter and an RPV was documented on a video tape, which covers the latter part of the shelling. It was taken by a member of the Force Mobile Reserve from a position overlooking the United Nations compound at Qana from a distance of about 1.5 kilometres. The RPV on the tape was of a type with a real-time data link capability.

### Findings

13. The following are my findings:

    (a) The distribution of impacts at Qana shows two distinct concentrations, whose mean points of impact are about 140 metres apart. If the guns were converged, as stated by the Israeli forces, there should have been only one main point of impact.

/...

(b) The pattern of impacts is inconsistent with a normal overshooting of the declared target (the mortar site) by a few rounds, as suggested by the Israeli forces.

(c) During the shelling, there was a perceptible shift in the weight of fire from the mortar site to the United Nations compound.

(d) The distribution of point impact detonations and air bursts makes it improbable that impact fuses and proximity fuses were employed in random order, as stated by the Israeli forces.

(e) There were no impacts in the second target area which the Israeli forces claim to have shelled.

(f) Contrary to repeated denials, two Israeli helicopters and a remotely piloted vehicle were present in the Qana area at the time of the shelling.

While the possibility cannot be ruled out completely, it is unlikely that the shelling of the United Nations compound was the result of gross technical and/or procedural errors.

### Preventing a recurrence

14. On 19 April, General Levine informed General Wozniak of new precautions adopted by the Israeli forces with regard to firing at targets near United Nations positions. I recommend that these measures be reviewed and confirmed at the political level.

(Signed) Franklin VAN KAPPEN
Major-General, Military Adviser

/...



Addendum dated 7 May 1996 to the report of the Secretary-General's Military Adviser concerning the Qana shelling

1. In view of the findings outlined in my report of 1 May, Ambassador David Peleg, Chargé d'affaires of the Permanent Mission of Israel, was invited to Headquarters on 2 May. In the presence of Mr. Kofi Annan I asked him for additional comments on two questions: the absence of any impacts from the second battery in the target area given; and the presence of helicopters and an RPV in the Qana area at the time of the shelling. Mr. Peleg was shown the videotape mentioned in paragraph 12 of my report.

2. On 6 May, Ambassador Peleg visited Headquarters together with Brigadier-General Dan Harel, Director of artillery of the Israel Defence Forces, and other officials. General Harel related the findings of an Israeli investigation which, he said, had been completed only the day before. He explained that, in their eagerness to cooperate with the United Nations, the Israeli forces had given me information during my visit before their own investigation was completed. Some of this information had turned out to be wrong. General Harel provided the following additions and corrections:

    (a) Two errors had been discovered in the checking by Northern Command of the distance of the targets from the United Nations compound (see para. 6 (b) of my report). First, the compound had been marked by a pin on a map (scale 1:20,000) about 100 metres north of its actual location. Secondly, in calculating the distance, the space covered by the compound had not been taken into account. As a result, the distance between the target and the compound (i.e., the edge of the compound - FVK) had been estimated at about 350 metres rather than the actual 180.

    (b) The fuse mix ratio had been the reverse of what I was told, namely, two thirds proximity fuses and one third impact fuses rather than the other way around.

    (c) The second battery had missed the second target completely. General Harel showed me an aerial photograph on which a group of seven impacts was marked about 150 metres west of the rocket site (180 metres south of the mortar site). General Harel could not explain why the second battery missed its target; the data provided to the battery had been correct.

    (d) General Harel could not explain why there were in Qana two distinct impact concentrations with main impact points 140 metres apart.

    (e) It was now known that an RPV had in fact been operated over southern Lebanon. However, it had moved between the area of Kafra/Yatar and the coast and had been in the Yatar area at the time of the shelling. It had been dispatched to Qana only at 1418 hours, that is, after the shelling ended, and arrived at its destination at 1431 hours. He pointed out that RPVs have a narrow field of view so that the presence of an RPV in the vicinity of Qana did not mean that Qana itself could be observed.

/...

    (f)  Two helicopters had been sent north of the "red line" (see para. 6 (a)) after the Israeli patrol came under attack in order to locate and attack the sources of fire. However, they could not find the target and left the area. General Harel did not know the route taken by the helicopters or whether they had overflown Qana. He would have to look into this.

    (g)  General Harel stressed that the Israeli forces were under strict instructions not to target the United Nations. Therefore, the shelling of the Qana compound could only be the result of a combination of technical and procedural errors and chance.

3.  It will be noted that the additional explanations provided by General Harel address the question why the Israeli forces fired at a target close to a United Nations compound. They do not address the first four of my findings. I also note that the Israeli forces have not yet provided details concerning the presence of helicopters in the Qana area, a question I first raised on 21 April. As I stated in my report, it is unlikely that gross technical and/or procedural errors led to the shelling of the United Nations compound. However, it cannot be ruled out completely.

                                                  (<u>Signed</u>)  Franklin VAN KAPPEN
                                                           Major-General, Military Adviser

-----