**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |
| ALI SAADALLAH BELHAS, SAADALLAH ) | Civil Action No. 1:05 CV 12167 (PLF) |
| ALI BELHAS, IBRAHIM KHALIL ) | |
| HAMMOUD, RAIMON NASEEB AL HAJA, ) | |
| HAMIDAH SHARIF DEEB, ALI ) | |
| MOHAMMED ISMAIL, and HALA YASSIM ) | |
| KHALIL, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| MOSHE YA'ALON, former Head of Army ) | |
| Intelligence, Israel, ) | |
| ) | |
| Defendant. ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN FURTHER SUPPORT OF MOSHE YA'ALON'S
MOTION TO DISMISS THE COMPLAINT**

Robert N. Weiner
Jean E. Kalicki
Matthew Eisenstein
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
Tel.: (202) 942-5000
Fax: (202) 942-5999

TABLE OF CONTENTS

Page

TABLE OF AUTHORITES ............................................................................................. ii

ARGUMENT ............................................................................................................... 2

I.      PLAINTIFFS MISCONSTRUE THE STANDARD OF REVIEW ............................ 2

        A.      The Court May Consider Evidence Under Rule 12(b)(1) .......................... 2

        B.      Plaintiffs Are Not Entitled to Discovery .............................................. 4

II.     SOVEREIGN IMMUNITY BARS PLAINTIFFS' CLAIMS ................................. 6

        A.      General Ya'alon Acted in His Official Capacity and Is Immune
                Under the FSIA ............................................................................. 6

        B.      The TVPA Does Not Preempt the Foreign Sovereign Immunity
                Act ............................................................................................. 11

        C.      The Statement of the Ambassador of Israel Is Entitled to
                Substantial Weight ....................................................................... 13

III.    THE POLITICAL QUESTION DOCTRINE BARS PLAINTIFFS'
        CLAIMS ........................................................................................................ 14

        A.      This Case Raises Highly Sensitive Political Questions
                Appropriately Reserved for the Executive Branch .............................. 14

        B.      Courts Have Not Adjudicated Claims Like Those Presented Here .......... 15

        C.      Multiple Factors -- Including the Volatility of Middle East
                Diplomacy and Potential Conflicts with Policies and Statements of
                the Executive Branch -- Make This Case Nonjusticiable ..................... 18

        D.      Adjudication of This Case Will Entangle the Court in Political and
                Military Issues That It Cannot Resolve ............................................. 20

IV.     THE ACT OF STATE DOCTRINE BARS ADJUDICATION OF
        PLAINTIFFS' CLAIMS .................................................................................. 22

CONCLUSION .......................................................................................................... 24

TABLE OF AUTHORITIES

Page(s)

Cases:

*Aktepe v. U.S.*,
    105 F.3d 1400 (11th Cir. 1997) ......................................................................21

*Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*,
    179 F.3d 1279 (11th Cir. 1999) ......................................................................13

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989)..........................................................................................8

*Baker v. Carr*,
    369 U.S. 186 (1962)...................................................................................1, 19

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964)..........................................................................3, 22, 23

*Bancoult v. McNamara*,
    445 F.3d 427 (D.C. Cir. 2006) ...................................................................7, 14

*Biton v. Palestinian Interim Self Gov't*,
    310 F. Supp. 2d 172 (D.D.C. 2004)...................................................15, 16, 18

*Biton v. Palestinian Interim Self Gov't*,
    412 F. Supp. 2d 1 (D.D.C. 2005) ...........................................................15, 16

*Burnett v. Al Baraka Inv. and Dev. Corp.*,
    292 F. Supp. 2d 9 (D.D.C. 2003) .....................................................................6

*Cabiri v. Assasie-Gyimah*,
    921 F. Supp. 1189 (S.D.N.Y. 1996)................................................................10

*Callejo v. Bancomer, S.A.*,
    764 F.2d 1101 (5th Cir. 1985) ........................................................................23

*Chuidian v. Phil. Nat'l Bank*,
    912 F.2d 1095 (9th Cir. 1990) ..........................................................................9

*Corrie v. Caterpillar, Inc.*,
    403 F. Supp. 2d 1019 (W.D. Wash. 2006).................................................19, 23

*DeNegri v. Republic of Chile*,
    Civ. A. No. 86-3085, 1992 WL 91914 (D.D.C. Apr. 6, 1992) ............................8

*Doe v. State of Israel*,
    400 F. Supp. 86 (D.D.C. 2005) ....................................................................3, 12, 15, 17, 18

*Doe v. Qi*,
    349 F. Supp. 2d 1258 (N.D. Cal. 2004) ....................................................................9, 12, 24

*El-Fadl v. Central Bank of Jordan*,
    75 F.3d 668 (D.C. Cir. 1996) ....................................................................................5, 6, 9

*El-Hadad v. Embassy of the U.A.E.*,
    69 F. Supp. 2d 69 (D.D.C. 1999) ....................................................................................22

*El-Shifa Pharm. Indus. Co. v. U.S.*,
    402 F. Supp. 2d 267 (D.D.C. 2005) ....................................................................................21

*Flatow v. Islamic Republic of Iran*,
    999 F. Supp. 1 (D.D.C. 1998) ....................................................................................23, 24

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
    422 F. Supp. 2d 96 (D.D.C. 2006) ....................................................................................15

*Gonzalez-Vera v. Kissinger*,
    No. 05-5017, 2006 WL 1563589 (D.C. Cir. June 9, 2006) ................................2, 8, 15, 17

*Haig v. Agee*,
    453 U.S. 280 (1981) ....................................................................................14

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) ....................................................................................21, 22

*Hilao v. Estate of Marcos*,
    25 F.3d 1467 (9th Cir. 1994) ....................................................................................9

*Hwang Geum Joo v. Japan*,
    172 F. Supp. 2d 52 (D.D.C. 2001), *aff'd*, 413 F.3d 45 (D.C. Cir. 2005) ............................8

*In re Papandreou*,
    139 F.3d 247 (D.C. Cir. 1998) ....................................................................................5, 6

*In re Phil. Nat'l Bank*,
    397 F.3d 768 (9th Cir. 2005) ....................................................................................23

*In re Terrorist Attacks on September 11, 2001*,
    392 F. Supp. 2d 539 (S.D.N.Y. 2005) ....................................................................................12, 13

*Jimenez v. Aristeguieta*,
    311 F.2d 547 (5th Cir. 1962) ..............................................................................23

*Jota v. Texaco, Inc.*,
    157 F.3d 153 (2d Cir. 1998)..........................................................................13, 14

*Jungquist v. Al Nahyan*,
    115 F.3d 1020 (D.C. Cir. 1997) ...........................................................................9

*Kadic v. Karadzic*,
    70 F.3d 232 (2d Cir. 1995)............................................................................10, 24

*Kentucky v. Graham*,
    473 U.S. 159 (1985)..............................................................................................9

*Klieman v. Palestinian Auth.*,
    424 F. Supp. 2d 153 (D.D.C. 2006) ...............................................15, 16, 17, 18

*Klinghoffer v. S.N.C. Achille Lauro*,
    937 F.2d 44 (2d Cir. 1991).............................................................................15, 18

*Knox v. Palestine Lib. Org.*,
    306 F. Supp. 2d 424 (S.D.N.Y. 2004) ...............................................................15

*Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*,
    184 F. Supp. 2d 277 (S.D.N.Y. 2001) ...............................................................13

*Linde v. Arab Bank*,
    384 F. Supp. 2d 571 (E.D.N.Y. 2005) ...............................................................15

*Linder v. Portocarrero*,
    963 F.2d  332 (11th Cir. 1992) ...........................................................................16

*Morton v. Mancari*,
    417 U.S. 535 (1974)............................................................................................12

*Mujica v. Occidental Petroleum Corp.*,
    381 F. Supp. 2d 1164 (C.D. Cal. 2005) .............................................................24

*Mwani v. bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) .................................................................................6

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984)................................................................................................8

*Phillips v. Bureau of Prisons*,
    591 F.2d 966 (D.C. Cir. 1979) ...................................................................................4

*Princz v. Fed. Republic of Germany*,
    26 F.3d 1166 (D.C. Cir. 1994) ...........................................................................8, 11

*Ramey v. Bowsher*,
    915 F.2d 731 (D.C. Cir. 1990) ...................................................................................8

*Rasul v. Bush*,
    542 U.S. 466 (2004) .........................................................................................21, 22

*Republic of Austria v. Altmann*,
    541 U.S. 677 (2004) .....................................................................................................3

*Risk v. Kingdom of Norway*,
    707 F. Supp. 1159 (N.D. Cal. 1989), *aff'd*, 936 F.2d 393 (9th Cir. 1991) .......................22

*Saltany v. Reagan*,
    702 F. Supp. 319 (D.D.C. 1988), *aff'd in part, rev'd in part*, 886 F.2d 438
    (D.C. Cir. 1989) ...................................................................................................10

*Sampson v. Fed. Republic of Germany*,
    250 F.3d 1145 (7th Cir. 2001) ...............................................................................11

*Schneider v. Kissinger*,
    412 F.3d 190 (D.C. Cir. 2005) .................................................................................15

*Sharon v. Time*,
    599 F. Supp. 538 (S.D.N.Y. 1984) .........................................................................15

*Smith v. Socialist People's Libyan Amrab Jamahiriya*,
    101 F.3d 239 (2d Cir. 1996) .....................................................................................11

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) .................................................................................................7

*Trajano v. Marcos*,
    978 F.2d 493 (9th Cir. 1992) ...............................................................................9, 10

*Ungar v. Palestine Lib. Org.*,
    402 F.3d 274 (1st Cir. 2005) .................................................................................15

*W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*,
    493 U.S. 400 (1990) .................................................................................................23

*Xuncax v. Gramajo*,
     886 F. Supp. 162 (D. Mass. 1995) .................................................................10

Statutes:

P.L. 102-572, 106 Stat. 4506 (1992).................................................................12

18 U.S.C. § 2331 ...............................................................................................16

18 U.S.C. § 2337 .........................................................................................13, 16

28 U.S.C. § 1350 ...............................................................................................17

Rules:

Fed. R. Civ. P. 12(b)(1)...............................................................................2, 3, 4

Fed. R. Civ. P. 12(b)(6)...................................................................................3, 4

Fed. R. Evid. 201 ................................................................................................4

Legislative Materials:

H.R. Con. Res. 280, 107th Cong. (2001) ...........................................................11

H.R. Rep. No. 102-242(I) (1991).......................................................................16

H.R. Rep. No. 102-1040 (1992).....................................................................13, 16

H.R. Res. 392, 107th Cong. (2002)....................................................................11

S. Rep. No. 102-249 (1991)..........................................................................9, 12

S. Rep. No. 102-342 (1992)........................................................................13, 16

Miscellaneous:

Restatement 2d of Agency § 229(1) .................................................................7, 8

U.N. SCOR, 51st Sess., 3654th mtg., U.N. Doc. S/PV.3654 (Apr. 18, 1996), *available at*
     http://domino.un.org/UNISPAL.nsf/52b7d0e66142a40e85256dc70072b982/b0c9
     d75daa80859085256316006c0a62!OpenDocument.......................................2, 19

U.N. voting record for A/RES/50/22C, *available at* http://unbisnet.un.org:8080/ipac20/
     ipac.jsp?session=108V0691N26Y9.82&menu=search&aspect=power&npp=50&i
     pp=20&profile=voting&ri=&index=.VM&term=ARES5022C#focus .........................2, 19

U.S. Dep't of State Daily Press Briefing, Apr. 19, 1996, *at*
    http://www.hri.org/docs/statedep/1996/96-04-19.std.html ...........................................18, 19

U.S. Dep't of State Dispatch, vol. 7, no. 18, Apr. 29, 1996 (speech by President Clinton,
    Apr. 28, 1996), *at*
    http://dosfan.lib.uic.edu/ERC/briefing/dispatch/1996/html/Dispatchv7no18.html .......1, 11

U.S. Dep't of State Dispatch (remarks by President George Bush, May 18, 2004), *at*
    http://www.whitehouse.gov/news/releases/2004/05/20040518-1.html ...........................11

U.S. Dep't of State Dispatch (Apr. 14, 2004), at
    http://www.whitehouse.gov/news/releases/2004/04/20040414-2.html ...........................11

Wright & Miller, Fed. Practice and Procedure § 1350 (3d ed. 2004) ...........................................3

## INTRODUCTION

Plaintiffs ask the Court to ignore the potential threat this case poses to the foreign policy of the United States, to turn a blind eye to the expressed concerns of the U.S. and Israeli governments, and effectively to nullify the sovereign immunity statute. This brief will refute each of Plaintiffs' arguments in turn, but this particularized exercise should not obscure the overarching, common-sense point: This Court is not the proper forum for Plaintiffs from overseas, who allegedly were injured overseas, to challenge the way a democratic U.S. ally defends itself overseas, against terrorist attacks overseas, especially where the Executive Branch has addressed the incident at issue in its diplomatic efforts to bring peace to the Middle East.

Plaintiffs seek to evade this common-sense point first by casting aside the public record reflecting the U.S. foreign policy interests at stake. In essence, Plaintiffs urge the Court to determine whether this action interferes with U.S. foreign policy without considering the policy statements of the U.S. or Israel. And when they do address those statements, Plaintiffs misjudge their significance. For example, President Clinton's determination that the shelling at Qana was a "tragic misfiring in Israel's legitimate exercise of its right to self-defense"[1] was not offered as evidence on the merits. The statement is significant because the President said it, because the *Executive Branch concluded* that the attack was accidental and addressed it as part of the diplomatic effort to achieve peace in the region. In denigrating these conclusions as "ambivalent," "irrelevant," and "baseless," Pl. Mem. at 39, Plaintiffs show a "lack of the respect due coordinate branches of government," *Baker v. Carr*, 369 U.S. 186, 217 (1962), and they ask

---

[1] U.S. Dep't of State Dispatch, vol. 7, no. 18, Apr. 29, 1996 (speech by President Clinton, Apr. 28, 1996), *at* http://dosfan.lib.uic.edu/ERC/briefing/dispatch/1996/html/Dispatchv7no18.html. Plaintiffs suggest that the report in the Saudi Gazette of a description by a third party of an off-the-record comment by President Clinton somehow trumps the verbatim, official, public statement he made. The suggestion illustrates the ways litigating this case could undermine the stated policy of the United States.

this Court to do the same.

Indeed, in preference to the conclusions of the Executive Branch, Plaintiffs invite the Court to rely on a resolution of the U.N. General Assembly condemning the Qana shelling. But Plaintiffs neglect to inform the Court that the United States voted against the resolution, and that more countries voted against it or abstained than voted for it.[2] Moreover, Plaintiffs do not disclose that the General Assembly considered the issue only after the United States persuaded the Security Council to defeat a similar resolution, because it was "one-sided" and incompatible with "negotiations towards an end to the fighting."[3] These omissions go directly to a critical point -- that Plaintiffs would have this Court adopt the position advanced by other countries, in opposition to that of the United States and in derogation of U.S. foreign policy.

Whether by artifice or omission, Plaintiffs cannot banish common sense from this courtroom. Issues of sovereign immunity and justiciability arise frequently in this Circuit. The law is well-developed and definitive. It recognizes that, as the Court of Appeals reaffirmed this month in *Gonzalez-Vera v. Kissinger*, No. 05-5017, 2006 WL 1563589 (D.C. Cir. June 9, 2006), a federal court is not a proper forum for this type of political warfare.

**ARGUMENT**

I.     PLAINTIFFS MISCONSTRUE THE STANDARD OF REVIEW

A.     The Court May Consider Evidence Under Rule 12(b)(1)

Plaintiffs contend that the Court may not consider evidence regarding U.S. foreign

---

[2] *See* U.N. voting record for A/RES/50/22C, *available at* http://unbisnet.un.org:8080/ipac20/ipac.jsp?session=108V0691N26Y9.82&menu=search&aspect=power&npp=50&ipp=20&profile=voting&ri=&index=.VM&term=ARES5022C#focus.

[3] U.N. SCOR, 51st Sess., 3654th mtg., U.N. Doc. S/PV.3654 (Apr. 18, 1996), *available at* http://domino.un.org/UNISPAL.nsf/52b7d0e66142a40e85256dc70072b982/b0c9d75daa80859085256316006c0a62!OpenDocument.

policy, even as it determines whether this case interferes with that policy. Plaintiffs concede that political question and sovereign immunity motions are jurisdictional, but assert that Act of State motions are not, and hence should be treated under Rule 12(b)(6) without consideration of evidence. Plaintiffs cite no case that so holds. The one case they do cite, *Republic of Austria v. Altmann*, 541 U.S. 677 (2004), says nothing about Rule 12(b)(1) or Rule 12(b)(6). It states only that, "[u]nlike a claim of sovereign immunity, which merely raises a jurisdictional defense, the act of state doctrine provides foreign states with a substantive defense on the merits." 541 U.S. at 700. Even if the Act of State doctrine is a rule of decision, it still rests on principles of abstention, requiring courts to refrain from examining the validity of the acts of a state within its own territory. *See, e.g.*, *Doe v. State of Israel*, 400 F. Supp. 86, 111 (D.D.C. 2005) ("the Court would abstain from exercising jurisdiction because of prudential concerns embodied in the act of state doctrine"). When all that Plaintiffs challenge is the act of a state within its own territory, then the Court must abstain from considering that challenge. Because this abstention reflects "the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427-28 (1964), the issue falls under Rule 12(b)(1), which encompasses motions relating to the appropriate exercise of judicial power. *See* 5B Wright & Miller, Fed. Practice and Procedure § 1350, at 100-02 (3d ed. 2004) ("scope of Rule 12(b)(1) is flexible, often serving as a procedural vehicle for raising various residual defenses … challenging the federal court's ability to proceed with the action"). Moreover, because the central concern underlying the Act of State doctrine is whether "engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere," *Sabbatino*, 367 U.S. at 423, it would be illogical to read the Rules of Civil Procedure as obstructing that inquiry. Indeed,

-3-

Plaintiffs highlight the fallacy, arguing both that Defendant bears the burden of proof on the Act of State doctrine, Pl. Mem. at 40, and that he cannot present evidence to satisfy it. *Id.* at 4.

Moreover, as Plaintiffs concede that sovereign immunity and the political question doctrine fall under Fed. R. Civ. P. 12(b)(1), the Court may consider evidence as to those issues. But it may not do so, on Plaintiffs' view, in applying the Act of State doctrine. In other words, if the evidence relating to the political question doctrine shows that this case could seriously impede U.S. diplomacy, then, according to Plaintiffs, the Court must expunge that information from its mind when it turns to Act of State. The formulaic rigidity of this approach, the lack of common sense, is telling. The key question here is whether this Court is the proper forum to assess the actions of a U.S. ally defending against terrorist attacks, whether this Court's decision could affect foreign policy or disrupt diplomatic efforts to achieve peace. Nothing requires this Court to quarantine each issue from the others, or bars the Court from considering the evidence it needs to determine whether it should exercise jurisdiction.[4]

B.    Plaintiffs Are Not Entitled to Discovery

Rule 12(b)(1), however, does not justify jurisdictional discovery, let alone the full-blown discovery on the merits that Plaintiffs request. Pl. Mem. at 27. Even limited discovery would infringe on Israeli sovereignty in sensitive areas of any government's operations -- military strategy and tactics, intelligence, weapons capability, and defense policy. Israel already has protested that infringement. *See infra* p. 18. Because of such concerns, courts have been reluctant to grant jurisdictional discovery in cases involving foreign sovereigns. *See El-Fadl v.*

---

[4] Even if the Court treats the Act of State portion of the motion as arising under Rule 12(b)(6), it can take judicial notice of the materials Defendant presented. They are governmental pronouncements submitted not for the truth of the assertions made, but for the fact that the government asserted them. *See* Fed. R. Evid. 201; *Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C. Cir. 1979) (a court may consider "matters of general public record" under 12(b)(6)).

*Central Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996). Indeed, in *In re Papandreou*, 139 F.3d 247, 254 (D.C. Cir. 1998), the Court of Appeals issued a writ of mandamus barring depositions of ministers of the Greek government on jurisdictional issues. Although the depositions sought evidence relevant to the FSIA issues, the Court held that "[r]elevance … is not enough. Because sovereign immunity is an immunity from suit … a district court authorizing discovery to determine whether immunity bars jurisdiction must proceed with circumspection, lest the evaluation of the immunity itself encroach unduly on the benefits the immunity was to ensure." 139 F.3d at 253. Here, where Plaintiffs seek jurisdictional discovery co-extensive with discovery on the merits, it would not merely "encroach" on the benefits of immunity; it would nullify them.

Likewise, courts have rejected discovery where, as here, it would serve no valid purpose. Plaintiffs ask to discover the "factual basis" for General Ya'alon's position that "he acted within the scope of his authority." Pl. Mem. 5, 6, 26-28. As shown below, pp. 6-14, Plaintiffs' legal theory is not viable in this Circuit. Even if it was, Israel has affirmed that the attack at issue was a "military action[] undertaken by the State of Israel in defending against terrorism," that it was a "sovereign act[] of the State of Israel, approved by the government of Israel in defense of its citizens against terrorist attacks," and that anything General Ya'alon did was in the course of his official duties and implemented official policies of the State. Def. Mem., Tab A (Letter from D. Ayalon, Ambassador of Israel, to N. Burns, Under-Secretary of State for Political Affairs, Feb. 6, 2006 (hereafter "State of Israel Letter")). Especially given the law in this Circuit, discovery here to establish that Israel is wrong about its own policy, mistaken that it approved the shelling, and ineffectual in ratifying General Ya'alon's actions, would be futile. It would "frustrate the significance and benefit of entitlement to immunity from suit." *El-Fadl*, 75 F.3d at 671 (no FSIA discovery absent showing that defendant Deputy Governor of Jordan acted ouside his

official capacity) (citation omitted); *Burnett v. Al Baraka Inv. and Dev. Corp.*, 292 F. Supp. 2d 9, 15 (D.D.C. 2003) (no FSIA discovery absent "showing that any of Prince Turki's alleged actions were taken other than in his official capacity"); *see also Mwani v. bin Laden*, 417 F.3d 1, 17 (D.C. Cir. 2005) (no FSIA discovery where Court did "not see what facts additional discovery could produce that would affect our jurisdictional analysis") (citation omitted).

In any event, even if discovery were useful regarding the FSIA, it is not regarding the political question doctrine. As in *Papandreou*, "where a colorable claim of immunity is made, a trial court should -- at least if the defendant so argues -- normally consider other potentially dispositive jurisdictional defenses before allowing FSIA discovery." 139 F.3d at 254.

## II.    SOVEREIGN IMMUNITY BARS PLAINTIFFS' CLAIMS

### A.    General Ya'alon Acted in His Official Capacity and Is Immune Under the FSIA

Common sense fares no better in Plaintiffs' arguments regarding the FSIA. Plaintiffs argue that the FSIA covers only officials who act in an official capacity, and an illegal act, they say, cannot be official. Thus, on Plaintiffs' circular logic, because they allege that General Ya'alon acted illegally, the FSIA is unavailable. This argument is meritless.

To begin with, Plaintiffs' arguments outrun their Complaint. Their brief suggests that General Ya'alon is liable because the attack on civilians at Qana was "premeditated and intentional." Pl. Mem. at 18. But their Complaint does not allege that General Ya'alon, as the head of Army Intelligence, attacked civilians, intentionally or otherwise, fired the artillery, or gave the order to fire. What the Complaint does allege is hedged and evasive. It alleges not premedition, but rather that General Ya'alon "knew *or should have known* that Lebanese civilians had sought shelter in the UNIFIL compound in Qana, and that directly shelling the compound with proximity fuse shells would kill or maim civilians." Compl. ¶ 52 (emphasis added). And it never asserts that General Ya'alon knew, or even should have known, that troops

in fact were "directly shelling the compound," much less the type of shells they used.  As to General Ya'alon's so-called "participation" in the decision to "target" the compound, alleged on information and belief, *id.* ¶ 35, the Complaint provides a string of alternatives, concluding with the option that he is "otherwise responsible for" the attack, *id.* ¶ 49 -- a normative, not a legal, description consistent with his knowing and doing nothing.

Nonetheless, on the counterfactual premise that General Ya'alon targeted civilians, Plaintiffs proffer a legal opinion that shelling civilians violates Israeli and international law.  On that basis, they argue that General Ya'alon could not have acted in an official capacity.  Indeed, Plaintiffs contend, "[e]ven if the assault on the United Nations compound were accidental, the killing and injuring of the civilians there would be war crimes," Pl. Mem. at 1, and thus outside the protection of sovereign immunity.  The implications of the proposition that accidents are *ultra vires*, the breadth of potential liability for military personnel, including U.S. soldiers, and the prospective demise of sovereign immunity even for claims of negligence, are startling.  *Cf. Sosa v. Alvarez-Machain,* 542 U.S. 692, 736 (2004) (noting "breathtaking" implications of allowing federal claim for arbitrary detention).

Not surprisingly, the law does not support the argument.  Plaintiffs fail to acknowledge the recent D.C. Circuit opinion on the issue.  In *Bancoult v. McNamara*, 445 F.3d 427 (D.C. Cir. 2006), indigenous residents of the Chagos Archipelago who were forcibly displaced in the 1960s by a U.S. military base sued former senior officials of the U.S. Departments of Defense and State.  They alleged, among other things, torture, genocide, and inhuman treatment.  *Id.* at 431.  They argued that the political question doctrine did not apply because the defendants' actions violated international law and human rights, and hence were *ultra vires.*  The Court disagreed, holding that the defendants' scope of employment encompassed "conduct … of the same general nature as that authorized, or incidental to the conduct authorized."  *Id.* at 437-38 (quoting Restatement 2d of

Agency § 229(1)).  Because the defendants were authorized to depopulate the islands, the "use of harsh measures" in doing so was incidental to their employment and not *ultra vires. Id.*

Similarly, in *Gonzalez-Vera*, 2006 WL 1563589, at *4, the plaintiffs argued that Henry Kissinger, as Secretary of State and National Security Adviser, was complicitous in human rights violations by the Pinochet regime in Chile.  The D.C. Circuit held that the alleged conduct fell within Kissinger's scope of employment.  Although the Court could "imagine a case in which a rogue agent commits an act so removed from his official duties that it cannot fairly be said to represent the policy of the United States," Kissinger's alleged acts furthered that policy. *Id.*

The Court's approach was consistent with the treatment of immunity under the 11th Amendment.  The Supreme Court has held that if actions of a state official were deemed to fall outside official capacity simply because they violate the law, as Plaintiffs urge here, "a plaintiff would need only to claim a denial of rights protected or provided by statute in order to override sovereign immunity.  Except in rare cases it would make the constitutional doctrine of sovereign immunity a nullity." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 112 (1984).  The D.C. Circuit has agreed. *See Ramey v. Bowsher*, 915 F.2d 731, 734 (D.C. Cir. 1990) (if official capacity was "coextensive with the official's lawful conduct, then immunity would be available only where it is not needed") (citation omitted).  The same logic applies under the FSIA, particularly given that foreign States themselves have immunity even for acts by their officials which violate national or international law. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989); *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994); *Hwang Geum Joo v. Japan*, 172 F. Supp. 2d 52, 60 (D.D.C. 2001), *aff'd*, 413 F.3d 45 (D.C. Cir. 2005); *DeNegri v. Republic of Chile*, Civ. A. No. 86-3085, 1992 WL 91914, at *3 (D.D.C. Apr. 6, 1992).  Under the FSIA, as under the 11th Amendment, conduct is in an official capacity if the actions were "neither personal nor private, but were undertaken only on behalf of"

the sovereign. *El-Fadl*, 75 F.3d at 671; *cf. Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (under 11th Amendment, action falls within "official capacity" if it involves a "policy or custom" for which the government itself is a "moving force").[5]

In determining whether an official acted on behalf of the government, the legality of his or her conduct may be one piece of evidence. But the more significant -- potentially definitive -- evidence is the position of the official's government. In this regard, Plaintiffs misread *Jungquist v. Al Nahyan*, 115 F.3d 1020, 1028 (D.C. Cir. 1997). The D.C. Circuit found there that a member of the royal family of Abu Dhabi was not entitled to immunity because "the Abu Dhabi government would have no part" in his actions, that is, it neither authorized nor ratified them. It followed that the acts were "not in furtherance of the interests of the sovereign but a personal and private action." *Id.* Nowhere does the case state, imply, or even hint at the proposition Plaintiffs tout, that an allegation of illegality nullifies sovereign immunity for actions authorized and ratified by foreign governments. Likewise, in *Doe v. Qi*, on which Plaintiffs rely, the Court quoted the statement in the Senate Report on the Torture Victim Protection Act ("TVPA") that "FSIA immunity would extend to an individual if the state 'admit[ted] some knowledge or authorization of relevant acts.'" 349 F. Supp. 2d 1258, 1288 n.20 (N.D. Cal. 2004) (quoting S. Rep. No. 102-249, at 8 (1991)). In that case, as well the others Plaintiffs cite, the government of the defendant official either denied that the official acted within his authority, *see id.* at 1287; *Hilao v. Estate of Marcos*, 25 F.3d 1467, 1472 (9th Cir. 1994); *Trajano v. Marcos*, 978 F.2d 493,

---

[5] Contrary to Plaintiffs' misconception, we do not contend that the inquiry turns on the official's motive, but on the nature of his conduct and authorization or ratification by his government. The very case Plaintiffs' cite, *Chuidian v. Phil. Nat'l Bank*, 912 F.2d 1095 (9th Cir. 1990), for the proposition that motive is not determinative makes clear what is. The Court held that the defendant there acted in an official capacity because "he purported to act as an official, not as an individual. Indeed, only his authority [as a government official] enabled him to prevent the payment. Thus, his actions, far from being 'completely outside his governmental authority,' were entirely dependent on it." 912 F.2d at 1106 (citation omitted).

498 n.11, 500 (9th Cir. 1992), or was silent, *Xuncax v. Gramajo*, 886 F. Supp. 162, 176 n.10 (D. Mass. 1995), sometimes because the official did not advance the claim, *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1198 (S.D.N.Y. 1996); *see also Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir. 1995) (finding that defendant's actions were "wholly unratified" by his government). Indeed, if official capacity turned solely on legal authority, there would have been no reason for these courts even to have considered the foreign State's position.

Under the proper test -- whether General Ya'alon acted on behalf of Israel -- Plaintiffs cannot dispute the result. The caption of the Complaint identifies him by his former position. The Complaint describes his military duties, the military situation in northern Israel and Lebanon, and the structure of the military operation there. It is difficult to conceive of an act more governmental, more within the scope of a military officer's employment, than participation in a military response to a military attack (assuming he did so). *See Saltany v. Reagan*, 702 F. Supp. 319, 321 (D.D.C. 1988) (finding it "manifest" that "civilian or military officials of the United States government who are alleged to have planned and/or executed the air strikes [on Libya] ordered by the President … did so in their official capacities" and were thus entitled to immunity), *aff'd in relevant part, rev'd in part*, 886 F.2d 438 (D.C. Cir. 1989). Based on Plaintiffs' own allegations, whatever General Ya'alon did was on behalf of the State of Israel.

To sustain their untenable reading of the FSIA, Plaintiffs repeatedly invoke Nuremberg. Pl. Mem. at 20, 21, 23-24, 26. Invocation of Nuremberg is not only inapt, but frankly, offensive. Israel is a democratic ally, founded out of the ashes of the Holocaust. The accusation here relates not to the systematic extermination of a people, but to an exchange of artillery fire with a terrorist organization. And the U.S. has repeatedly characterized this artillery barrage, and

Israel's actions against terrorists generally, as legitimate self-defense.[6]  The issue at Nuremberg, moreover, was not whether Nazi war criminals were immune from private lawsuits under the FSIA, but whether they should answer to a world tribunal.  *Cf. Sampson v. Fed. Republic of Germany*, 250 F.3d 1145, 1152 (7th Cir. 2001) ("although *jus cogens* norms may address sovereign immunity in contexts where the question is whether international law itself provides immunity, e.g., the Nuremberg proceedings," they "do not require Congress (or any government) to create jurisdiction" in its own courts); *Smith v. Socialist People's Libyan Amrab Jamahiriya*, 101 F.3d 239, 242-45 (2d Cir. 1996); *Princz*, 26 F.3d at 1173-74 & n.1.

B.      The TVPA Does Not Preempt the Foreign Sovereign Immunity Act

In support of their claim that the FSIA does not cover acts taken on behalf and with the approval of the official's government, Plaintiffs craft a strained argument under the TVPA.  The TVPA extends to officials who, acting with "actual authority," commit torture or extrajudicial killing.  Therefore, Plaintiffs argue, in enacting the TVPA, Congress must have intended to override sovereign immunity for such officials even if they did their government's bidding, lest there be no one who could ever be liable.  Once again trying to put blinders on the Court, Plaintiffs urge it to disregard the express statements in the legislative history of the TVPA that the statute did not displace the FSIA.  Those statements are off-limits, Plaintiffs say, because the statutory language purportedly makes clear that the TVPA does preempt sovereign immunity.

To begin with, Plaintiffs' premise is wrong.  Leaving the FSIA intact does not exempt all

---

[6] *See, e.g.*, U.S. Dep't of State Dispatch, *supra* n.1 (statement by President Clinton that "[t]his has been a trying time … for the Lebanese children in Qana who were caught between -- make no mistake about it -- the deliberate tactics of Hezbollah in their positioning and firing and the tragic misfiring in Israel's legitimate exercise of its right to self defense"); remarks by President George Bush, May 18, 2004, *at* http://www.whitehouse.gov/news/releases/2004/05/20040518-1.html ("Israel is a democracy and a friend, and has every right to defend itself from terror"); *id.*, Apr. 14, 2004, at http://www.whitehouse.gov/news/releases/2004/04/20040414-2.html ("Israel will retain its right to defend itself against terrorism, including to take actions against terrorist organizations"); *see also* H.R. Res. 392; H.R. Con. Res. 280, 107th Cong. (2001).

TVPA claims against foreign officials acting with "actual authority." In addition to cases where the foreign governments subsequently waive sovereign immunity or disavow the acts of their officials, the FSIA has important exceptions. For instance, it denies immunity for acts by designated state sponsors of terror and for acts committed in the United States. As the Supreme Court has held, "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). The two statutes here can co-exist.

Moreover, the supposedly "clear" language of the TVPA says nothing at all about sovereign immunity. The TVPA has been on the books for almost 15 years, yet Plaintiffs cite not a single case holding that it overrides the FSIA, much less one that has perceived the "clarity" they claim is dispositive. To the contrary, cases decided since the TVPA have recognized that sovereign immunity applies. The Court in *Doe v. Israel* held that sovereign immunity protected Israeli officials accused of violations of the TVPA. 400 F. Supp. 2d at 104. In *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 553-54 (S.D.N.Y. 2005), the Court upheld sovereign immunity for two Saudi princes accused of financing, conspiring to commit, and aiding and abetting terrorism in violation of the TVPA and other statutes. And as noted, in *Doe v. Qi*, the Court held that sovereign immunity would bar a claim against a foreign official under the TVPA if, as the Senate Report on the TVPA concluded, the official's government "'admit[ted] some knowledge or authorization of relevant acts.'" 349 F. Supp. 2d at 1288 n.20 (quoting S. Rep. No. 102-249, at 8).

Moreover, the same Congress that enacted the TVPA in March 1992 passed the Anti-Terrorism Act ("ATA") in October 1992. *See* P.L. 102-572, 106 Stat. 4506 (1992). The ATA provided U.S. citizens a remedy for terrorist acts. But it did not allow claims against "a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency

-12-

thereof acting within his or her official capacity or under color of legal authority."  18 U.S.C. § 2337.  The Congressional reports on the ATA made clear that this restriction did not distinguish it from the TVPA or other laws.  Rather, the Reports affirmed, "This provision maintains the status quo, in accordance with the Foreign Sovereign Immunities Act, with respect to sovereign states *and their officials*."  S. Rep. No. 102-342, at 47 (1992); H.R. Rep. No. 102-1040, at 7 (1992) (emphasis added).  Indeed, accepting Plaintiffs' argument that the TVPA overrides sovereign immunity would mean that Congress gave foreign plaintiffs greater remedies under the TVPA than U.S. plaintiffs have under the ATA.  That does not accord with common sense.

C.     The Statement of the Ambassador of Israel Is Entitled to Substantial Weight

Perhaps Plaintiffs' gravest assault on common sense, however, is their insistence that this Court disregard the letter of the Israeli Ambassador to the Under-Secretary of State reflecting knowledge, approval, and ratification of the attack at issue here.  In that letter, the Ambassador affirmed that the attack was a sovereign act of Israel, that it was a "military action[] by the State of Israel in defending against terrorism," and that anything General Ya'alon did was in the course of his "official duties, and in furtherance of official policies of the State of Israel."  State of Israel Letter.  Courts have given significant weight to similar submissions.  *See In re Terrorist Attacks*, 392 F. Supp. 2d at 551; *Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 287-88 (S.D.N.Y. 2001).  Nonetheless, Plaintiffs claim that this Court cannot consider the letter because it renders a legal opinion on General Ya'alon's authority, and the Ambassador is not a lawyer.  The Ambassador's legal training, however, is irrelevant.  He is not speaking for himself.  He is conveying the official position of Israel, which is what Ambassadors do.  *See, e.g.*, *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1295-96 (11th Cir. 1999) (ambassadors represent "the sending State in the receiving State") (citation omitted); *Jota v. Texaco, Inc.*, 157 F.3d 153, 163 (2d Cir. 1998) (ambassadors

"represent the state's position before foreign courts").[7]  And Israel's position is not a legal

opinion, but a governmental statement of policy.

In sum, Plaintiffs ask this Court to hold that an official acting on behalf of his

government, whose government authorizes his conduct beforehand and ratifies it after, does not

act in an official capacity.  Plaintiffs further ask the Court, as it thus eviscerates the sovereign

immunity statute, to disregard the legislative history of the TVPA disavowing any such intention.

And they urge the Court to ignore the statement of Israel's Ambassador that General Ya'alon

acted on behalf of and implemented official policies of the State.  The law in this Circuit does

not permit, much less require, such a cloistered, artificial exercise, straining this rule or that to

block the Court from considering what Congress intended or to impede the Court's access to the

real world.  Rather, the law contemplates a reasoned and reasonable approach.  On such an

approach, sovereign immunity bars Plaintiffs' claims.

III.    THE POLITICAL QUESTION DOCTRINE BARS PLAINTIFFS' CLAIMS

A.    This Case Raises Highly Sensitive Political Questions Appropriately Reserved for
the Executive Branch

The same apparent detachment from reality infects Plaintiffs' discussion of the political

question doctrine.  Contrary to Plaintiffs' suggestion, many courts have held that the doctrine has

particular force in foreign relations.  *See, e.g.*, *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters

intimately related to foreign policy and national security are rarely proper subjects for judicial

intervention.").  Indeed, three times within the last year, the D.C. Circuit has affirmed that

national security and foreign relations are "the quintessential sources of political questions,"

*Bancoult*, 445 F.3d at 433, that "decision-making in the fields of foreign policy and national

---

[7] Should the Court nonetheless wish further confirmation of General Ya'alon's authority, Israel
is prepared to make a formal *amicus* submission or such other submission as the Court requests.

security is textually committed to the political branches of government," *Schneider v. Kissinger,*
412 F.3d 190, 194 (D.C. Cir. 2005), and that courts cannot decide claims calling "into question
foreign policy decisions textually committed to the political branches." *Gonzalez-Vera*, 2006
WL 1563589, at *4. As the Court held in *Doe v. Israel*, assessing Israel's defense against
terrorism "would draw the Court into the foreign affairs of the United States, thereby interfering
with the sole province of the Executive Branch." 400 F. Supp. 2d at 112.

      B.      Courts Have Not Adjudicated Claims Like Those Presented Here

      Plaintiffs' claim that courts have often interceded in the Middle East is illusory. None of
the cases Plaintiffs cite was against a sovereign state or its official, as this one is.[8] None attacked
the policies of a U.S. ally. None evoked a governmental protest from the ally that the case "runs
counter to the ongoing … dialogue" with the U.S. and "the key diplomatic role" the U.S. has
played. *See* State of Israel Letter. And none arose against the backdrop of a recent case,
presenting many parallel claims, where the U.S. government warned that "determinations
respecting the nature and appropriateness of Israeli actions undertaken in the midst of an ongoing
armed conflict abroad that the United States (through its political branches) is attempting to
resolve … would intrude upon the foreign policy prerogatives of the political branches." Fed.
Defs.' Mem., *Doe v. State of Israel*, Civ. No. 1:02 CV 01431 (D.D.C.), Oct. 31, 2002.

      The cases on which Plaintiffs rely are distinguishable in other respects as well. For
example, in *Biton v. Palestinian Interim Self-Gov't*, the Palestinian Authority and the PLO argued

---

[8] Seven of the cases were brought under the ATA against nongovernmental organizations for
sponsoring terrorism. *See Ungar v. Palestine Lib. Org.*, 402 F.3d 274 (1st Cir. 2005);
*Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991); *Klieman v. Palestinian Auth.*,
424 F. Supp. 2d 153 (D.D.C. 2006); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 422 F.
Supp. 2d 96 (D.D.C. 2006); *Linde v. Arab Bank*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005); *Biton v.
Palestinian Interim Self Gov't*, 412 F. Supp. 2d 1 (D.D.C. 2005) and 310 F. Supp. 2d 172
(D.D.C. 2004); *Knox v. Palestine Lib. Org.*, 306 F. Supp. 2d 424 (S.D.N.Y. 2004). The eighth
was brought *by* a foreign official. *Sharon v. Time*, 599 F. Supp. 538 (S.D.N.Y. 1984).

that claims against them under the ATA for an attack on a school bus were not justiciable.  The

Court disagreed, because Congress in enacting the ATA specifically provided U.S. citizens a

remedy for terrorist attacks, and the President in signing the law had intended the Court to

adjudicate such claims.  412 F. Supp. 2d at 6.  Indeed, the Congressional report on the ATA, citing

the difficulties injured U.S. citizens had faced in suing terrorist organizations, declared that the

Act was "designed to fill this gap in American law."  H.R. Rep. No. 102-242(I), at 179 (1991).  At

the same time, Congress carefully fashioned the ATA in a manner that avoided issues of

justiciability.  As noted, the Act expressly did not extend to acts of "a foreign state, an agency of a

foreign state, or an officer or employee of a foreign state or an agency thereof acting within his or

her official capacity or under color of legal authority."  18 U.S.C. § 2337(2).  Moreover, the ATA

sidestepped disputes that courts are not equipped to resolve by excluding injuries incurred during

an "armed conflict between military forces of any origin," 18 U.S.C. § 2331(4)(c), such as the

artillery battle here between the IDF and Hezbollah.  Thus, the Court in *Biton* distinguished the

terrorist attack on a school bus in that case, from the situation in *Linder v. Portocarrero*, 963 F.2d

332 (11th Cir. 1992), where adjudicating claims involving Nicaragua would have required the

Court "'to measure and carefully assess the use of the tools of violence and warfare in the midst of

a *foreign civil war*', and to inquire into 'the relationship between United States policy and the

actions of the contras[.]'"  310 F. Supp. 2d at 184.

 In other words, having carved out from the ATA the types of claims most likely to raise

political questions, Congress expected courts to adjudicate the rest.  *See Klieman*, 424 F. Supp.

2d at 162; *Biton*, 310 F. Supp. 2d at 184; S. Rep. No. 102-342, at 47; H.R. Rep. No. 102-1040, at

7.  That does not help Plaintiffs here, because they do not sue under the ATA, but rather under

the TVPA.  Although, as noted, sovereign immunity will preclude some but not all TVPA

claims, that statute does not expressly incorporate the same protections that the ATA built in to

avoid political questions.  Thus, the D.C. Circuit has held that the TVPA -- unlike the ATA -- generally does not displace the political question doctrine.  In *Gonzalez-Vera,* the plaintiffs argued, as here, that the TVPA provided cognizable standards for the Court to apply and that, like the ATA, it reflected a congressional mandate to apply them.  Appellant Reply Br., *Gonzalez-Vera v. Kissinger*, No. 05-5017, 2005 WL 3627995, at *13.  The Court rejected that claim, holding, "[w]e need not quarrel with the plaintiffs' assertion that certain claims for torture may be adjudicated in the federal courts as provided in the TVPA, *see* 28 U.S.C. § 1350 note. We simply observe that such a claim, like any other, may not be heard if it presents a political question." *Gonzalez-Vera*, 2006 WL 1563589, at *4.  In that case, where the plaintiffs alleged that U.S. officials caused, supported and facilitated torture, false imprisonment and wrongful death, the Court found that "the plaintiffs were unable to extricate their TVPA claims from the political question that permeates their complaint." *Id.*

In *Klieman*, another ATA case involving a terrorist attack on a bus, this Court recognized the significance of the different statutory setting there.  Comparing *Klieman* to *Doe v. Israel*, where the political question doctrine barred claims against Israel and its officials, this Court found it consequential that "the defendants in *Doe v. Israel* were not being sued under the ATA." 424 F. Supp. 2d at 162.[9]  Moreover, as the Court made clear, the plaintiffs in *Klieman* sued non-

---

[9] Plaintiffs efforts to distinguish *Doe v. Israel* are fruitless.  Unlike this case, Plaintiffs assert, Doe sought damages, injunctive relief, and a declaration deriding Israel's policies on the West Bank.  But Plaintiffs here also seek damages, including exemplary damages, allege a "pattern and practice of systematic human rights violations," Compl. ¶ 91, and request a "declaratory judgment declaring that the conduct of the Defendant was in violation of the law of nations, treaties of the United States, the common law of the United States, and the laws of the District of Columbia."  Compl. at 21.  In any event, it was not the relief sought in *Doe* that implicated political questions, but rather the route necessary to arrive at the relief, which required the Court to assess Israel's national security policies. *See, e.g.*, *Doe*, 400 F. Supp. 2d at 112 ("The Court cannot find that plaintiffs state a RICO claim unless the Court implicitly determines that the Israeli settlement activities are illegal or tortious.  That … is a foreign relations determination to be made by the Executive or Legislative Branches….").

state actors.  Thus, the case did not require the Court to examine the defense policies of a foreign

government or potentially infringe on the sovereignty of a U.S. ally.  And, because the case did

not involve armed conflict between military forces, the Court also did not have to assess

battlefield decisions, choices of weaponry, or the reliance on and reliability of intelligence.  In

sum, neither *Klieman* nor the other ATA cases Plaintiffs cite conflict in any way with application

of the political question doctrine here.

> C.    Multiple Factors -- Including the Volatility of Middle East Diplomacy and
> Potential Conflicts with Policies and Statements of the Executive Branch -- Make
> This Case Nonjusticiable

Plaintiffs also cannot so easily shrug off the turbulence in the Middle East by citing the

observation from *Biton* that the politically charged nature of the conflict there "alone is

insufficient to make the plaintiffs' claims non-justiciable."  310 F. Supp. 2d at 184; *see*

*Klinghoffer*, 937 F.2d at 49.  To be sure, claims regarding Israel's national security policies are,

as the Court found in *Doe v. Israel*, "peculiarly volatile."  400 F. Supp. 2d at 111.  But we do not

argue that this factor *standing alone* makes Plaintiffs' claims nonjusticiable.  Numerous factors

render the claim nonjusticiable, as reflected in:

- The statement of the Ambassador of Israel that this case "risks complicating or
  undermining the important political and diplomatic avenues that are currently
  being pursued."  State of Israel Letter, at 2.

- The statement of the United States in *Doe v. Israel* that assessing the
  appropriateness of Israeli actions "undertaken in the midst of an ongoing conflict
  abroad that the United States (through its political branches) is attempting to
  resolve … would intrude on the foreign policy prerogatives of the political
  branches."  Fed. Defs.' Mem., *Doe v. State of Israel*, *supra*.

- The statement of the President of the United States (quoted verbatim) that the
  incident at issue was a "tragic misfiring in Israel's legitimate exercise of its right
  to self-defense."  *See supra* n.6.

- The statement of the Department of State accepting Israel's explanation of the
  incident and seeking to resolve the issue as part of the diplomatic negotiations.
  *See* U.S. Dep't of State Daily Press Briefing, Apr. 19, 1996, *at*

http://www.hri.org/docs/statedep/1996/96-04-19.std.html.

- The vote of the United States *against* the United Nations resolution that Plaintiffs suggest should bind this Court.  *See supra* n.2.

- The declaration by the U.S. ambassador to the U.N. that the Security Council resolution tracking the one Plaintiffs tout was "one-sided and highly selective," that Israel's actions "were in response to Hezbollah strikes launched from Lebanese territory against civilian centers in Israel," and that the peace process required "a sense of fairness and balance" lacking in the resolution.  *See supra* n.3.

- The finding of the Court in *Doe* that adjudication of claims involving Israel's national security policies, including claims that Israel used "indiscriminate force … involving civilians killed or wounded during IDF missile, bomb and rocket attacks," *Doe* Compl. ¶ 180, and massacred civilians in refugee camps, *id.* ¶¶ 114-134, would "interfere with the sovereignty of Israel," and "usurp the roles" of coordinate branches of government.  400 F. Supp. 2d at 105, 112.

- The finding of the Court in *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1032 (W.D. Wash. 2006), that attacks on Israel's conduct of the war against terrorism presented political questions because they challenged "the official acts of an existing government in a region where diplomacy is delicate and U.S. interests are great."

Thus, this suit threatens to interfere with the foreign policy of the United States, and to disregard "an initial policy determination" by the Executive Branch.  *Baker*, 369 U.S. at 216.  Moreover, adjudicating Plaintiffs' claims will exhibit "lack of the respect due coordinate branches of government."  *Id.*  Even now, Plaintiffs cannot restrain themselves from attacking "the baseless conclusions of U.S. officials" that Israel shelled the Qana compound accidentally.  Pl. Mem. at 39 n.23.[10]  Indeed, litigation of Plaintiffs' claims would not merely disavow "a political decision already made" and risk embarrassing the United States with "multifarious pronouncements by various departments on one question."  *Baker*, 369 U.S. at 216.  It would

---

[10] Plaintiffs also dismiss President Clinton's conclusions because they preceded a U.N. general's investigative report.  Plaintiffs apparently fail to see the irony of their own reliance on a General Assembly resolution that preceded both the investigative report and the President's statement.

potentially place the Court on the opposite side of a U.N. vote from the United States, supporting

the position of other countries which the U.S. disparaged as one-sided and harmful to peace

negotiations.  Plaintiffs' central reliance on the General Assembly vote and the report of a U.N.

military officer -- both of which conflict with the stated position of the United States and Israel --

highlight the political perils of this suit.

>    D.    Adjudication of This Case Will Entangle the Court in Political and Military Issues
>          That It Cannot Resolve

Those political perils would multiply as this case progressed.  Plaintiffs' own declaration

asserts that the legality of the artillery response here depends, among other things, on whether

those who "plan or decide upon an attack" take "all feasible precautions in the choice of means

and methods of attack with a view to avoiding, and in any event to minimizing, incidental"

civilian casualties.  Aceves Decl. at 8.  Further, Plaintiffs claim, when "a choice is possible

between several military objectives for obtaining a similar military advantage," the objective

selected must be the one expected to cause the least civilian casualties.  *Id.* at 9.  If we accept

these propositions for purposes of this motion, how is the Court to determine what "precautions"

were "feasible" in the midst of artillery exchanges?  Would the Court allow discovery into the

means the Israeli military had available for the attack, the weapons it could have employed, how

long it would have taken to deploy other weapons, the accuracy of that weaponry, the troops

available, the level of acceptable casualties by Israeli troops and civilians?  Can the Court assess

whether other types of artillery or ammunition would have been effective against the Hezbollah

guns?  Will the Court or the jury balance the political, military or human consequences of not

silencing the Hezbollah artillery against the risks to noncombatants posed by a particular choice

of weaponry or ammunition?  Will Plaintiffs be able to inquire about the types of telemetry,

software, and other targeting technology that Israel employs in its weaponry?  Will Plaintiffs be

able to depose senior military personnel regarding the intelligence they provided and received, including the sources and reliability?  Will General Ya'alon or other military commanders be required to disclose Israeli strategy in dealing with Hezbollah?  Or Israel's policies and tactics in responding to terrorist attacks?  Will Plaintiffs be allowed to explore the discussions in the inner councils of the Israeli government for this purpose, or as part of the virtually identical jurisdictional discovery they seek?

Even minimal foresight shows that this case does not involve merely routine application of settled legal principles.  Even a glancing preview lays bare the potential infringement on Israel's sovereignty, the interference with U.S. foreign policy, and the entanglement in issues beyond judicial competence.[11]  It defies reality to pretend that a case against a high official of a close ally raises no serious foreign policy issues.  Nor is it is credible to suggest that the inquiry calls on conventional judicial skills.  That is why, in similar cases, courts consistently have refused to intercede.  *See, e.g.*, *Aktepe v. U.S.*, 105 F.3d 1400, 1404 (11th Cir. 1997) (dismissing claims requiring court to determine how a "reasonable military force" should have acted in mistaken U.S. attack on Turkish ship); *El-Shifa Pharm. Indus. Co. v. U.S.*, 402 F. Supp. 2d 267, 275-76 (D.D.C. 2005) (dismissing claims requiring court to "inquir[e] into the reasonableness of the judgments" by U.S. military and intelligence officials in launching missile strike on Sudanese pharmaceutical plant mistakenly identified as terrorist facility).[12]  Plaintiffs have articulated no

---

[11] Plaintiffs contend that these inquiries would not interfere with Israeli sovereignty (even though Israel says they will) because a U.N. general undertook his own inquiry.  Pl. Mem. at 48.  This argument makes no sense.  Whether a U.N. official spoke with military personnel 10 years ago has no bearing on whether a judicial proceeding, with mandatory process, depositions and document productions directed by private litigants, intrudes on the sovereignty of a U.S. ally.

[12] *Rasul v. Bush*, 542 U.S. 466 (2004), and *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), in no way sanction judicial inquiries into military targeting decisions.  In *Rasul*, the Court made clear that the *only* issue it was addressing was "whether the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing."  542 U.S. at 485.  That determination had nothing to do with

Footnote continued on next page

reason why inquiries into military targeting decisions of foreign allies would be *more* appropriate for U.S. courts than identical inquiries into U.S. military targeting decisions, which courts repeatedly have declined to hear.

## IV.  THE ACT OF STATE DOCTRINE BARS ADJUDICATION OF PLAINTIFFS' CLAIMS

Plaintiffs' arguments regarding the Act of State doctrine are similarly infirm.  Plaintiffs contend that the Act of State doctrine does not apply because the artillery shells fell in Lebanon.  But, as noted, the Complaint does not allege that General Ya'alon carried out the attack, fired the artillery, or did anything outside Israel.  Nor do Plaintiffs allege that Israel's artillery was stationed outside its borders, that when it fired those weapons, it did so from outside the country.  Without such an allegation, the most Plaintiffs can argue is that the effects of an action taken by Israel within its boundaries occurred outside Israeli territory.

The cases Plaintiffs cite do not support this argument.  Two, *El-Hadad v. Embassy of the U.A.E.*, 69 F. Supp. 2d 69 (D.D.C. 1999) and *Risk v. Kingdom of Norway*, 707 F. Supp. 1159 (N.D. Cal. 1989), *aff'd*, 936 F.2d 393 (9th Cir. 1991), involved claims against officials who, unlike General Ya'alon, acted on behalf of their governments outside the boundaries of their state.  By contrast, many cases apply the Act of State doctrine to actions that are taken within a state but have extraterritorial effects.  *Sabbatino* itself, the seminal case on the Act of State

---

Footnote continued from previous page

combat decisions on targeting and weaponry.  Moreover, the Court did not decide "[w]hether and what proceedings may become necessary" going forward, where political questions could well arise.  *Id.*  Similarly, in *Hamdi,* the Court made clear that it was not addressing what happened on the battlefield, but only the determination later "to *continue* to hold those who have been seized." 542 U.S. at 534.  Prescribing procedures for those determinations, the Court held, "meddles little, if at all, in the strategy or conduct of war," *id.* at 535, reflecting the Court's view that such meddling would not be appropriate.  Moreover, in holding that citizens detained for lengthy periods had to receive some kind of process, the Court held that this process could be provided by the military itself.  *Id.* at 538.  Because the Court did not interject itself into the evaluation of military judgments on targets or weaponry, or second-guess battlefield decisions, it did not confront the types of political questions that Plaintiffs raise here.

doctrine, dealt with the economic and legal effects outside Cuba of an expropriation within the country.  376 U.S. at 413; *see also In re Phil. Nat'l Bank*, 397 F.3d 768, 773 (9th Cir. 2005) (Act of State doctrine applied to judgment of the Philippines Supreme Court, even though it concerned matters wholly outside the Philippines); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1121 n.29 (5th Cir. 1985) (even when an act of a foreign state affects property outside of its territory, "the considerations underlying the act of state doctrine may still be present").  The metaphysical inquiry Plaintiffs would launch -- determining whether a governmental action occurred where it was initiated or where it had impact -- ignores the fundamental purpose of the Act of State doctrine.  The doctrine is "a consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990) (quoting *Sabbatino*, 376 U.S. at 423).

    Taken at face value, the Complaint here challenges military decisions formulated at the highest ranks of the Israeli government to protect its citizens against terrorist attacks.  *See, e.g.*, Compl. ¶¶ 21, 25, 28-30, 37-52; Aceves Decl. at 1-15.  The Act of State doctrine was designed to prevent exactly this line of inquiry.  *See Jimenez v. Aristeguieta*, 311 F.2d 547, 557 (5th Cir. 1962) (defining the doctrine as "essentially … the principle that conduct of one independent government cannot be questioned by the courts of another"); *see also Corrie*, 403 F. Supp. 2d at 1032 (applying doctrine to Israeli actions in West Bank because the "military orders" occurred in Israel).  As discussed above, allowing that attack, that infringement on Israeli sovereignty, would indeed hinder the conduct of foreign affairs.

    Plaintiffs also cite *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 24 (D.D.C. 1998), where the Court held that an attack on a bus by an organization the U.S. had designated as

terrorist, with the support of a country the U.S. had designated as a state sponsor of terrorism, was not a "valid act[ ] of state." That holding does not help Plaintiffs here, where the actions of an ally of the U.S., initiated within its own territory during military combat, against an organization designated by the U.S. as terrorist, resulted in civilian casualties.

*    *    *

One final point warrants comment. Plaintiffs suggest that if the State Department were concerned about this case, it would file a brief here, as it did in the cases Defendant cited. But in *Doe v. Israel*, the U.S. filed as a party-defendant. And in *Doe v. Qi*, 349 F. Supp. 2d at 1264, as well as *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1169 (C.D. Cal. 2005), the courts asked the State Department for its views. The Court has made no such request here. The inference Plaintiffs draw is therefore spurious. The concerns the U.S. Government expressed in similar cases, particularly *Doe v. Israel*, apply on their face to Plaintiffs' claims here. No decision prevents the Court from considering them. Of course, should it wish to do so, this Court has discretion to ask the State Department to speak in this case regarding the potential impact of the suit on the U.S. foreign policy. *Kadic*, 70 F.3d at 250 (court "inquire[d] whether the United States wished to offer any further views concerning any of the issues raised"); *Mujica*, 381 F. Supp. 2d at 1169 (granting request to solicit State Department's views).

**CONCLUSION**

For these reasons, that General Ya'alon is protected by sovereign immunity, that this suit infringes on Israeli sovereignty, and that it usurps the role of the Executive Branch and potentially interferes with U.S. foreign policy in the Middle East, the motion to dismiss should be granted.

-24-

Dated: June 26, 2006      Respectfully submitted,

            /s/ Robert N. Weiner
            Robert N. Weiner (RW 5542)
            Jean E. Kalicki (JK 4845)
            Matthew A. Eisenstein (ME 7709)
            ARNOLD & PORTER LLP
            555 Twelfth Street, N.W.
            Washington, D.C. 20004-1206
            Tel: (202) 942-5000
            Fax: (202) 942-5999

     Attorneys for Defendant Moshe Ya'alon